JEFFREY LEE COSTELL (SBN 93688)
jlcostell@costell-law.com
JOSHUA S. STAMBAUGH (SBN 233834)
jstambaugh@costell-law.com
SARA M. MCDUFFIE (SBN 252187)
smcduffie@costell-law.com
**COSTELL & ADELSON LAW CORPORATION**
100 Wilshire Blvd., Suite 700
Santa Monica, CA 90401
Telephone: (310) 458-5959

KEITH M. FROMM (SBN 73529)
keithfromm@aol.com
**LAW OFFICES OF KEITH M. FROMM**
907 Westwood Blvd., Suite 442
Los Angeles, CA 90024
Telephone: (310) 500-9960

Attorneys for Plaintiffs and Petitioners Newcastle
Courtyards, LLC, and Jonathan Benabou, as Trustee
on behalf of The Mani Benabou Family Trust

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEWCASTLE COURTYARDS, LLC, a California limited liability company; JONATHAN BENABOU, as Trustee on behalf of THE MANI BENABOU FAMILY TRUST; and ROES 1 through 500,<br><br>          Plaintiffs and Petitioners,<br><br>       v.<br><br>CITY OF LOS ANGELES; COUNTY OF LOS ANGELES; COUNTY OF LOS ANGELES RECORDER'S OFFICE; DOES 1 through 500,<br><br>       and<br><br>ALL PERSONS INTERESTED IN THE MATTER of the ULA and all proceedings related thereto,<br><br>        Respondents and Defendants. | Case No.:<br><br>**VERIFIED PETITION AND COMPLAINT FOR:**<br><br>1. **Violation of Equal Protection – Gross Sales As Proxy for Ability to Pay Is Arbitrary and Irrational;**<br>2. **Violation of Equal Protection – Requirements of Uniformity and Apportionment;**<br>3. **Violation of Article XIII A, Section 4, of California Constitution;**<br>4. **Violation of *Gov. Code* Section 53725;**<br>5. **Governmental Taking Without Compensation – Monetary Exaction No Essential Nexus or Rough Proportionality;**<br>6. **Governmental Taking Without Compensation – Unconstitutional Special Assessment;**<br>7. **Governmental Taking Without** |

Compensation – ULA Is Confiscation of Property, Not Taxation;

8. **Violation of Article 1, Section 10, U.S. Constitution – ULA Is Unconstitutional Retroactive Legislation;**

9. **Violation of Freedom of Speech Through Imposition of Unreasonable Burden to Exercise Constitutional Right;**

10. **Damages Under 42 U.S.C. Section 1983;**

11. **Writ of Mandate;**

12. **Declaratory Relief;**

13. **Determination of Invalidity (*Code of Civil Procedure* §§ 860 *et seq.*);**

14. **Violation of Substantive Due Process;**

15. **Unlawful Delegation of Authority; and**

16. **Unconstitutional Vagueness.**

## DEMAND FOR JURY TRIAL

1.    Plaintiffs and Petitioners NEWCASTLE COURTYARDS, LLC, a California limited liability company, JONATHAN BENABOU, as Trustee on behalf of THE MANI BENABOU FAMILY TRUST, and ROES 1 through 500 (collectively, "Plaintiffs") bring this action on behalf of themselves and in the public interest for a writ of mandate, declaratory relief, injunctive relief, damages, restitution and other appropriate relief and also as an *in rem* reverse validation action against Defendant and Respondent CITY OF LOS ANGELES (the "City" or the "City of Los Angeles"), Defendant and Respondent COUNTY OF LOS ANGELES (the "County" or the "County of Los Angeles"), Defendant and Respondent COUNTY OF LOS ANGELES RECORDER'S OFFICE (the "Recorder's Office"), and all other interested persons (collectively, with the City, County, and Recorder's Office as, "Defendants") out of an abundance of caution to protect the rights of Plaintiffs and those of the public, to the extent, and only to the extent, that the validation statutes at *Code of Civil Procedure* §§ 860 *et seq.* are deemed to apply to the matters alleged herein. Plaintiff also brings this action for, among other things, a writ of mandate pursuant to *Code of Civil Procedure* §1085 directing Defendants to: (a) vacate the unlawful operation of Initiative Ordinance ULA (the "ULA" or "ULA Ordinance"), touted by its proponents as the "Mansion Tax," a proposed Los Angeles City Ordinance passed by voter initiative pursuant to the November 8, 2022  general election which imposes, effective April 1, 2023, a special surcharge transfer tax of 4.0% of the gross proceeds of sale on all real properties sold in the City of Los Angeles where the sales prices are more than $5,000,000 but less than $10,000,000 and 5.5% of the gross proceeds of sale where the sales prices are $10,000,000 or more (collectively the "ULA taxes"), (b) cease and desist in the collection and enforcement of the unlawful ULA taxes, and (c) restore to Plaintiffs any and all monies that have been unlawfully charged, collected, misused or diverted as the unlawful ULA taxes, in an amount according to proof at trial but, in any event, in excess of this Court's minimum jurisdiction.  In addition, Plaintiffs are entitled to damages, restitution, declaratory relief, injunctive relief, and attorneys' fees and costs as prayed for herein.  Therefore, without admitting that the validation statutes apply to the matters alleged herein or to any other matters related thereto, and without waiving any rights or remedies, Plaintiffs hereby allege as follows.

///

///

# I.  THE PARTIES

2.    At all times relevant herein, Plaintiffs are property owners whose real properties are located in the City of Los Angeles, have values in excess of $5,000,000 and are being injured and will be injured by the requirement that they pay the new special ULA taxes.

3.    Defendants are all persons/entities interested in the validity of the ULA Ordinance. Defendants include, but are not limited to, the City of Los Angeles, the County of Los Angeles, and the County of Los Angeles Recorder's Office.

4.    At all times relevant herein, the City of Los Angeles is and was a charter city of the State of California organized and operating under the Charter of the City of Los Angeles that passes and implements ordinances, resolutions and policies including, without limitation, the ULA Ordinance, and collects taxes in respect thereto, including the ULA taxes purported to be imposed by the ULA Ordinance. Upon information and belief, the City of Los Angeles became a Charter City in 1903.

5.    At all times relevant herein, the County of Los Angeles is and was a county within the State of California and is, upon information and belief, responsible for collecting the ULA taxes purported to be imposed by the ULA Ordinance.

6.    At all times relevant herein, the County of Los Angeles is and was a county within the State of California and is, upon information and belief, responsible for collecting the ULA taxes purported to be imposed by the ULA Ordinance and then transferring said taxes to the City of Los Angeles.

7.    At all times relevant herein, the County of Los Angeles Recorder's Office is and was a branch of the County of Los Angeles and, upon information and belief, is responsible for collecting the ULA taxes purported to be imposed by the ULA Ordinance and then transferring said taxes to the City of Los Angeles.

8.    As members of the sub-class of all property owners owning property in the City of Los Angeles who may be obligated to pay the ULA taxes and do pay the ULA taxes imposed by the ULA Ordinance, Plaintiffs are interested persons who have standing to bring this reverse validation action pursuant to *Code of Civil Procedure* §863 (should the reverse validation statutes apply) and to bring this petition for writ of mandate pursuant to *Code of Civil Procedure* §1085.

///

9.     Plaintiffs are informed and believe, and based thereon allege, that Defendants and Does 1 through 500, inclusive, at all relevant times were, and currently are, the agents, servants, employees and/or representatives of one another, and in such capacity or capacities have participated in the conduct alleged in this Complaint and were, and currently are, acting within the scope and furtherance of each of their respective agencies, servitudes, employment, and/or authorities and in such capacity or capacities have participated in the acts and omissions alleged in this Complaint or in some manner are responsible indirectly or directly for the injuries and damages suffered by Plaintiffs.

10.     The true names and capacities, whether individual, corporate, governmental, associate or otherwise, of defendants, DOES 1 through 500, inclusive, and each of them, are unknown to Plaintiffs, who therefore sues said defendant(s) by such fictitious names (collectively, the "Does" and individually, a "Doe").  Plaintiffs are informed and believe, and allege thereon, that each of the defendant(s) designated herein as Doe is, in some manner, legally responsible for the events and happenings referred to herein, and proximately caused the injuries and damages hereinafter alleged.   Plaintiffs shall amend this Complaint to insert the true names and capacities of said Doe(s) once ascertained.

## II. JURISDICTION AND VENUE

11.     This is an action for injunctive, declaratory relief and damages pursuant to 42 U.S.C. § 1983 based upon the continuing violations of Plaintiffs' rights under the First, Fifth, Tenth and Fourteenth Amendments to the United States Constitution. Jurisdiction exists pursuant to 28 U.S.C. § 1331 and 1343 based on 42 U.S.C. §1983 and questions of federal constitutional law. Jurisdiction also exists under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202.

12.     The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a), because Plaintiffs' state constitutional claims arise from the same nucleus of operative facts as its federal claims and thus form part of the same case or controversy under Article III of the United States Constitution.

13.     Venue is proper in the Central District of California in that the events and conduct complained of herein all occurred in the Central District of California. Plaintiffs own real property located in Los Angeles County, which is the subject of the taxes and/or exactions and/or special assessments to be imposed by the ULA.

14.    Venue is also proper in the Central District of California because the injuries of Plaintiffs, will occur and have occurred in the Central District of California, the Defendants' liability arose in the Central District of California, Defendants actions and inactions took place within the Central District of California and Defendants are all governmental entities residing within the Central District of California.

15.    Pursuant to *Code of Civil Procedure* §861 and *Government Code* §6063 (should the reverse validation statutes apply), jurisdiction will be perfected as of the date of the third successive weekly publication of the summons issued in this action in a newspaper of general circulation.

### III.  GENERAL ALLEGATIONS

16.    Plaintiffs bring this action to invalidate and enjoin the operation of the ULA, touted by its proponents as the "Mansion Tax," a proposed Los Angeles City Ordinance passed by voter initiative pursuant to the November 8, 2022, general election in Los Angeles. (A true copy of the Voter Information Pamphlet ("Voter Information Pamphlet" or "VIP") for such Ballot Initiative, which includes the text of the proposed ordinance, is attached hereto as Exhibit "A".)

17.    The ULA prescribes, *inter alia*, that, in addition to and above and beyond the current, longstanding Documentary Transfer Tax of general application to all real properties in the city of Los Angeles that exists pursuant to *Revenue and Taxation Code* Sections 11911-11933 (the "Pre-Existing Transfer Tax"), effective April 1, 2023:

> (a) all real properties sold in the City of Los Angeles (the "City") having a value of over $5,000,000 to $9,999,999 shall require payment to the City of an additional, special "Transfer Tax") of 4% of the gross sales prices of such properties (without regard to existing encumbrances), and
> (b) all real properties sold in the City having a value of $10,000,000 or more, shall require payment to the City of an additional, special Transfer Tax of 5.5% of the gross sales prices of such properties (without regard to existing encumbrances).

18.    The applicable provision of the ULA reads as follows:

> *SEC. 21.9.2. TAX IMPOSED. (a) There is hereby imposed on each deed, instrument or writing by which any lands, tenements, or other realty sold within the City of Los Angeles shall be granted, assigned, transferred or otherwise conveyed to, or vested in, the purchaser or purchasers, or any other person or persons, by his or their direction, when the consideration or value of the interest or property conveyed (exclusive of the value of any*

*lien or encumbrance remaining thereon at the time of sale) exceeds $100.00, a tax at the rate of $2.25 for each $500.00 or fractional part thereof. (b) In addition to and separate from any tax imposed under Subsection (a) of this section, starting on April 1, 2023, there is hereby imposed a tax known as the "Homelessness and Housing Solutions Tax" on each deed, instrument or writing by which any lands, tenements, or other realty sold within the City of Los Angeles shall be granted, assigned, transferred or otherwise conveyed to, or vested in, the purchaser or purchasers, or any other person or persons, by his or their direction, when the consideration or value of the interest or property conveyed (including the value of any lien or encumbrance remaining thereon at the time of sale) exceeds: (1) $5,000,000 but is less than $10,000,000, a tax at the rate of 4% of the consideration or value; or (2) $10,000,000 or greater, a tax at the rate of 5.5% of the consideration or value.*

(Italics and underlining added.)

19.     The properties sold in the City whose *consideration or value of the interest or property conveyed (including the value of any lien or encumbrance remaining thereon at the time of sale) exceeds $5,000,000* are referred to in this Complaint as the "$5,000,001 sub-class."

20.     All properties sold for $5,000,000 or less, even if they are sold for one dollar less than the properties in the $5,000,001 sub-class, are not subject to any payment whatsoever for this ULA transfer tax (the "$4,999,999 sub-class").

21.     The new ULA transfer taxes apply even if such properties are (a) sold at a loss, (b) the sellers are not receiving any <u>net</u> proceeds at all from such sales and/or (c) the sellers of such properties are not "billionaires" or "millionaires," which the proponents of the ULA contended in the Voter Information Pamphlet are the only persons who will pay for such tax.

### A.  THE STATED PURPOSE OF THE ULA IS TO REDUCE HOMELESSNESS

22.     The expressly stated purpose of the ULA is to reduce homelessness. The very first line in the arguments in favor of the ULA portion of the Voter Information Pamphlet says exactly that:

> Argument in Favor of Initiative Ordinance ULA.  As homelessness and housing experts we encourage you to vote YES on Initiative Ordinance ULA *to reduce homelessness* and protect seniors.

> (Voter Information Pamphlet, p. 32.)

23.     The California Supreme Court has stated that, where, as here, a provision has been adopted by initiative, its intended meaning "*may be resolved by referring to the ballot summary, the arguments and analysis presented to the electorate, and the contemporaneous construction of the Legislature.*" *Los Angeles County Transportation Com. v. Richmond*, 31 Cal. 3d 197, 203 (1982), *superseded on other grounds by Proposition 218, Capistrano Taxpayers Assn., Inv. v. City of San Juan Capistrano*, 235 Cal.App.4th 1493 (2015) (italics added).

24.     Referring to the ballot summary and the arguments and analysis presented to the electorate in the Voter Information Pamphlet for the ULA, it states in the "Impartial" section of the Voter Information Pamphlet that at least *92 percent of the proceeds from the tax* would be deployed to programs under the "*Homeless Prevention Program*" (VIP, p. 29.)

25.     The Voter Information Pamphlet also states:

"Here's how it works:  …The money would be used to *reduce homelessness*." (VIP, p. 29.)

"*ULA will prevent new homelessness* before it even starts, raising an estimated $240 million per year… ." (VIP, p. 39.)

"Unlike past efforts, this measure would create sustained funding *to reduce homelessness* with oversight from an independent *board of homelessness and housing experts*… ." (VIP, p. 33.)

"You can tell a lot about a measure based on who supports it and who doesn't.  Initiative Ordinance *ULA was drafted by homeless service providers*… ." (VIP, p. 32.)

"We're *homelessness service providers*…and ask you to vote yes.  Yes to *reduce homelessness.*" (VIP, p. 33.)

"Over the next ten years, Measure *ULA will raise more resources to address homelessness than the City of LA has ever had before*." (VIP, p. 39.)

"The bottom line is this: Millionaires and billionaires cashing in on mega properties can afford to pay the 'mansion tax,' and *we'll all benefit from reduced homelessness* when they chip in and pay their fair share." (VIP, p. 32.)

"Every day, 227 people in LA become *homeless*, based on the official results of the 2020 *homeless* count. If ULA were passed last year, it would have raised $240 million *to prevent homelessness* and $565 million to build housing for people *experiencing homelessness*." (VIP, p. 40.)

### B. THE REDUCTION OF HOMELESSNESS IS A MATTER OF STATEWIDE CONCERN, IT IS NOT MERELY AN ISSUE OF INTRA-MUNICIPAL CONCERN WHICH IS GOVERNED BY THE HOME RULE DOCTRINE

26.     Homelessness does not just exist in the City of Los Angeles.  It exists in immediately adjacent cities such as Inglewood, West Hollywood, Culver City, Burbank, Beverly Hills and Santa Monica, as well as every other city and county in California (and, indeed, in the United States and in every other country of the world).

27.     There are no barriers, physical or legal, between the City of Los Angeles and these immediately adjacent cities that keep homeless persons from moving between such adjacent cities and the City of Los Angeles.

28.     By the very nature of "homelessness," homeless people are residents of no fixed address.  A homeless person might very well sleep one night in Los Angeles, another in Beverly Hills, another in West Hollywood, another in Culver City, another in Santa Monica, and another in yet a different neighboring county such as Orange County, Ventura County, San Bernardino County or Riverside County.

29.     Upon information and belief, homeless persons come to Los Angeles from all over the United States and even other countries, legally and illegally.  Upon information and belief, Los Angeles is particularly attractive to homeless persons from colder climates because of its warm weather, particularly in winter.

30.     Upon information and belief, to the extent that the ULA achieves its goal of improving the lives of homeless people and providing homes for them, the City of Los Angeles can expect that many more homeless persons will come from outside of Los Angeles to receive such benefits all paid for by the $5,000,001 sub-class, comprising the relatively very few property owners who happen to sell a property in the City of Los Angeles for more than $5,000,000.

31.     Some homeless persons who may benefit from the ULA can be expected to come from places outside of the City's boundaries, perhaps even outside the United States' borders.  Since they are "homeless" they are not restricted to Los Angeles' municipal borders either before or after they receive benefits from the ULA funding.

32.      Some such homeless persons after they receive, for example, educational resources funded by the ULA, may, in turn, leave the confines of the City of Los Angeles.  As such, the benefits of the ULA funding will benefit persons outside of the borders of the City of Los Angeles.

33.      The stated goal of the ULA (i.e., the reduction of homelessness), is a matter of *statewide concern*.  In a September 2022 statewide survey by the Public Policy Institute of California, 14% of Californians mentioned homelessness as *the most important issue facing the state*, a share that is second only to jobs, the economy, and inflation. Solid majorities across regions in California saw homelessness as a big problem, with the exception of only Orange and San Diego Counties, where about half hold that view.

34.      Numerous bills proposed by both the California Assembly and the California Senate directly target homelessness, e.g. AB 2547 "*Housing Stabilization to Prevent and End Homelessness Among Older Adults and People With Disabilities Act*" (requiring the California Department of Aging to create and administer the Housing Stabilization to Prevent and End Homelessness Among Older Adults and People with Disabilities Program; AB 2325 "*Coordinated Homelessness Response*" (requiring the California Interagency Council on Homelessness to convene a funder's workgroup to accomplish specified goals related to ending homelessness; AB 2569 "*Department of Homelessness Prevention, Outreach and Support*", requiring the California Health and Human Services Agency to create a Department of Homelessness Prevention, Outreach and Support (requiring the California Health and Human Services Agency to create a Department of Homelessness Prevention, Outreach, and Support).

35.      The State has also proposed Grant Programs and other Funding Sources related to the reduction of homelessness such as SB 1006 "*Law Enforcement: Homeless Outreach Teams*" (requiring the Department of Justice to administer a competitive grant program to enable local law enforcement agencies to establish and operate homeless outreach teams; SB 1427 "*Board of State and Community Corrections: Homeless and Mental Health Court and Transitioning Home Grant Programs* (requiring the Board of State and Community Corrections to establish two new grant programs:  *the Homeless and Mental Health Court Grant Program and the Transitioning Home Grant Program*"); SB 1282 "*Homelessness: Addiction Treatment and Prevention: Funding*" (requiring relevant state and local departments to consider the use of funds received under the terms of the 2021 Multistate Opioid

Settlement Agreement settlement for the treatment and prevention of addiction within the homeless population; AB 2483 "*Housing for Individuals Experiencing Homelessness*" (requiring the Department of Housing and Community Development, to award reasonable priority points to Multifamily Housing Program project applicants that agree to set aside at least 25 units for individuals that are either experiencing homelessness or eligible to receive specified services, including, among others, those received under the Program of All-Inclusive Care for the Elderly.

36.   California Assembly Bill AB 83 which was enacted and signed by the Governor on June 29, 2022, addresses homelessness as a matter of state-wide concern.  These aforementioned bills are just a glimpse of the literally dozens of bills passed and/or proposed by the California State Government that, cumulatively, upon information and belief, address all or substantially all of the same issues and more, relating to homelessness that are purported to be addressed by the ULA.  Attached hereto as Exhibit "B" is an article from February 26, 2022 that identifies and describes ***twenty-one (21)*** such bills.  The sheer number of bills of the State of California concerning homelessness demonstrates that homelessness is clearly a matter of state-wide concern and not merely of concern to the City of Los Angeles.

37.   Upon information and belief, some owners in the $5,000,001 sub-class do not reside within the borders of the City of Los Angeles or even in the State of California and reasonably relied, in their acquisition of properties in Los Angeles, on reasonable investment backed expectations that the laws of the state of California, and particularly its Constitutional provisions, would protect them from the imposition of transfer taxes that are prohibited by such laws and such Constitution.

38.   Unlike the situation in *Fielder v. City of Los Angeles*, 14 Cal.App.4th 137 (1993), the revenues from the ULA taxes will not merely support the City's finances.  Because homeless persons, literally "have no home" and come from all over, such as adjacent cities like West Hollywood, Santa Monica, Inglewood, Burbank and Beverly Hills, as well as other cities in California, other states and even other countries and are not just residents of the City of Los Angeles, much of such *"[p]rogram funds* [which] *would be allocated primarily for supportive and affordable housing programs, including development, construction, acquisition, rehabilitation, and operation of housing" and "[f]unds* [which] *also would be allocated for financial, educational, and other resources to low-income and other tenants*

*at risk of homelessness, displacement, or eviction*" (VIP, p. 41), upon information and belief, will be spent on persons outside of the City of Los Angeles.

39.    Upon information and belief, the benefits of the ULA revenues will be a magnet for homeless persons not only from neighboring cities such as Culver City, Santa Monica, Inglewood and West Hollywood, but from all over the country and even outside the country and will encourage them to come to the City of Los Angeles so that such ULA revenues may be spent on them.

40.    Upon information and belief, the benefits of such ULA funds paid for entirely by the small group of members of the $5,000,001 sub-class will be conferred upon the neighboring cities because such cities' own societal homeless problem will be reduced when some of their homeless population migrates to Los Angeles to benefit from the ULA funds.

41.    The values of such properties of the $5,000,001 sub-class in Los Angeles can reasonably be expected to drop because they are unfairly and discriminatorily burdened with the costs of essentially reducing the world's homelessness problem while property owners of properties equivalent to those of the $5,000,001 sub-class, except that they are located in neighboring cities such as Beverly Hills or Santa Monica, will see their property values correspondingly increase because they are not so encumbered by such an enormous burden.

42.    It cannot credibly be disputed that homelessness is a matter of statewide concern that is not limited to the confines of the municipal borders of the City of Los Angeles.

43.    The small group of $5,000,001 sub-class in Los Angeles cannot, in any fairness, be expected to shoulder the tax burden for extra-municipal societal problems of cities, states and even countries outside the City of Los Angeles.

C.    **THE ULA UNCONSTITUTIONALLY (I.E. WITHOUT A RATIONAL BASIS) USES *GROSS SALES PROCEEDS* AS A PROXY *FOR ABILITY TO PAY***

44.    The proponents of the ULA state in the Voter Information Pamphlet: "*It will be paid for by millionaires and billionaires. Unlike past measures, the majority of people in LA will not pay a single penny.*" (VIP, p. 39.)

45.    The proponents also state in the Voter Information Pamphlet: "*The bottom line is this: Millionaires and billionaires cashing in on mega properties <u>can afford to pay</u> the 'mansion tax' and we'll all benefit from reduced homelessness when they chip in and pay their fair share.*" (VIP, p. 32.)

46.    The Voter Information Pamphlet emphasizes that the ULA impacts only a small fraction of properties and states that: "*It would have applied to only 3% of all real estate sales in 2019 (those selling for more than $5 million).  Let's be clear: Only people selling real estate for more than $5 million will pay this tax. No one else will.*" (VIP, p. 32.)  The Voter Information Pamphlet further states that of the many thousands of sales of homes and condos in Los Angeles: "*… this tax would have applied to only 2.5% of home and condo sales in 2021-2022.  The millionaires and billionaires cashing in <u>can afford to pay</u> their taxes*." (VIP, p. 39.)

47.    Upon information and belief, 3% of the residential *and* commercial real estate sales in 2022 was approximately only 1,021 total sales, and a search by the Daily News on real estate site Redfin, looking only at *single-family* homes that sold for more than $5 million during the past two years, found approximately 1,000 such sales in Los Angeles or, on average, about 500 such sales per year.

48.    Though <u>all</u> property owners in Los Angeles are subject to the longstanding and already existing graduated and apportioned Pre-Existing Transfer Tax of general application, the proponents of the ULA made it clear in the Voter Information Pamphlet that the ULA is intended to apply only to a very small percentage (2-3%) of such property owners who, according to such proponents, are "*millionaires and billionaires cashing in*."

49.    Unlike the Pre-Existing Transfer Tax which applies to every real property in Los Angeles and is paid for by every property owner, the ULA taxes are paid for only by the very small percentage of property owners whose properties sell for a gross sales price of more than $5,000,000.  All other property sellers do not pay a penny of the ULA taxes, even if their properties sell for $1 less than the $5,000,000 threshold.

50.    Also, unlike the Pre-Existing Transfer Tax, the ULA taxes are applied to the *gross* sales proceeds without subtraction for existing indebtedness that is assumed by the buyer.  The magnitude of the ULA taxes is also far greater than the magnitude of the Pre-Existing Transfer Tax for each sales transaction to which both taxes apply.

51.     As expressly stated by the proponents in the ULA Voter Information Pamphlet, sellers of properties covered by the ULA are deemed by these ULA proponents to be able to "*afford to pay*" the ULA taxes, simply because the <u>gross</u> sales price of their properties (with no deduction for any mortgage balance that must be paid off, brokerage commissions, title insurance, escrow costs, taxes under the Pre-Existing Transfer Tax or any other sales costs) exceeds $5,000,000.

52.     Such ULA taxes on the <u>gross</u> sales price apply even if such properties are being sold (a) at a loss, (b) under distress circumstances, such as a divorce, death, job loss, employment transfer, loss of a key tenant,  business failure or bankruptcy and/or because the property owners can no longer afford to keep them, (c) because the property may have been encumbered to such a degree that after payment of the encumbrances and selling costs such as broker's commissions, escrow costs, title insurance and the Pre-Existing Transfer Tax, there will be no net proceeds available from the sale to even pay the ULA taxes, and (d) even if the seller is neither a billionaire nor a millionaire, nor for that matter, even financially solvent.

53.     The ULA will apply to all real property in Los Angeles, of any type, that sells for more than $5,000,000, including, but not limited to, single family homes, small apartment buildings, commercial properties, industrial properties, retail properties, hotels, medical buildings, parking lots and vacant land.  The gross values of each of these types of properties are determined by entirely different metrics from one another.

54.     The gross sales price of a single-family home may be determined by the gross value of similar homes sold in the same neighborhoods. The gross sales price of such a property may be influenced by its location, the amount of land it possesses, its views, the age of its improvements, the size of its improvements, the condition of its improvements and/or its architectural features.

55.     The gross sales prices of office buildings depend on the rents they receive from their tenants, the creditworthiness of their tenants, the lengths of their leases, their abilities to raise their tenants' rents, their locations, the ages of their improvements, the size of their improvements, the condition of their improvements, the tenant improvements which have been made for existing tenants and/or which will need to be made to fill vacancies, their vacancy rates, their efficiency of management, the availability of financing to purchase them, the rates and terms of such financing, the existence of

deferred maintenance and numerous other factors that have very little in common with other classifications of real property.

56.    The gross sales value of raw land, for example, which generally receives no income, depends greatly, not only on its location, but upon what uses may legally be made of such land, i.e. what can be built on it, what general plan designation does it have, what zoning does it have, what entitlements does it possess, what entitlements does it need, the likelihood of obtaining such entitlements, how long will it take to get those entitlements, and what will it cost to obtain such entitlements or to construct the improvements thereon.  The owner of a piece of raw land, unless it is built upon, generally only makes a profit, if at all, if the owner can sell the property for more than he or she paid for it and for all the costs of holding it until sale, such as interest costs, property taxes and marketing costs (such as broker's commissions).  A ULA tax on that property can turn such a hold of raw land into a loss and can even render it impossible for the owner to sell because it will not yield enough net proceeds to pay the ULA tax after payment of all existing encumbrances and any other taxes due.

## FIRST CLAIM FOR RELIEF

### (Violation of Equal Protection – Against Defendants)

57.    Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 56 as though fully set forth herein.

58.    The ULA violates both the 14th Amendment of the United States Constitution and the Equal Protection Clause of the California Constitution because, as held in *Stewart Dry Goods Co. v. Lewis*, 294 U.S. 550 (1935) ("*Stewart*"), a tax, as here, based on gross sales rather than net income is an arbitrary and irrational metric for determining the ability to pay a tax.

59.    While the true legal characterization of the "transfer tax" prescribed in the ULA is yet to be determined by a Court of Law and Plaintiffs contend that it may well be better legally characterized as an unconstitutional and illegal monetary exaction or an illegal special assessment, rather than a "tax," if it is a "transfer tax," it is an unconstitutional one.

60.    As noted by the Court of Appeal in *Ashford Hospitality v. City and County of San Francisco*, 61 Cal.App.5th 498, 501 (2021) ("*Ashford*"), *as modified on denial of reh'g (Mar. 8, 2021)*,

*review denied (May 26, 2021)*: "*The transfer tax is an excise tax on the conveyance of real property*."
(Italics added.)

61.     If the "transfer taxes" required by the ULA constitute "excise taxes" they are
unconstitutional as being in violation of the equal protection clauses of the United States Constitution
and California Constitution because, *inter alia*, such excise taxes that, as in the ULA, utilize gross sales
amounts as a proxy for ability to pay, are arbitrary and irrational.

62.     The United States Supreme Court held in *Stewart*, *supra*, where, (as in the ULA) gross
sales (rather than net income) are used as the justification for the taxpayer's purported ability to pay such
excise tax (as touted by the proponents of ULA that only "billionaires" and "millionaires" would pay
such tax), such justification is arbitrary and irrational and, therefore, in violation of both the United States
Constitution and the California Constitution.

63.     The various types of real properties (e.g., single family residential, office buildings,
industrial, hotels, shopping centers, parking lots, apartment buildings, raw land, etc.) constitute entirely
different types of "merchandise," whose gross sales do not bear a constant relation to their net profits to
their sellers, the net operating profits vary year to year on the same buildings, the gross sales proceeds
and the net sales proceeds from a sale vary with the character of the building and the diverse kinds of real
properties each yield differing ratios of profit or loss when sold.

64.     The United States Supreme Court in *Stewart*, *supra*, 294 U.S. at 558-559, stated:
Argument is not needed, and indeed practical admission was made at the
bar, that the <u>*gross sales* of a merchant **do not bear a constant relation to
his net profits**</u>; that net profits vary from year to year in the same enterprise;
that diverse kinds of merchandise yield differing ratios of profit; and that
gross and net profits vary with the character of the business as well as its
volume. The trial court made <u>***no finding that the relation between gross
sales and net profits, or increase of net worth, was constant, or even that
there was a rough uniformity of progression within wide limits of
tolerance***</u>.

(Emphasis added.)

65.     The California Court of Appeal recently summarized the holding of *Stewart* as follows:

The court held that the graduated tax could not be justified by a merchant's
ability to pay because the gross receipts tax was imposed regardless of
whether a merchant made a profit.

*Ashford*, *supra*, 61 Cal.App.5th at 505 (citing *Stewart*).

66.     The United States Supreme Court in *Stewart* stated:

> **The difference in effect between a tax measured by gross receipts and one measured by net income, recognized by our decisions, is manifest and substantial, and it affords a convenient and workable basis of distinction between a direct and immediate burden upon the business affected and a charge that is only indirect and incidental.** *A tax upon gross receipts affects each transaction in proportion to its magnitude and irrespective of whether it is profitable or otherwise.* **Conceivably it may be sufficient to make the difference between profit and loss, or to so diminish the profit as to impede or discourage the conduct of the commerce.** *A tax upon the net profits has not the same deterrent effect, since it does not arise at all unless a gain is shown over and above expenses and losses, and the tax cannot be heavy unless the profits are large.*

294 U.S. at 558 (emphasis added).

> **As we have said, the statute does not purport to levy a tax on incomes. Plainly it does not in fact do so.** ***A merchant having a gross business of $1,000,000, but a net loss, must pay a greater tax than one who has a gross of $400,000 and realizes a substantial net profit.*** **The record discloses such a situation.**

*Id*. at 560 (emphasis added).

> ***The law arbitrarily classifies these vendors for the imposition of a varying rate of taxation, solely by reference to the volume of their transactions, disregarding the absence of any reasonable relation between the chosen criterion of classification and the privilege the enjoyment of which is said to be the subject taxed.*** **It exacts from two persons different amounts for the privilege of doing exactly similar acts because the one has performed the act oftener than the other.**

*Id*. at 566 (emphasis added).

67.     The United States Supreme Court, in invalidating the tax, as here, based on the ***gross proceeds*** rather than the net proceeds, or profit, suggested that a fairer tax that would not have violated Equal Protection would be an income tax or flat tax: "*The record fails to show that an income tax or a flat tax on sales would not accomplish the desired end.*" 294 U.S. at 563 (italics added).

68.     Many examples applicable to the ULA tax can be presented to demonstrate the reasons that the Supreme Court found that the *gross sales* basis for applying a tax, which is the same as the ULA

tax, was held to be arbitrary and irrational, and, therefore, in violation of the equal protection clauses of both the United States Constitution and the California Constitution.

69. For example, a property owner that sells for $2,000,000 a property that is unencumbered with debt will have far more net proceeds from a sale than a property owner that sells a $5,000,001 property having an 80% mortgage. Yet the latter seller who obtains the least amount of net proceeds will be required to pay the ULA tax while the former seller who obtains more proceeds from the sale pays nothing under the ULA. This is arbitrary and irrational.

70. One property owner could sell five (5) single family homes, individually, *seriatim*, for $4,000,000 each, for total gross sales of $20,000,000, and pay nothing under ULA while another could sell one apartment building for the same $20,000,000 and be liable for a tax burden of $1,100,000. This is arbitrary and irrational.

71. A property owner who owns a ten-unit condominium building could sell the individual units, *seriatim*, for $1,100,000 each, for a total of $11,000,000 and pay no ULA taxes, but if he sells the very same building in bulk *for half that price* ($5,500,000), he will owe the ULA tax of $220,000. Likewise, if a landowner subdivides his land into ten parcels which he sells, *seriatim*, for $1,100,000 each, for a total of $11,000,000, he pays no ULA taxes. If he sells the entire parcel for half of that price ($5,500,000), he pays the ULA taxes. It is irrational and arbitrary that the very same owner could sell the very same building or land and, in the case where he sells it for a ***greater*** gross sales price, he would pay no tax whereas if he sells it in bulk for a ***lesser price***, he would be required to pay the ULA taxes.

72. One property owner could own five (5) adjacent apartment buildings each having a different assessor's parcel number and sell each of them individually, *seriatim*, for $4,000,000 apiece, for an aggregate gross sales price of $20,000,000 and pay nothing under the ULA, while his neighbor next door may own five (5) identical apartment buildings on one lot, having one assessor's parcel number and be liable for $1,100,000 in ULA taxes. This disparate treatment in respect to two identical properties is arbitrary and irrational. There is no rational basis for treating each of these sets of two property owners differently and imposing a highly onerous burden on the one property owner to pay the costs of the public purpose of reducing homelessness, while the other property owner selling identical properties, bears no such burden whatsoever to solve such public burden.

73.     Two property owners may have bought identical houses next door to one another. One property owner may have taken on debt to improve his house. The other did not. The one with the debt may have boosted the sales price of his house to $5,000,001 because of the debt and work he took on to improve his house. The debt free house next door sells for $4,900,000. The indebted seller has to pay ULA taxes, the debt free one does not.

74.     Upon information and belief, many, if not the vast majority of such properties in the $5,000,001 sub-class, are owned by persons who are not billionaires or even millionaires, and many will not even turn a profit upon their sale and may result in a loss. It is arbitrary and irrational to conclude that just because a real property, be it a single-family home, shopping center or raw land, may sell for a gross sales price of $5,000,001 or more, the seller of the property is able to afford to pay a tax of 4% or 5.5% of the gross sales price.

75.     It is also arbitrary and irrational to conclude that a property owner whose property sells for $5,000,001 can more ably afford to pay a tax of 4% of the gross sales price of such property, than a property owner who sells his property for $4,999,999 or, indeed, any lesser amount, who, under the ULA is not required to pay any such ULA taxes.

76.     Upon information and belief, many persons in the $4,999,999 sub-class who may own multiple properties whose individual values are less than $5,000,000 may have far greater wealth and ability to pay taxes than persons in the $5,000,001 sub-class who own one or more properties whose gross values are greater than $5,000,000.

77.     The gross sales price of a property is not a rational metric for determining whether the seller is more able to pay ULA taxes than any other person who does not own real property, nor is it a rational metric for concluding whether the seller is even a person of wealth or even solvency, much less a "billionaire" or "millionaire." Many of such properties in the $5,000,001 sub-class, particularly office buildings and shopping centers, are owned by the pension and retirement funds for working class persons such as teachers, police and firefighters, who are far from being either billionaires or millionaires and, who, individually cannot afford to pay the ULA taxes.

78.     Upon information and belief, _many persons who have no real properties at all_ have far greater wealth and ability to pay to reduce homelessness than persons in the $5,000,001 sub-class who

may own properties whose gross sales prices are more than $5,000,000. For example, persons owning no real estate, may own millions of dollars in cash, stock, bonds, jewelry, vehicles, yachts, aircraft, intellectual property, crypto currency, artwork or any number of other forms of valuables and may have a far greater ability to pay taxes or pay to reduce homelessness than the owners of real property covered by the ULA, whom the proponents of the ULA have falsely and deceptively labeled as being all "billionaires" or "millionaires."

79.    Upon information and belief, many property owners may have liens and encumbrances on their properties, with little or no equity, and no net proceeds or insufficient net proceeds of sale with which to pay the ULA taxes, which are taxed on the "gross sales proceeds" irrespective of whether the "net" proceeds (after encumbrances, broker's commissions, recording fees, the Pre-Existing Transfer Tax, etc.) are sufficient to pay said taxes.

80.    As in *Stewart*, even if the gross sales prices are the same, the relative tax burden on the $5,000,001 sub-class of one type of property will be wildly different than the relative tax burden on the others in the $5,000,001 sub-class. No rational conclusion can be drawn that just because any of these various types of properties sells for $5,000,001, the seller can afford to pay such tax while a person in the $4,999,999 sub-class who sells his property for $5,000,000 or less cannot, or that there is any fairness in such $5,000,001 sub-class having to pay the ULA taxes while the $4,999,999 sub-class pays no such tax whatsoever, for the sake of reducing homelessness, a society wide problem that should be borne by the public, as a whole.

81.    All of the foregoing examples demonstrate why the ULA's choice of "gross proceeds of sale" as a proxy for "ability to pay" is arbitrary and irrational as held by the United States Supreme Court in *Stewart*.

82.    This Court should follow the precedent set forth in *Stewart* and hold that the ULA is unconstitutional.

///

///

///

///

## SECOND CLAIM FOR RELIEF

### (Violation of Equal Protection – Against Defendants)

83.    Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 82 as though fully set forth herein.

84.    The ULA also violates the Equal Protection requirements of uniformity and apportionment under both the United States Constitution and the California Constitution.

85.    The Court of Appeal has stated: "Principles of equal protection require 'that persons who are similarly situated receive like treatment under the law and that statutes may single out a class for distinctive treatment *only if that classification bears a rational relationship to the purposes of the statute*. Thus, if a law provides that one subclass receives different treatment from another class, *it is not enough that persons within that subclass be treated the same.* Rather, *there must be some rationality in the separation of the classes*.'" *Kumar v. Superior Court*, 149 Cal.App.4th 543, 550-551 (2007) (italics and underlining added).

86.    In considering whether a tax is consistent with equal protection principles, "courts will look for a rational basis for the class of persons selected to pay the tax. Additionally, the classification must bear a reasonable relation to a legitimate governmental purpose. Arbitrary and capricious classifications are not permitted. [Citation.] The persons who are to pay the tax must be a `reasonably justifiable subclassification' of persons; otherwise, 'the operation of the tax must be such as to place liability therefor equally on all members of the class.'" *City of Santa Cruz v. Patel*, 155 Cal.App.4th 234, 247 (2007) (underlining added).

87.    There is no rational basis under the ULA to require the $5,000,001 sub-class to pay at least $200,000 (and possibly millions of dollars) in ULA taxes on a sales transaction while the $4,999,999 sub-class, and, indeed, all other members of society who do not even own property, pay nothing at all to accomplish the stated purpose of the ULA (i.e., to reduce the societal problem of homelessness).

88.    The ULA taxes impose a huge rate comprising at least $200,000 on the $5,000,001 sub-class who sell properties for over $5,000,000 for performing the same exact function (transferring property via a written instrument) that it does for free for all the property owners whose properties sell

for $5,000,000 or less and arbitrarily charges the hundreds of thousands of dollars in ULA taxes, solely based on whether the sales price is $5,000,001 or it is less than that amount.

89. The cut-off is clearly an arbitrary figure and the consequences of being one dollar above this cut-off subject the property seller to ULA taxes of hundreds of thousands of dollars, whereas being one dollar below it, means the seller pays nothing. There is nothing in between, no graduation, no apportionment, no uniformity amongst either all property owners in Los Angeles or all taxpayers in Los Angeles, whether they own property or not. Yet there is no discernible or rational distinction or difference between a real property that sells for $5,000,001 and one that sells for $5,000,000.

90. The imposition of the tax on the gross sales proceeds above the arbitrary $5,000,000 threshold bears no rational relationship to a taxpayer's "ability to pay" such tax, nor to the time and costs associated with the city's audits for self-reported transfer taxes, which are covered, in any case by the Pre-Existing Transfer Tax of general applicability, which unlike the ULA is (a) apportioned among all property owners, (b) graduated as to the values of properties, and (c) subtracts from the proceeds of the sale the amount of existing indebtedness that is assumed by the buyer. The ULA tax, therefore, is clearly arbitrary and irrational in how it is imposed, and it is, therefore, a violation of the Equal Protection Clause of the United States Constitution and the California Constitution.

91. There is no rationality in separating sellers of properties of $5,000,001 properties from sellers of properties of, for example, $4,999,999 properties such that the former pays $200,000 to reduce homelessness while the latter pays nothing at all. As the purpose of the ULA is to reduce homelessness and homelessness is a societal problem, then, if any property owner should be required to pay a tax to reduce it, all property owners should be required to do so, in some reasonable apportionment based on the respective values of their properties. Indeed, all taxpayers, whether property owners or not, in fairness, should chip in to shoulder the burden of reducing homelessness since it is everyone's problem not merely the problem of property owners. A property seller of a $5,000,001 property has not caused homelessness either at all or to any greater degree than a property seller of a $4,999,999 property or, indeed, any amount or even to any greater degree than a person who owns no property at all. There is no rational distinction between either the causation of homelessness or the responsibility to reduce

homelessness between the $5,000,001 sub-class of property owners whose properties sell for more than $5,000,000 and the $4,999,999 sub-class of property owners whose properties sell for $5,000,000 or less.

92.    In considering whether a tax is consistent with equal protection principles, courts will look for a rational basis for the class of persons selected to pay.  There is no rational basis to require the $5,000,001 sub-class to pay at least $200,000 in ULA taxes while the $4,999,999 sub-class pays nothing at all.  The persons who are to pay the tax must be a "reasonably justifiable subclassification" of persons; otherwise, "the operation of the tax must be such as to place liability therefor equally on all members of the class." *City of Santa Cruz v. Patel*, 155 Cal.App.4th 234, 247–248 (2007).

93.    The ULA demonstrates a conscious failure on the part of its proponents and the City to exercise a fair and impartial judgment, and resorts to arbitrary methods varying from those (such as the Pre-Existing Transfer Tax) employed in assessing other property of like character, resulting in the imposition designedly of an unequal burden upon the property of the $5,000,001 sub-class.  The VIP demonstrates that the imposition of the entire burden of the ULA taxes upon those few persons in the $5,000,001 sub-class, comprising approximately 3% of all property owners, was, by design, an intentional act of "class warfare" against what the ULA proponents intentionally and falsely characterized as comprising only "billionaires" and "millionaires." This resulted in such a small group of persons comprising the $5,000,001 sub-class being unfairly saddled with the entirety of the burden of the societal problem of reducing homelessness.

94.    The ULA irrationally discriminates against the $5,000,001 sub-class in favor of the $4,999,999 sub-class for a legislative purpose, to reduce homelessness, that is a society wide problem. The varying treatment of the two sub-classes is so unrelated to the achievement of the purpose of the ULA, reducing homelessness, that it is irrational and, therefore, invalid because it violates the equal protection clauses of the United States Constitution and the California Constitution.

## THIRD CLAIM FOR RELIEF

**(Violation of Article XIII A, Section 4, of California Constitution – Against Defendants)**

95.    Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 94 as though fully set forth herein.

96.    The ULA is invalid because it violates Article XIII A, Section 4, of the California Constitution.

97.    Article XIII A was added to the California Constitution by an initiative measure known as Proposition 13 on June 6, 1978. Section 4 imposes limits on the ability of local governmental entities to enact new taxes. It expressly prohibits *a transaction tax or sales tax on the sale of real property within such City*, which is exactly what the ULA is and/or purports to be.

98.    As noted by the California Supreme Court in *Huntington Park Redevelopment Agency v. Martin*, 38 Cal.3d 100, 105 (1985):

> Article XIII A of the Constitution is the product of Proposition 13, a 1978 initiative aimed at reducing property taxes. Section 4 of that article provides that '*Cities*, Counties and special districts, by a two-thirds vote of the qualified electors of such district, *may impose special taxes* on such district ....' Although this section appears to be a grant of power allowing local entities to enact special taxes, it actually has the effect of limiting their enactment (*City and County of San Francisco v. Farrell* (1982) 32 Cal.3d 47, 53, 184 Cal.Rptr. 713, 648 P.2d 935). While a majority of the voters may favor a proposal, they are likely to be thwarted by the requirement of attaining a two-thirds vote. The section is part of the 'interlocking package' of sections in article XIII A, 'deemed necessary by the initiative's framers to assure effective real property tax relief.' (*Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 231, 149 Cal.Rptr. 239, 583 P.2d 1281.) *The purpose of section 4 is to prevent the government from recouping its losses from decreased property taxes by imposing or increasing other taxes. (Ibid.).*

(Underlining added.)

99.    Article XIII A provides, in pertinent part:

> Cities, Counties and special districts, by a two-thirds vote of the qualified electors of such district, may impose special taxes on such district, *except* ad valorem taxes on real property or a transaction tax or sales tax on the sale of real property within such City, County or special district.

(Italics and underlining added.)

100.    The Court of Appeal in *Cohn v. City of Oakland*, 223 Cal.App.3d 261, 263 (1990), interpreted the "except" clause, at issue here, as *prohibiting the imposition of ad valorem real property taxes and real property sale or transfer taxes which are special taxes*.

101.    The California Supreme Court defined "special taxes" in Section 4 to mean taxes levied for a specific purpose rather than a levy placed in the general fund to be utilized for general governmental purposes. *See City and County of San Francisco v. Farrell*, 32 Cal.3d 47, 57 (1982), *superseded on other grounds by Proposition 62*, *Borikas v. Alameda Unified School Dist.* (2013) 214 Cal.App.4th 135 ("We [the California Supreme Court] have defined 'special taxes' in section 4 to mean taxes levied for a specific purpose rather than a levy placed in the general fund to be utilized for general governmental purposes.").

102.    The ULA is a real property sale or transfer tax which is a special tax because it is enacted for the special purpose of reducing homelessness and, as such, the taxes must comply with the California Constitution, including, without limitation, Propositions 13, 26 and/or 218, and/or other applicable law. The California Constitution provides that: <u>*No local government ... may impose any transaction tax or sales tax on the sale of real property within the city*</u>. The ULA taxes are prohibited by each of such propositions from being imposed by a local government including the City of Los Angeles.

103.    However, the City has intentionally disregarded the prohibition in Proposition 13 of imposing a tax on the sale of real property.

104.    In the alternative, or in addition, the ULA taxes violate Propositions 218 and 26.

105.    Proposition 218 (also known as the "Right to Vote on Taxes Act") was passed by California voters in 1996. Among other things, Proposition 218 states that "local governments have subjected taxpayers to excessive tax, assessment, fee and charge increases that not only frustrate the purposes of voter approval for tax increases, but also threaten the economic security of all Californians and the California economy itself. This measure protects taxpayers by limiting the methods by which local governments exact revenue from taxpayers without their consent." It further states that the proposition should be liberally construed "to effectuate its purposes of limiting local government revenue and enhancing taxpayer consent." In 2010, Proposition 26 was enacted to provide a more specific definition of state and local "taxes."

106.    However, under any circumstances, and regardless of local voter approval, local districts may not impose sales taxes on transfer of real property.  (See Cal. Const. art. XIII A, § 4.)

107.    Therefore, in the alternative and/or in addition, the City has violated, and continues to violate, Propositions 218 and 26 because the ULA taxes violate Proposition 13.

108. In *Fielder*, *supra*, 17 Cal.Rptr.2d at 633, the Court of Appeal adopted the holding in *Cohn v. City of Oakland*, which held that the enactment of or increase in a transfer tax is not prohibited by article XIII A when the transfer tax is a general, <u>*rather than a specific, tax*</u>.

109. By the plain wording of the constitutional provision as well as the doctrine of *expressio unius est exclusio alterius*, when, as here, the transfer tax is a special tax, it is prohibited by Article XIII A. Therefore, the ULA is prohibited by said Article XIII A, Section 4.

110. Charter cities, such as Los Angeles, have been held by the Court of Appeal to be subject to legislation enacted to implement Proposition 13. *See City of Rancho Cucamonga v. Mackzum*, 228 Cal.App.3d 929 (1991), *rev. granted and opinion superseded by City of Rancho Cucamonga v. Mackzum*, 812 P.2d 153 (Cal. 1991), *dismissed, remanded and publication ordered*, *City of Rancho Cucamonga v. Mackzum*, 816.P.2d 891 (Cal. 1991); *John Tennant Memorial Homes, Inc. v. City of Pacific Grove*, 27 Cal.App.3d 372 (1970) (striking down a local tax on payments by occupants of retirement homes on the ground that it violated a state statute implementing tax exemptions for charitable institutions); *Century Plaza Hotel Co. v. City of Los Angeles*, 7 Cal.App.3d 616 (1970) (invalidated a local tax on the purchase of alcoholic beverages on the ground that it conflicted with state regulation and taxation of alcoholic beverages).

111. The Court of Appeal has also held that the purpose of Proposition 13 itself was to achieve statewide control over escalating local property tax rates and was therefore a grant of authority to the Legislature to act in an area of statewide concern, and, therefore, controlled over the home rule taxing power of charter cities, such as the City of Los Angeles:

> In City of Rancho Cucamonga v. Mackzum, supra, 228 Cal.App.3d 929, 46 Cal. Rptr.2d 448, the court recognized that "the purpose of Proposition 13 itself was to achieve statewide control over escalating local property tax rates." (Id. at p. 945, 46 Cal.Rptr.2d 448.) The court determined that Proposition 13 was a grant of authority to the Legislature to act in an area of statewide concern, and therefore, controlled over the home rule taxing power of charter cities. (228 Cal.App.3d at p. 945, 46 Cal.Rptr.2d 448.) The court concluded that although the home rule power was limited, it was not repealed.

*County of Sonoma v. Commission on State Mandates*, 84 Cal.App.4th 1264, 1293 (2000), *as modified on denial of reh'g (Dec. 19, 2000)*.

112.    The Property owners in the City of Los Angeles who are subject to the ULA are also subject to taxation by the *County* of Los Angeles and, as set forth above, the *State* of California (as well as the United States) for matters of countywide and statewide (and national) concern.

113.    Such property owners have only a finite amount of resources to tax.  If, as here, the ULA taxes such property owners on the "gross sales proceeds" of their properties, without regard to whether these property owners are even receiving any *net* proceeds and can afford to pay such ULA taxes, the ULA is, in violation of Proposition 13 (and Government Code Section 53725), illegally usurping, essentially "hi-jacking," potentially available taxable resources of the County of Los Angeles and the State of California to tax the same individuals for the same homelessness which is of both countywide and state concern.

114.    As noted by the California Supreme Court in *California Cannabis Coalition v. City of Upland*, 3 Cal.5th 924, 942 (2017), *as modified on denial of reh'g (Nov. 1, 2017)*: "When a local government lacks authority to legislate in an area, perhaps because the state has occupied the field (e.g., American Financial Services Assn. v. City of Oakland (2005) 34 Cal.4th 1239, 1252, 23 Cal.Rptr.3d 453, 104 P.3d 813 [predatory lending practices] ), that limitation also applies to the people's local initiative power. (DeVita, at p. 776, 38 Cal.Rptr.2d 699, 889 P.2d 1019.)"

115.    Because the reduction of homelessness is unquestionably a subject of statewide concern, as set forth in *Fielder*, *supra*, 14 Cal.App.4th at 143, the ULA, a charter city tax measure, must yield to it and the City, whether by city council action or voters' initiative, has no power to enact it because to do so lies beyond the City's constitutional sovereign power over municipal affairs.

116.    As noted by the *Fielder* court:

> Since charter cities such as defendant have sovereign power over municipal affairs (Cal.Const., art. XI, § 5), subdivision (a) of Government Code section 53725 does not necessarily restrict the power of a charter city to impose a transaction tax such as that enacted by ordinance No. 166976. The Legislature may preempt such conflicting charter city legislation only where the matter addressed is one of such statewide concern as to warrant the Legislature's action. (California Fed. Savings & Loan Assn. v. City of Los Angeles (1991) 54 Cal.3d 1, 7, 283 Cal.Rptr. 569, 812 P.2d 916.) "In the event of a true conflict between a state statute reasonably tailored to the resolution of a subject of statewide concern and a charter city tax measure,

the latter ceases to be a 'municipal affair' to the extent of the conflict and must yield."

…

When a court invalidates a charter city measure in favor of a conflicting state statute, the result does not necessarily rest on the conclusion that the subject matter of the former is not appropriate for municipal regulation. It means, rather, that under the historical circumstances presented, the state has a more substantial interest in the subject than the charter city." (Id. at pp. 17-18, 283 Cal.Rptr. 569, 812 P.2d 916.) Thus, "the hinge of the decision is the identification of a convincing basis for legislative action originating in extramunicipal concerns, one justifying legislative suppression based on sensible, pragmatic considerations." (Id. at p. 18, 283 Cal.Rptr. 569, 812 P.2d 916.)

*Id*. at 143-144.

117.    As noted by the California Supreme Court: "Although municipal taxation is a 'municipal affair' within the meaning of article XI, section 5(a), in that it is a necessary and appropriate power of municipal government, aspects of local taxation may under some circumstances acquire a 'supramunicipal' dimension, transforming an otherwise intramural affair into a matter of statewide concern warranting legislative attention." *California Fed. Savings & Loan Assn. v. City of Los Angeles*, 54 Cal.3d 1, 7 (1991).

118.    Even though municipal taxation is a "municipal affair" within the meaning of Article XI, Section 5(a), in that it is a necessary and appropriate power of municipal government, the aspect of such local taxation in the ULA, which is applied to the reduction of homelessness, which is a matter of statewide concern, acquires a "supramunicipal" dimension, transforming an otherwise intramural affair into a matter of statewide concern warranting legislative attention.  A reasonable assessment of the facts on an *ad hoc* inquiry leads to the conclusion that reducing homelessness is an activity of statewide concern and not merely of municipal concern to the City of Los Angeles.

119.    The Court of Appeal has stated that:

The determination of whether an activity is a municipal affair or one of statewide concern "is an ad hoc inquiry; ... 'the constitutional concept of municipal affairs is not a fixed or static quantity.'" Rather, it poses a question which "'must be answered in light of the facts and circumstances surrounding each case.'" (California Fed. Savings & Loan Assn. v. City of Los Angeles, supra, 54 Cal.3d at p. 16, 283 Cal.Rptr. 569, 812 P.2d 916.) Initially, "a court asked to resolve a putative conflict between a state statute

and a charter city measure ... must satisfy itself that the case presents an actual conflict between the two." (Ibid.) That element is present here; there is a clear, unmistakable conflict between subdivision (a) of Government Code section 53725 and ordinance No. 166976. Hence, "... the question of statewide concern is [a] bedrock inquiry through which the conflict between state and local interests is adjusted." (54 Cal.3d at p. 17, 283 Cal.Rptr. 569, 812 P.2d 916). If the subject is not one of statewide concern, the charter city measure lies "'beyond the reach of legislative enactment.'"

*Fielder*, *supra*, 14 Cal.App.4th at 143.

120.   The small group of $5,000,001 sub-class in Los Angeles cannot, in any fairness, be expected to shoulder the tax burden for the societal problems of cities, states and even countries outside of the City of Los Angeles.

121.   The values of such properties of the $5,000,001 sub-class can reasonably be expected to drop because they are unfairly and discriminatorily burdened with the costs of essentially reducing the world's homelessness problem while property owners of properties equivalent to those of the $5,000,001 sub-class with the sole exception that they are located in neighboring cities, such as Beverly Hills or Santa Monica, will benefit from the ULA and see their property values correspondingly increase because they are not so encumbered by such an enormous burden.

122.   Unlike the situation in *Fielder*, the burden of the tax rests on more than just the City's "citizens and taxpayers and those doing business within its limits" and the revenues from the tax will serve many persons coming from outside of the City of Los Angeles who will be consuming such services as well as the neighboring cities whose homelessness will be reduced by migration of some of their homeless population to the City of Los Angeles to receive the ULA's benefits.

123.   The Court of Appeal has stated in reference to determining if a matter is of statewide concern:

It means, rather, that under the historical circumstances presented, the state has a more substantial interest in the subject than the charter city." (Id. at pp. 17-18, 283 Cal.Rptr. 569, 812 P.2d 916.) Thus, "the hinge of the decision is the identification of a convincing basis for legislative action originating in extramunicipal concerns, one justifying legislative suppression based on sensible, pragmatic considerations." (Id. at p. 18, 283 Cal.Rptr. 569, 812 P.2d 916.)

*Fielder*, *supra*, 14 Cal.App.4th at 144.

124.    Under the historical circumstances presented, the State of California has a more substantial interest in the subject of homelessness than does the City of Los Angeles.  Unlike the facts in *Fielder*, the homelessness which the ULA seeks to address is not "confined in operation to the City of Los Angeles and affect[s]" far more persons than merely the City of Los Angeles' "citizens and taxpayers and those doing business within its limits."  *Id*. at 146.  Homelessness originates in extramunicipal concerns rather than merely concerns within the City of Los Angeles itself particularly because the homeless come to (and leave) the City of Los Angeles from essentially everywhere, including many places outside of Los Angeles, be it from neighboring cities, neighboring counties, other states or other countries.

125.    Based on the foregoing, the ULA is unconstitutional and invalid because it violates Article XIII A, Section 4, of the California Constitution.

## FOURTH CLAIM FOR RELIEF

### (Violation of *Government Code* Section 53725 – Against Defendants)

126.    Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 125 as though fully set forth herein.

127.    The ULA is invalid because it violates *Government Code* section 53725, and the reduction of homelessness is a statewide concern.

128.    *Government Code* section 53725 states: "Except as permitted in Section 1 of Article XIII A of the California Constitution, no local government ... may impose any ad valorem taxes on real property. *No local government ... may impose any transaction tax or sales tax on the sale of real property within the city*, county or district."  (Italics and underlining added.)

129.    *Government Code* section 53729 states: "This Article may only be amended by vote of the electorate of the State of California."

130.    *Government Code* section 53730 states: "If any provision of this Article, or the application thereof to any person, organization, local government, district, or circumstance is held invalid or unconstitutional, the provision to other persons, organizations, local governments, districts, or circumstances shall not be affected thereby but shall remain in full force and effect."

131.    As set forth above, the stated purpose of the ULA is to reduce homelessness.

132.    The California Supreme Court in *Westbrook v. Mihaly*, 2 Cal.3d 765, 776 (1970), *vacated on other grounds*, *Mihaly* v. *Westbrook*, 403 U.S. 915 (1971), stated that the requirement of a supermajority vote in a property tax matter "*may have been designed to protect property owners from the unrestrained desires of the landless for publicly financed projects.*"  The supermajority vote in Proposition 13, indeed, *the entire prohibition of new transfer taxes by local governments*, is exactly intended *to protect the few sellers of properties that sell for more than $5,000,000 from the unrestrained desires of the proponents of the ULA*, who, by their own admission, will not be subject to the tax because they do not own such properties but desire it for publicly financed projects, i.e. to reduce homelessness.

133.    The ULA tax is invalid because it violates Government Code Section 53725.

## FIFTH CLAIM FOR RELIEF

### (Governmental Taking Without Compensation – Against Defendants)

134.    Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 133 as though fully set forth herein.

135.    The ULA is a disguised exaction which constitutes a taking under the Fifth Amendment of the United States Constitution and the California Constitution without just compensation, which neither bears any essential nexus with the purpose of the ULA, to reduce homelessness, nor any reasonable proportion to the creation of homelessness by the sale of a property for more than $5,000,000 or the registration of a deed of sale.

136.    While the ULA labels the charges it imposes upon the $5,000,001 sub-class as a "transfer tax," in reality, it is an unconstitutional monetary exaction.  Unlike the ULA, the longstanding Pre-Existing Transfer Tax, which exists and has existed prior to the ULA, is a law of general applicability because it applies to each and every property sold in Los Angeles.

137.    The ULA, on the other hand, by admission of its own proponents, applies only to a relatively few specified properties (i.e., those 2 to 3% of all properties sold in the City of Los Angeles), whose gross sales price exceeds $5,000,000.

138.    The proponents of the ULA even boast that the ULA is *not of general applicability*, but, in fact, *only applies* to "millionaires and billionaires."  "*It would have applied to only 3% of all real estate*

*sales in 2019 (those selling for more than $5 million). Let's be clear: <u>Only people selling real estate for more than $5 million will pay this tax. No one else will.</u>*" (VIP, p. 32.)

139.    The Voter Information Pamphlet further states that of the many thousands of sales of homes and condos in Los Angeles: "*… this tax would have applied to only 2.5% of home and condo sales in 2021-2022. The millionaires and billionaires cashing in can afford to pay their taxes.*" (VIP, p. 39.)

140.    Upon information and belief, as of December 15, 2022, of the approximately 5,498 single-family homes that had traded hands in Los Angeles in 2022, only 229 had sold for $5 million or more, about 4.17%.

141.    Upon information and belief, of the 2,526 condominium sales in Los Angeles that had taken place to that date in 2022 only 22 had sold for $5 million or more, about 0.87%.

142.    As such, the ULA is not a law of general applicability, and, indeed, its proponents proudly boast that it *only applies* to approximately 3% of property owners.

143.    Rather, the ULA is very intentionally targeted to be limited to an extremely few, perhaps a few hundred identifiable persons, whom the proponents of the ULA falsely and deceptively characterized as all being "millionaires or billionaires."

## UNLIKE A TAX OF GENERAL APPLICABILITY AND MORE CHARACTERISTIC OF A MONETARY EXACTION, THE ULA RESERVES DISCRETION IN THE CITY WHETHER OR NOT TO IMPOSE THE ULA TAX

144.    Unlike a tax of general applicability which applies across the board to all taxpayers, the ULA reserves a discretion to the City to dispense exemptions to the ULA tax to favored land transferees, who, for example, demonstrate to the satisfaction of the Los Angeles Housing Department, or its successor agency, according to a procedure and criteria that does not yet even exist, and is, therefore, as of yet undefined, that the transferees of such properties or one of their partners or members can demonstrate a history of affordable housing development and/or affordable housing property management experience.

145.    Thus, not only is the imposition of the ULA discretionary based upon the decision of City bureaucracy, but there are no defined criteria upon which such discretion is even to be exercised. For

example, Section 21.9.14 provides the City with discretion to exempt a sales transaction (i.e. waive the ULA tax), upon certain conditions:

> SEC. 21.9.14. EXEMPTION—QUALIFIED AFFORDABLE HOUSING ORGANIZATION. The Homelessness and Housing Solutions Tax imposed by Subsection (b) of Section 21.9.2 of this Code shall not apply with respect to any deed, instrument or writing by which any lands, tenements, or other realty sold within the City of Los Angeles shall be granted, assigned, transferred or otherwise conveyed to, or vested in, a purchaser or purchasers, or any other person or persons, by his or their direction if such transferee is: (1) a non-profit entity within Internal Revenue Code Section 501(c)(3); (2) a Community Land Trust, as defined in Section 22.618.2 of the Los Angeles Administrative Code; (3) a Limited-Equity Housing Cooperative, as defined by California Civil Code Section 817; or (4) a limited partnership or limited liability company in which only bona fide nonprofit corporations, Community Land Trusts, and/or Limited-Equity Housing Cooperatives are the general partners or managing members. _To qualify for an exemption under this section, the transferees or one of its partners or members must demonstrate a history of affordable housing development and/or affordable housing property management experience, as determined by the Los Angeles Housing Department, or its successor agency, **according to a procedure that will be promulgated by the Los Angeles Housing Department,** or its successor agency._

(Emphasis added.)

146.    The ULA provides under Section 21.9.16 that the City shall have the power to issue further discretionary exemptions from the ULA tax, without further voter approval, which means the City maintains yet other discretionary grounds to impose conditions on the exaction or exemption from the exaction of the ULA "tax":

> SEC. 21.9.16. ADDITIONAL EXEMPTIONS—CITY COUNCIL APPROVAL. The People of the City of Los Angeles authorize the City Council to enact ordinances, without further voter approval, to exempt from the Homelessness and Housing Solutions Tax imposed by Subsection (b) of Section 21.9.2 of this article property acquired by non-profit organizations to produce income-restricted affordable housing, as the Council may define those terms consistently with the purposes set forth in Article 9 of Chapter 24 of Division 22 of the Los Angeles Administrative Code.

147.    Without the registration of the deed of transfer, the transferor cannot rid himself of encumbrances of record on his property and the transferee cannot effectively make use of the property (e.g., obtain mortgage financing, obtain building permits, title insurance, etc.).

148.    A seller in the $5,000,001 sub-class cannot register a deed for the sale of his property unless he either pays the ULA tax or satisfies the City, according to undefined standards, that his transferee meets certain criteria. The City, therefore, maintains a quasi-judicial discretion to either charge the seller the tax as a condition to registering the deed or to waive it depending upon whether the seller has satisfied conditions imposed by the City, under, for example, Sections 21.9.14 or 21.9.16. of the ULA.

149.    When, as in the ULA, the government conditions the grant of a benefit such as the *registration* of a deed in the recorder's office upon the giving up a property right, such as, in the ULA of 4% or 5.50% of the gross proceeds of sale, the fee becomes an *exaction* rather than a tax and it becomes subject to the exactions analysis to a legislative ordinance, including the stricter scrutiny and the *Nollan* and *Dolan* constitutional requirements of essential nexus and rough proportionality.

150.    The Ninth Circuit Court of Appeal stated that any government action that conditionally grants a benefit, such as a "registration" (i.e., of a deed), can supply the basis for an exaction claim:

> In Cedar Point Nursery, the Court highlighted that **"[t]he essential question is not ... whether the government action at issue comes garbed as** regulation (or statute, or **ordinance,** or miscellaneous decree)**."** 141 S. Ct. at 2072. Yet the Court still limited the exactions context to "[w]hen the government conditions the grant of a benefit such as a permit, license, or ***registration***" on giving up a property right. Id. at 2079. Thus, the Supreme Court has suggested that any government action, including administrative and legislative, **that conditionally grants a benefit, such as a permit, can supply the basis for an exaction claim rather than a basic takings claim.** See id. at 2072; see, e.g., Com. Builders of N. Cal. , 941 F.2d at 873 (applying exactions analysis to legislative ordinance imposing a fee to finance low-income housing in connection with the issuance of permits for nonresidential development).

*Ballinger v. City of Oakland*, 24 F.4th 1287 (9th Cir.), *cert. denied sub nom. Ballinger v. City of Oakland, California*, 142 S. Ct. 2777, 213 L.Ed.2d 1015 (2022) (emphasis added).

151.    Under the ULA, the City reserves the discretion to condition the registration of a deed upon the payment of a 4% or 5.5% transfer tax, or to exempt such registration based upon a quasi-judicial, and not ministerial, individual discretionary determination as to the character of the purchaser of the property.

152.    The California Supreme Court has stated: "When such exactions are imposed—as in this case—<u>neither generally nor ministerially, but on an individual and discretionary basis, we conclude that the heightened standard of judicial scrutiny of Nollan and Dolan is triggered</u>." *Ehrlich v. City of Culver City*, 12 Cal.4th 854, 876 (1996), *cert. denied*, 519 U.S. 929 (underlining added).

153.    The City's exercise of its discretion to impose or waive the ULA tax does not depend on the wording it uses in its conditions. It is immaterial whether a government order states that the ULA exemption is "approved if" the City's conditions are met as opposed to that the ULA exemption is "denied until" the conditions are met.  *See Koontz v. St. Johns River Water Management Dist.*, 570 U.S. 595, 607 (2013) ("The government cannot sidestep constitutional protections merely by rephrasing its decision from 'only if' to 'not unless[.]' … To do so here would effectively render *Nollan* and *Dolan* a dead letter.").

154.    In the ULA, because the City maintains the discretion, on an individual, not ministerial basis, to either impose the ULA "tax" or waive it by imposing any conditions upon the registration of the deed where the property falls within the $5,000,001 sub-class, it is a monetary exaction and not a tax.

155.    The ULA "tax" is really a disguised, discretionary land use monetary exaction, imposed on only a very few specific property owners in respect to particular and identified parcels of land, rather than a tax of general application to all property owners within the City of Los Angeles.  Monetary exactions are subject to the nexus and rough proportionality requirements of *Nollan* and *Dolan*.  The United States Supreme Court stated:

> For that reason and those that follow, we reject respondent's argument and hold that so-called ***"monetary exactions" must satisfy the nexus and rough proportionality requirements of Nollan and Dolan.***

*Koontz*, *supra*, 570 U.S. at 612 (emphasis added).

156.    The ULA, therefore, falls within the stricter scrutiny and reasonable nexus and rough proportionality requirements of *Nollan* and *Dolan*.

157.    There is no nexus, reasonable or otherwise, between (a) the registration of a deed of transfer of title for a property in the $5,000,001 sub-class and (b) causation of homelessness in the City of Los Angeles.

158.    There is no nexus, reasonable or otherwise, between the sale of a property in Los Angeles for more than $5,000,000 and either the causation or reduction of homelessness in the City of Los Angeles.

159.    There is no rough proportionality or, indeed, any proportionality, in the true cost of registering a deed for a property in the $5,000,001 sub-class and the minimum exaction of $200,000 for registering such deed.

160.    There is no rough proportionality between the causation or reduction of homelessness in imposing an exaction of $200,000 for the sale of a property for $5,000,001, while there would be zero ($0) exaction for the sale of a property for $5,000,000.

161.    The ULA "tax" is, therefore, an unconstitutional taking under the United States Constitution and the California Constitution.

## SIXTH CLAIM FOR RELIEF

### (Governmental Taking Without Compensation – Against Defendants)

162.    Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 161 as though fully set forth herein.

163.    The ULA violates the Fifth Amendment of the United States Constitution and the California Constitution against takings without just compensation as a special assessment because it lacks both an essential nexus to the creation or reduction of homelessness and lacks any rough proportionality to the creation of homelessness by the sale of either a property for more than $5,000,000 or the registration of a deed for such sale.

164.    A special assessment may fund the construction of a local public improvement. *See Inglewood v. County of Los Angeles*, 207 Cal. 697, 702 (1929); *Taylor v. Palmer*, 31 Cal. 241, 254-256 (1866); *County of Placer v. Corin*, 113 Cal.App.3d 443, 450 (1980); *Solvang Mun. Improvement Dist. v. Board of Supervisors*, 112 Cal.App.3d 545, 552 (1980); *County of San Bernardino v. Flournoy*, 45 Cal.App.3d 48, 51-52 (1975); *Harrison v. Board of Supervisors*, 44 Cal.App.3d 852, 856 (1975), *superseded on other grounds by Proposition 218*, *Silicon Valley Taxpayers Assn. v. Santa Clara County Open Space Authority*, 44 Cal.4th 431 (2008); *Northwestern Mut. Life Ins. Co. v. State Bd. of Equalization*, 73 Cal.App.2d 548, 551-552 (1946).

165.     The Court of Appeal has stated that special assessments and ad valorem taxes overlap to some extent:

> In practical application, the two types of taxation, general ad valorem taxes and special assessments, to some extent overlap, and we cannot always differentiate between them with precision. **A tax to pay the cost of a particular improvement may be crafted as a special assessment levied against particular real property within a local district on the theory that this property is the primary beneficiary of the improvement, or it may be structured as a general ad valorem tax levied on property in a larger area on the theory that all property within the larger area benefits to some extent from the improvement**. Such variegated treatment may be seen in the projects of water districts, flood control districts, sewer districts, irrigation districts, and similar public entities, where the benefit of the improvement to particular property is sometimes thought to [112 Cal.App.3d 554] outweigh its benefit to property in the larger area, and sometimes not. (Los Angeles County Flood Control Dist. v. Hamilton (1917) 177 Cal. 119, 124-126, 169 P. 1028; Roberts v. City of Los Angeles (1936) 7 Cal.2d 477, 491, 61 P.2d 323; Harrison v. Board of Supervisors (1975) 44 Cal.App.3d 852, 856-859, 118 Cal.Rptr. 828.)

*Solvang Mun. Improvement Dist. v. Board of Supervisors*, 112 Cal.App.3d 545, 553–554 (1980) (emphasis added).

166.     Despite its label as a "tax," the ULA is really a special assessment to build public improvements that the proponents of the tax claim will benefit, by reducing homelessness, the properties charged with funding it, to wit: "The Affordable Housing Program would fund the development of affordable housing to serve acutely low, very low, and low-income households." (VIP, p. 29.) "ULA will go to work quickly *by purchasing existing buildings* and cutting red tape to create more affordable housing." (VIP, p. 32.)

> This tax is estimated to generate $600 million to $1.1 billion annually. <u>*At least 92 percent of the proceeds from the tax would fund affordable housing under the Affordable Housing Program*</u> and tenant assistance programs under the Homeless Prevention Program. No more than 8 percent would fund program administration, reporting, compliance, and implementation.
>
> This measure's goals include increasing the supply of affordable housing, addressing the need for tenant protections and assistance programs, and building organizational capacity of organizations serving low-income and disadvantaged communities, among others.

*The Affordable Housing Program would fund the development of affordable housing to serve acutely low, very low, and low-income households.* Housing units would be affordable for 55 years or permanently, if permitted by law, and be subject to resale restrictions.

*This program would fund affordable housing, including: • Development of multifamily housing; • Alternative housing solutions that can include new supportive and affordable rental or mixed rental/homeownership projects, with up to 20 percent of the units available at market rate and 20 percent set aside for acutely or extremely low-income households; • Acquisition, preservation, lease, rehabilitation, or operation of affordable housing; and • Homeownership opportunities, capacity-building for Community Land Trusts and similar organizations, operating assistance, and rental subsidies.*

(VIP, p.29.)

Based on 2021-2022 real estate sales, Initiative Ordinance ULA could generate around $900 million every year. Initiative Ordinance ULA will go to work quickly by purchasing existing buildings and cutting red tape to create more affordable housing.

(VIP, p. 32.)

167.    "Property may be specially assessed only for improvements that provide it benefits beyond those received by the public." *White v. County of San Diego*, 26 Cal.3d 897, 904 (1980).

168.    The ULA is clearly an assessment against only certain properties (i.e., those that sell for more than $5,000,000), to pay for public improvements (i.e., low-cost housing for homeless persons), for the benefit of all of society, and not merely the benefit of the property owners who pay the ULA taxes.

169.    But the only members of society who are responsible to pay the ULA tax are the $5,000,001 sub-class (sellers of properties that sell for $5,000,000 or more).  The rest of the members of society, who receive the same benefit from the reduction of homelessness, pay nothing under the ULA.

170.    While it could be said, in the abstract, that every real property in Los Angeles, indeed every person whether they own property or not, will benefit from a reduction in homelessness occasioned by the development of affordable housing funded by assessments against properties in Los Angeles, it cannot be said that only those properties upon which the ULA is levied (comprising only about 3% of the properties sold in Los Angeles) benefit any more than any other properties, or, more particularly, that the $4,999,999 sub-class do not benefit whatsoever from the development of affordable housing funded by the ULA.  In this sense, there is no proportionality, either approximate or any at all between the

hundreds of thousands of dollars in assessments that must be paid by each of the $5,000,001 sub-class, while each of the property owners in the $4,999,999 sub-class pays nothing.

171.    While the constitutional requirements of uniformity and fair apportionment do not require a precise measurement of "benefit" flowing to the property owner affected, the courts have said that the cost of the improvement must be spread among the benefited property owners in some equitable manner.

172.    The courts have said that while the assessment levied against a particular parcel need not be exactly proportional to the benefit received by such parcel, a disparity, as here, of 100% between the assessment and benefit is unacceptable.

173.    In the case of the ULA, the $5,000,001 sub-class pays 100% of the ULA while all other property owners in Los Angeles pay zero (0) even though all parcels benefit, roughly equally, by the public improvements funded by such special assessment.

174.    In *American River Flood Control Dist. v. Sayre*, 136 Cal.App.3d 347, 357 (1982), the Court of Appeal indicated that a margin of error of 25 to 30 percent would be acceptable in calculating the benefit assessment but that a disparity of 100 percent between assessment and benefit would be unacceptable.

175.    The provisions of the ULA "inevitably force the $5,000,001 sub-class of property owners "alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Murr v. Wisconsin*, 137 S.Ct. 1933, 1943 (2017).  Because the members of the $5,000,001 sub-class of property owners are, by the terms of the law, afforded no compensation, the ULA is facially invalid, under the Takings Clauses of both the United States Constitution and the California Constitution.

## SEVENTH CLAIM FOR RELIEF

### (Governmental Taking Without Compensation – Against Defendants)

176.    Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 175 as though fully set forth herein.

177.    The ULA is an unconstitutional taking under the Fifth Amendment of the United States Constitution and the California Constitution because the money demanded under the ULA is so arbitrary as to constrain to the conclusion that it was not the exertion of taxation but a confiscation of property.

178.    The takings clause of the Fifth Amendment to the United States Constitution provides, in pertinent part: "nor shall private property be taken for public use, without just compensation."

179.    The analogous provision of the California Constitution, Article I, Section 19, reads in pertinent part: "Private property may be taken or damaged for public use only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner." The California Supreme Court has held that this provision of the California Constitution is more protective of private property than the federal Constitution.  *See Varjabedian v. City of Madera*, 20 Cal.3d 285, 296-298 (1977).

180.    The Takings Clause does cover temporary takings for the period before an invalid land use control is struck down. *See First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, Cal.*, 482 U.S. 304, 318 (1977).

181.    Even a tax can constitute a taking under the United States Constitution and the California Constitution.  The ULA's obligation to pay money rather than real or personal property does not mean that it cannot be an unconstitutional taking even though money is generally considered fungible. *See United States v. Sperry Corp.*, 493 U.S. 52, 62 n.9 (1989) (money may still be subject to a per se taking if it is a specific, identifiable pool of money); *see also Phillips v. Wash. Legal Found.*, 524 U.S. 156, 169–170 (1998).

182.    Indeed, the Supreme Court has held multiple times that money can be subject to a taking, based on the United States Supreme Court's "long-settled view that property the government could constitutionally demand through its taxing power can also be taken by eminent domain."  *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 616 (2013).

183.    When the government commands the relinquishment of funds linked to a specific, identifiable property interest such as a bank account or parcel of real property, a "per se [takings] approach" is the proper mode of analysis under the Court's precedent. *See Brown v. Legal Foundation of Wash.*, 538 U.S. 216, 235 (2003); *Koontz*, *supra*, 570 U.S. at 613.

184.    The monies being taken by the ULA are taken from a completely identifiable pool of money.  Upon the sale of each property, identified by its legal description and/or assessor's parcel number and/or its municipal address, a wholly identifiable escrow agent is required to pay from a wholly

identified escrow account a wholly identifiable amount of money (i.e. 4% of the gross proceeds for sales of $5,000,001 to $9,999,999, and 5.5% of sales of $10,000,000 or more), from the wholly identifiable bank account of such escrow agent to the County Recorder as a pre-condition to recording the wholly identifiable deed of transfer for the sale of the property.  The amount of money being taken by the ULA is wholly identifiable and unique in every respect and is not, in the slightest respect, a tax of general applicability.

185.    Taxes could constitute a taking if the act complained of was so arbitrary as to constrain to the conclusion that it was not the exertion of taxation, but a confiscation of property. *See Koontz*, 570 U.S. at 615 (collecting cases distinguishing taxes and user fees from money that can be taken).  Thus, when it comes to takings "[t]he Constitution…is concerned with means as well as ends." *Horne v. Department of Agriculture*, 576 U.S. 350, 362 (2015); *see also Dickman v. Comm'r of Internal Rev.*, 465 U.S. 330, 336 (1984) ("We have little difficulty accepting the theory that the use of valuable property—in this case money—is itself a legally protectible property interest.").

186.    Thus, even if the ULA "tax" is considered to be a true tax, it can still constitute a taking if, as here, "the act complained of was so arbitrary as to constrain the conclusion that it was not the exertion of taxation, but a confiscation of property." *Brushaber v. Union Pac. R. Co.*, 240 U.S. 1, 24-25 (1916).

187.    The ULA applies to only a small group of property owners comprising the $5,000,001 sub-class, leaving unregulated all of the many thousands of other commercial and residential properties in the City comprising the $4,999,999 sub-class. The 4.0% or 5.5% ULA taxes are obviously not imposed on every other property in the City. Consequently, a heightened level of scrutiny is proper, because this is the type of particularized governmental exaction imposed upon a property owner which was seen in *Ehrlich. See Ehrlich*, *supra*, 12 Cal.4th at 876.

188.    In this case, the confiscation, touted falsely and with intentional discrimination as only being applied to "millionaires and billionaires," of 4% or 5.5% of the gross value of any real property in Los Angeles upon its transfer, without regard to whether such transfer results in a profit or loss, without regard to any distinction between the type of real estate, the time during which such property was held, and the fact that zero dollars are being taken from other similarly situated property owners is so arbitrary

as to constrain the conclusion that it was not the exertion of taxation, but a confiscation of property.  It therefore violates both the United States Constitution and the California Constitution.

**EIGHTH CLAIM FOR RELIEF**

**(Violation of Article 1, Section 10, of the U.S. Constitution – Against Defendants)**

189.    Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 188 as though fully set forth herein.

190.    The ULA is unconstitutional retroactive legislation.

191.    Article 1, Section 10, of United States Constitution, applicable to the states, prohibits "ex post facto" laws (i.e., laws that have retroactive effect).

192.    The ULA does not say that it applies only to properties acquired after its effective date of April 1, 2023.  Rather, it says that it applies to all properties that are sold on or after April 1, 2023, whenever they may have been acquired.  Therefore, in applying a tax upon the entire value of such property that had accumulated since the property had been acquired by the seller until the date it was sold after the effective date of the ULA, the ULA is retroactive legislation.

193.    Preceding the passage of the ULA, in some cases many years before the passage of the ULA, Plaintiffs and other members of the $5,000,001 sub-class reasonably relied, in their formation of contracts for acquisition, financing, leasing, improvement and ownership of properties in Los Angeles, upon reasonable investment backed expectations that the laws of the state of California, and particularly its Constitutional provisions, including, without limitation, Proposition 13, Proposition 128, Proposition 26 and *Government Code* section 53725, which prohibited the imposition of _a transaction tax or sales tax on the sale of real property within such City_, (which is exactly what the ULA is and/or purports to be), would not be impaired by the application of an ordinance such as the ULA which purports to do exactly that.

194.    Before the ULA came into existence, perhaps many years before, the owners of such properties had relied upon the value of such properties without regard to an unforeseen, indeed, unforeseeable subtraction of 4% or 5.5% of the gross value as a ULA tax, as the case may be, in planning their business affairs and reasonable investment backed expectations such as (a) whether to even buy the property in Los Angeles, (b) whether to pay monies to improve it, and (c) whether and how much to

borrow against it to either acquire it or improve it.  Buyers might have decided to purchase comparable properties in areas such as Beverly Hills, which are unaffected by the ULA, rather than the City of Los Angeles which imposes such gross surcharge.

195.    Lenders also relied upon the value of such properties without regard to an unforeseen, indeed, unforeseeable subtraction of 4% or 5.5% as the case may be, in planning their business affairs and reasonable investment backed expectations such as (a) whether to loan any money against the security of such Property and/or its gross sales proceeds,  (b) at what interest rate to lend any such monies,  (c) whether to lend monies to improve it, (d) how much such lender can lend upon such property with the reasonable expectation that the borrower may be able to sell it and the gross proceeds of such sale, after the payment of all taxes, will be sufficient to repay the loan secured by such property, and (e) what is the risk that the borrower may not be able to repay the loan out of the proceeds of sale of the property.

196.    For example, a merchant builder may buy a piece of land upon which to build a house at a price that will yield him a net profit of 12% of the gross sales proceeds, after the payment of all costs to acquire, improve and sell such house, but he would not purchase the land at the same price if his net profit was only 8% or 6.5% due to the application of the unforeseen ULA taxes.

197.    All of the builders who purchased land in the City of Los Angeles before the passage of the ULA have suffered an impairment of the rights that they possessed when they acted to purchase the property.  The ULA has increased those builders' liability for the past conduct of buying such property and paying money to improve the value of the property, because they will now have to come up with more money to pay off their loans (i.e., incur additional liabilities to borrow more money), where previously they relied upon having sufficient net proceeds of sale with which to do so.  The ULA also imposes the new duty of paying the 4.0% or 5.5% ULA taxes upon the sale, which did not previously exist.

198.    All of the lenders who advanced monies to such builders both calculated the amounts they were willing to advance and the interest rates they would charge on such loans based on their risk adjusted expectations that the properties securing their loans would be able to be sold without regard to a deduction of 4.0% or 5.5% of the gross proceeds for an unanticipated ULA tax. Indeed, the ULA taxes on the "gross proceeds" of sale, may prevent such loans from being able to be paid off at all.  At the very least, the loan

amounts of these contracts would likely have been reduced and the interest rates might have been raised to adjust for the increased risk of having less available net proceeds of sales to secure the loans. Such borrowers and lenders had settled expectations as to the expected net proceeds of sales. The imposition of the ULA taxes alters the legal consequences of the past actions of such borrowers and lenders in entering into the contractual loan transactions. Their pre-existing contractual relations have also been impaired by the retroactive effect of the ULA taxes.

199.    Plaintiffs and other members of the $5,000,001 sub-class entered into loan agreements, long term leases, contracts for improvements to their properties and other contracts and even selected the locations of their properties based on the reasonable investment backed expectation that no such transfer tax much less a large transfer tax, such as the ULA taxes, of 4% or 5.5% of the gross sales proceeds from such a property would be imposed upon them.

200.    Lenders also advanced long-term loans based on the security of such properties and upon the reasonable investment backed expectation that the values of such properties would not be suddenly and unforeseeably diminished by the imposition of *a transaction tax or sales tax on the sale of real property within such City*, which, was and is still prohibited by the California Constitution under Proposition 13, Proposition 128 and Proposition 26, as well as Government Code Section 53725.

201.    Borrowers in the $5,000,001 sub-class may not have entered into legal loan agreements with lenders and borrowed specified amounts of monies on specified terms and lenders may not have lent such monies, in the same amounts and on the same specified terms such as interest rates and maturity dates, against the security of properties now covered by the $5,000,001 sub-class if they had known when they entered into such loan contracts, that, sometime after such loans had been made, the net proceeds of sale from such properties available to repay such loans would be reduced by 4% or 5.5% of the gross sales proceeds from the sales of such properties.

202.    Purchasers of income properties make projections as to their eventual net proceeds of sale in order to determine the purchase prices that they are willing to pay for particular properties and then enter into purchase and financing contracts accordingly. Investors and financiers, such as retirement and pension funds, in such purchases, make similar calculations in determining whether or not to invest and/or

what investment return they are willing to accept for such an investment and they make their contracts based on such reasonable projections of the net proceeds of sale as well.

203.    Some property owners raised monies in the public securities markets and issued securities based on good faith projections to investors of the net sales proceeds to be expected from their properties without regard to the deduction of the 4.0% or 5.5% of the gross proceeds of sale that were unforeseeable to them at the time of such projections. The rights of such investors, including public and private pension and retirement funds, have been greatly impaired by the retroactive effect of the ULA taxes in that the value of their investments has been reduced by the future liability for the ULA taxes that was not anticipated at the time of their investment.  The aggregate adverse costs to the property owners, in the billions of dollars, directly corresponds to the aggregate amount of money to be raised by the ULA.

204.    The law on the constitutional prohibition against retroactive legislation is summarized as follows:

> In general, the courts disfavor retroactivity. "[C]ongressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." *Bowen v. Georgetown University Hospital,* 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988). **Fairness concerns dictate that courts must not lightly disrupt settled expectations or alter the legal consequences of past actions.** *See Landgraf v. USI Film Products,* 511 U.S. 244, 265–66, 114 S.Ct. 1483, 1497, 128 L.Ed.2d 229 (1994); *Kaiser Aluminum & Chem. Corp. v. Bonjorno,* 494 U.S. 827, 855, 110 S.Ct. 1570, 1586, 108 L.Ed.2d 842 (1990) (Scalia, J., concurring) ("**The principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal human appeal.**")
> …
> **Cases involving settled contract and property rights, for example, require predictability and stability and are generally inappropriate candidates for statutory retroactivity**. *Id.* at 270–72, 114 S.Ct. at 1500. **Similarly, the courts presumptively should not apply "statutes affecting substantive rights, liabilities, or duties to conduct arising before their enactment."** *Id.* at 278, 114 S.Ct. at 1504. Accordingly, the Court provided a framework for approaching retroactivity questions:
>
>> When a case implicates a federal statute enacted after the events in suit, the court's **first task is to determine whether Congress has expressly prescribed the statute's proper reach.** If Congress has done so, of course, there is no need to resort to judicial default rules. **When, however, the**

**statute contains no such express command, the court must determine whether the new statute would have retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed.** If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.

*Covey v. Hollydale Mobilehome Ests.*, 116 F.3d 830, 835 (9th Cir.), *opinion amended on denial of reh'g*, 125 F.3d 1281 (9th Cir. 1997)

205.    The ULA clearly impairs the rights which the property owners comprising the $5,000,001 sub-class possessed when they entered into the contracts that they did prior to the passage of the ULA. The ULA unconstitutionally impairs existing contracts and is, therefore, invalid.

## NINTH CLAIM FOR RELIEF

### (Violation of Freedom of Speech – Against Defendants)

206.    Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 205 as though fully set forth herein.

207.    The ULA violates the freedom of speech guarantees in both the United States Constitution and the California Constitution because it imposes an unreasonable burden on some property owners' rights to give public notice of the title to their property.

208.    The purpose of the recording of deeds is to give public notice of the ownership of properties to all of the world.  The recording of a deed is a statement by its owner to all the world that "I own this property" or that "I transferred this property to this person." Thus, such notice is a constitutionally protected form of speech protected by the First Amendment of the United States Constitution and the California Constitution.

209.    The imposition of an exorbitant charge in a minimum amount of at least $200,000 and possibly millions of dollars, upon those few persons who are members of the $5,000,001 sub-class in order to merely exercise their right of free speech and give public notice of the ownership or transfer of ownership of their properties, is an unconstitutional abridgment of such protected right of free speech.

210.    The government cannot charge members of one small group hundreds of thousands or millions of dollars merely to exercise their constitutional right to the same freedom of speech to say

exactly the same thing (e.g., "I own this property"), which is enjoyed by all others who only pay the relatively nominal amount of money to exercise the same right (i.e., the approximate proportional cost of administering the recording offices and registering a deed). *See Wieman v. Updegraff*, 344 U.S. 183, 191 (1952) ("[T]he government may not deny a benefit to a person on a basis that infringes his constitutionally protected ... freedom of speech even if he has no entitlement to that benefit[.]") (Internal quotation marks omitted).

211.    The United States Supreme Court has stated:

> We have often concluded that denials of governmental benefits were impermissible under the unconstitutional conditions doctrine. See, e.g., Perry, 408 U.S., at 597, 92 S.Ct. 2694 (explaining that the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests" (emphasis added)); Memorial Hospital, 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (finding unconstitutional condition where government denied healthcare benefits). In so holding, we have recognized that regardless of whether the government ultimately succeeds in pressuring someone into forfeiting a constitutional right, the unconstitutional conditions doctrine forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them.
>
> …
> As in other unconstitutional conditions cases in which someone refuses to cede a constitutional right in the face of coercive pressure, the impermissible denial of a governmental benefit is a constitutionally cognizable injury.

*Koontz*, *supra*, 570 U.S. at 606-607.

212.    The Government "***may not deny a benefit to a person on a basis that infringes his constitutionally protected ... freedom of speech*** even if he has no entitlement to that benefit." *Agency for Intern. Development v. Alliance for Open Society Intern., Inc.*, 570 U.S. 205, 214 (2013) (emphasis added, and internal quotation marks omitted).

213.    The ULA violates Plaintiffs' rights to freedom of speech under the United States Constitution and the California Constitution and is, therefore, invalid.

///

///

///

## TENTH CLAIM FOR RELIEF

### (Damages Under 42 U.S.C. Section 1983 – Against Defendants)

214. Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 213 as though fully set forth herein.

215. 42 U.S.C. Section 1983 provides, in pertinent part, that:

> Every person who, under color of any…ordinance of any State or Territory…subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress… .

216. Under 42 U.S.C. Section 1983, the City, acting through the Electorate, in enacting the invalid ULA, under the color of an ordinance, and the County and Recorder's Office, in facilitating the collection of the ULA taxes, deprived Plaintiffs of their rights to: equal protection under the United States Constitution and the California Constitution, compensation for takings under the United States Constitution and the California Constitution, freedom of speech under the United States Constitution and the California Constitution, freedom from retroactive legislation under Article 1, Section 10 of the United States Constitution, and procedural due process and substantive due process under the United States Constitution and the California Constitution.

217. Plaintiffs can and hereby do sue Defendants under 42 U.S.C. Section 1983.

### GOVERNMENT CLAIMS ACT COMPLIANCE

218. Plaintiffs, concurrently herewith or shortly hereafter (within the applicable deadlines), have/will present claims to Defendants pursuant to the Government Claims Act, *Government Code* §900 *et seq*. (the "Governmental Claims").

219. As of this time, Defendants have not accepted or rejected any of the Governmental Claims.

220. Plaintiffs could not wait for Defendants to accept and/or reject the Governmental Claims before filing this Complaint because of the need to challenge the ULA within the required time period under any interpretation of the reverse validation statutes (should they apply).

///

///

## **ELEVENTH CLAIM FOR RELIEF**

### **(Writ of Mandate – Against Defendants)**

221.    Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 220 as though fully set forth herein.

222.    Upon information and belief, Defendants have refused, and continue to refuse, to comply with all applicable law,  including, without limitation, Propositions 13, 26 and/or 218 as codified in article XIII A – D of the California Constitution, the equal protection, takings, freedom of speech, retroactive impairment of contracts and due process clauses of the United States Constitution and the California Constitution, and prohibitions on by, among other things, enacting, imposing, collecting and/or enforcing the ULA taxes.  Defendants' enactment, imposition, collection and enforcement of the ULA taxes and Defendants' improper use and/or diversion of revenue generated from the ULA taxes, as well as any and all acts and proceedings leading up to the same, are unlawful, invalid, void and/or unconstitutional.

223.    Plaintiffs have a clear, present and beneficial right to the performance of Defendants' duties to comply with all applicable law and policy including, without limitation, the constitutional and statutory mandates of the California Constitution (including Propositions 13, 26 and 218, as codified at article XIII A – D) and the United States Constitution.

224.    Plaintiffs have been damaged by Defendants' violations of Proposition 13 because, among other things, Plaintiffs have been and/or will be forced to pay special transfer taxes of from 4% to 5.5% of the gross sales proceeds or value of their properties in the City of Los Angeles.  Plaintiffs have also suffered diminution in value of their properties due to the unlawful ULA Ordinance and taxes.

225.    In the alternative, Plaintiffs have been damaged by Defendants' violations of Proposition 218 and/or 26 because, among other things, Plaintiffs have been, or will be, forced to pay property-related assessments, exactions, taxes, fees or charges under the guise of purported special transfer taxes which are prohibited by the California Constitution, the United States Constitution and *Government Code* section 53725.

226.    Defendants have also violated Plaintiffs' right to equal protection under the United States Constitution and the California Constitution, compensation for takings under the United States Constitution and the California Constitution, freedom of speech under the United States Constitution and

the California Constitution, freedom from retroactive legislation under Article 1, Section 10 of the United States Constitution, and procedural due process and substantive due process under the United States Constitution and the California Constitution. These constitutional enactments guarantee that a person will not be deprived of his or her property without due process of law and without just compensation.

227.    In addition, the equal protection clause set forth at Section 7, Article 1 of the California Constitution provides that "[a] person may not be ... denied equal protection of the laws" and the equal protection clause set forth in the Fourteenth Amendment to the United States Constitution provides that the State shall not "deny to any person within its jurisdiction the equal protection of the laws."

228.    In addition, Plaintiffs are informed and believe, and based thereon allege, that among other things, the wrongful conduct of Defendants as alleged herein were acts committed by government officials under color of state law.  Defendants' illegal conduct constitutes a violation of Plaintiffs' civil rights under 42 U.S.C. § 1983 in that, among other things, under color of this illegal conduct, Defendants have subjected Plaintiffs to a deprivation of their rights and privileges under the United States Constitution as alleged herein.

229.    As a proximate result of the foregoing, Defendants have sought to exact a certain measure of punishment (under the guise of acting under state law) against Plaintiffs all in violation of Plaintiffs' constitutionally protected rights. Being motivated by improper animus, comprising "class warfare" against persons many of whom were falsely, derisively and discriminatorily labeled "millionaires and billionaires," in derogation of Plaintiffs' constitutional rights, the illegal imposition, collective, use and/or diversion of the unlawful ULA taxes are actionable under 42 U.S.C. § 1983. Plaintiffs have also incurred and/or will incur attorneys' fees and other fees and costs because of this proceeding, which Plaintiffs are entitled to recover pursuant to 42 U.S.C. § 1988.

230.    Defendants have violated, and continue to violate, the law as alleged herein each and every time the subject ULA taxes have been unlawfully demanded, used, applied, transferred, diverted, increased, imposed and/or collected. Accordingly, Plaintiffs will continue to suffer such harm for as long as Defendants continue to impose, demand, collect, enforce, use and/or divert the unlawful ULA taxes in violation of applicable law and the United States Constitution and California Constitution.

231.    Plaintiffs do not have an adequate remedy at law.

232.     Accordingly, Plaintiffs are entitled to a writ of mandate pursuant to *Code of Civil Procedure* §1085 directing Defendants to, among other things: (a) cease and desist in the collection and enforcement of the ULA taxes; (b) vacate any and all decisions, acts, ordinances and/or resolutions unlawfully imposing, authorizing, extending, increasing, diverting, spending or transferring the ULA taxes; (c) restore to Plaintiffs any and all moneys that have been unlawfully and/or improperly collected as ULA taxes; (d) restore to Plaintiffs any and all moneys collected through ULA taxes that were unlawfully diverted, transferred or applied to other purposes; and (e) comply with their constitutional and legal obligations with respect to the ULA taxes.

## TWELFTH CLAIM FOR RELIEF

### (Declaratory Relief – Against All Defendants)

233.     Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 232 as though fully set forth herein.

234.     Pursuant to *Code of Civil Procedure* §1060 *et seq*., Plaintiffs seek a declaration of the parties' respective rights and duties regarding the ULA Ordinance and the ULA taxes.

235.     Plaintiffs contend that the ULA Ordinance and the ULA taxes are unlawful and improper because, among other things, the ULA taxes: (a) do not comply with the prohibition on special transfer taxes under Proposition 13; (b) do not comply with the requirements for local "taxes"; and/or (c) do not comply with the requirements for property related assessments, fees or charges under Proposition 218 because, among other reasons, they are not proportional to the special benefit or service actually received by the particular properties, (d) do not comply with Government Code Section 53725, and (e) do not comply with the United States Constitution and the California Constitution. Plaintiffs further contend that Defendants' use and diversion of the ULA taxes is, and has been, unlawful.

236.     Upon information and belief, Defendants deny the contentions of Plaintiffs.   Therefore, an actual controversy has arisen and now exists between the Plaintiffs, on the one hand, and the Defendants, on the other hand.

237.     Accordingly, Plaintiffs hereby request a judicial declaration of their rights with respect to the controversy described herein.  Such a declaration is necessary and appropriate at this time under the

circumstances so that Plaintiffs can ascertain their ongoing rights and duties with respect to the ULA Ordinance and ULA taxes.

### THIRTEENTH CLAIM FOR RELIEF

#### (Determination of Invalidity – Against All Defendants)

238.    Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 237 as though fully set forth herein.

239.    Plaintiffs bring this *in rem* reverse validation action in order to protect the rights of Plaintiffs, and only to the extent, that the validation statutes at *Code of Civil Procedure* §§ 860 *et seq*. are deemed to apply to the matters alleged herein.

240.    As alleged herein, the ULA taxes are invalid because such taxes violate applicable law and policy including, but not limited to, Proposition 13, Proposition 218, and Proposition 26 (as codified in Article XIII A-D of the California State Constitution), as well as the United States Constitution and the California Constitution and/or other applicable law.

241.    By virtue of the foregoing, the ULA Ordinance and ULA taxes and all proceedings related thereto are invalid.

### FOURTEENTH CLAIM FOR RELIEF

#### (Violation of Substantive Due Process – Against All Defendants)

242.    Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 241 as though fully set forth herein.

243.    The United States Constitution and California Constitution ensure the right to substantive due process.  As noted by the Court of Appeal, "[t]he substantive due process doctrine thus acts as a limitation on unreasonable and arbitrary legislation."  *California Rifle & Pistol Assn. v. City of West Hollywood*, 66 Cal.App.4th 1302, 1330 (1998). Accordingly, "deprivation of a right is supportable only if the conduct from which the deprivation flows is prescribed by reasonable legislation that is reasonably applied; that is, the law must have a reasonable and substantial relation to the object sought to be attained." *People v. Kilborn*, 41 Cal.App.4th 1325, 1328 (1996).

244.    Here, there is neither a reasonable, nor a substantial, relationship between the act of selling real estate and homelessness.  The absurdity and unreasonableness of the ULA can best be illustrated

with an example.  Take for example automobiles. The State of California implements a yearly vehicle license fee that acts as a tax based on the value of an automobile.  This tax needs to be paid on a yearly basis when an individual renews his or her automobile registration.  Unlike the ULA (which only taxes the $5,000,001 sub-class), *all* individuals with automobiles registered in the State of California must pay the yearly vehicle license fee.  While someone who drives a Lamborghini will undoubtedly be paying more per year, individuals with Lamborghinis are not the *only* individuals who are required to pay the yearly vehicle license fee.  To take it a step further (which is what Defendants have done with the ULA); imagine that only the Lamborghini owners were required to pay the yearly vehicle license fee, and that funds from the yearly vehicle license fee that were only required to be paid by Lamborghini owners were to be used to build and provide free cars to individuals who were carless.  While it sounds ludicrous, that is exactly what the ULA does.

245.    By virtue of the foregoing, the ULA Ordinance is in violation of the substantive due process protections of the United States Constitution and the California Constitution and, thus, this Court should declare it unconstitutional.

### FIFTEENTH CLAIM FOR RELIEF

### (Unlawful Delegation of Authority – Against All Defendants)

246.    Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 245 as though fully set forth herein.

247.    Under the doctrine of separation of powers, the lawmaking function is assigned to the legislature, it is a cardinal principle of constitutional law that the legislature cannot delegate to any other agency its primary and exclusive power to make laws (*Kugler v. Yocum*, 69 Cal.2d 371, 375 (1968)), nor may the people, in enacting a law through the passage of an initiative measure, delegate their legislative power. *Southern Cal. Jockey Club v. California Horse Racing Bd.*, 36 Cal.2d 167, 171 (1950).

248.    Here, the delegation of power through the passage of an initiative measure is exactly what has occurred.  The ULA unconstitutionally delegates rulemaking power as discussed above (and specifically in Paragraphs 144 through 148 herein).

249.    By virtue of the foregoing, the ULA Ordinance is in violation of the doctrine of separation of powers and, thus, this Court should declare it unconstitutional.

### SIXTEENTH CLAIM FOR RELIEF

### (The ULA is Unconstitutionally Vague – Against All Defendants)

250.    Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 249 as though fully set forth herein.

251.    "[A] statute will be deemed void for vagueness if it either forbids or requires the doing of an act in terms so vague that persons of common intelligence must necessarily guess as to its meaning and differ as to what is required." *Nisei Farmers League v. Labor & Workforce Development Agency*, 30 Cal.App.5th 997, 1013 (2019).  As discussed above (and specifically in Paragraphs 144 through 148 herein), the ULA leaves many questions unanswered, which results in persons of common intelligence to guess as to its meaning and differ as to what is requires.

252.    By virtue of the foregoing, the ULA Ordinance is unconstitutionally vague and, thus, this Court should declare it unconstitutional.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request entry of a judgment in their favor and against Defendants, and each of them, and prays for the following relief:

**On the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Fourteenth, Fifteenth, and Sixteenth Claims for Relief**:

1.    A judicial determination and declaration that the ULA Ordinance is invalid because it violates one or more provisions of the United States Constitution, the California Constitution, and/or one or more provisions of California law and policy including, but not limited to Proposition 218, Proposition 26 and/or Proposition 13 (as codified in article XIII A–D of the California State Constitution).

2.    A judicial determination and declaration that the ULA Taxes are invalid, illegal, void, unenforceable and not binding on anyone.

3.    Writ of mandate pursuant to *Code of Civil Procedure* §1085 directing Defendants to, among other things: (a) cease and desist in the collection and enforcement of the ULA taxes; (b) vacate any and all decisions, acts, ordinances and/or resolutions unlawfully imposing, authorizing, extending, increasing, diverting, spending or transferring the ULA; (c) restore to Plaintiffs' any and all moneys that have been unlawfully and/or improperly collected as ULA taxes; (d) restore to Plaintiffs all moneys

collected through ULA taxes that were unlawfully diverted, transferred or applied to other purposes; and (e) comply with their constitutional and legal obligations with respect to the ULA taxes.

4.     A judicial determination of the parties' respective rights and duties regarding the so-called ULA Ordinance that is consistent with the allegations set forth in this Complaint and in accordance with applicable law, contracts and policy.

5.     An order and/or judgment pursuant to *Code of Civil Procedure* §526a restraining and preventing any and all illegal expenditures of funds collected by Defendants as so-called ULA taxes including, without limitation, a judgment prohibiting Defendants from: (i) using or diverting the ULA taxes in a manner that is in violation of applicable law and/or contractual obligations and/or against policy including, without limitation, Propositions 13, 26 and/or 218 (codified at article XIII A–D of the California Constitution), and/or (ii) using or diverting ULA taxes in any other manner that violates the U.S. or California Constitution, applicable law and/or contractual obligations and/or against policy including, without limitation, Propositions 13, 26 and/or 218 (codified at article XIII A–D of the California Constitution).

**On the Tenth Claim for Relief**:

6.     Damages according to proof.

7.     Attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

**On the Eleventh Claim for Relief**:

8.     A writ of mandate pursuant to *Code of Civil Procedure* §1085 directing Defendants to, among other things: (a) cease and desist in the collection and enforcement of the ULA taxes; (b) vacate any and all decisions, acts, ordinances and/or resolutions unlawfully imposing, authorizing, extending, increasing, diverting, spending or transferring the ULA taxes; (c) restore to Plaintiffs' any and all moneys that have been unlawfully and/or improperly collected as ULA taxes; (d) restore to Plaintiffs all moneys collected through ULA taxes that were unlawfully diverted, transferred or applied to other purposes; and (e) comply with their constitutional and legal obligations with respect to the ULA taxes.

9.     An order and/or judgment pursuant to *Code of Civil Procedure* §526a restraining and preventing any and all illegal expenditures of funds collected by Defendants as so-called ULA taxes including, without limitation, a judgment prohibiting Defendants from: (i) using or diverting the ULA

taxes in a manner that is in violation of applicable law and/or contractual obligations and/or against policy including, without limitation, Propositions 13, 26 and/or 218 (codified at article XIII A–D of the California Constitution), and/or (ii) using or diverting ULA taxes in any other manner that violates the U.S. or California Constitution, applicable law and/or contractual obligations and/or against policy including, without limitation, Propositions 13, 26 and/or 218 (codified at article XIII A–D of the California Constitution).

**On the Twelfth Claim for Relief**:

10.    A judicial determination and declaration that the ULA Ordinance is invalid because it violates one or more provisions of the United States Constitution, the California Constitution, and/or one or more provisions of California law and policy including, but not limited to Proposition 218, Proposition 26 and/or Proposition 13 (as codified in article XIII A–D of the California State Constitution).

11.    A judicial determination and declaration that the ULA taxes are invalid, illegal, void, unenforceable and not binding on anyone.

12.    A judicial determination of the parties' respective rights and duties regarding the so-called ULA Ordinance that is consistent with the allegations set forth in this Complaint and in accordance with applicable law, contracts and policy.

**On the Thirteenth Claim for Relief**:

13.    A judicial determination and declaration that the ULA Ordinance is invalid because it violates one or more provisions of the United States Constitution, the California Constitution, and/or one or more provisions of California law and policy including, but not limited to Proposition 218, Proposition 26 and/or Proposition 13 (as codified in article XIII A–D of the California State Constitution).

14.    A judicial determination and declaration that the ULA taxes are invalid, illegal, void, unenforceable and not binding on anyone.

**On All Claims for Relief**:

15.    Interest at the legal rate from the date of each loss or claim for refunds or restitution.

16.    Costs incurred herein.

17.    Attorneys' fees pursuant to *Code of Civil Procedure* section 1021.5.

18.    Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury.

Dated:  January 6, 2023                    **COSTELL & ADELSON LAW CORPORATION**

By: _____

Jeffrey Lee Costell
Joshua Stambaugh
Attorneys for Plaintiffs and Petitioners

Dated:  January 6, 2023                    **THE LAW OFFICES OF KEITH M. FROMM**

By: _____

Keith M. Fromm
Attorneys for Plaintiffs and Petitioners

VERIFIED PETITION AND COMPLAINT

**VERIFICATION**

I, BENJAMIN LEEDS, am the Managing Member of NEWCASTLE COURTYARDS, LLC, a Plaintiff in the above-entitled action.  I have read the foregoing Complaint and know the contents thereof. The same is true of my own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, I believe it to be true.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed at ___Los Angeles___, California.

Dated: January _6_, 2023

_____

-58-
VERIFIED PETITION AND COMPLAINT

# VERIFICATION

I, JONATHAN BENABOU, as Trustee of 'THE MANI BENABOU FAMILY TRUST" declare that I am a PLAINTIFF in the above-entitled action. I have read the foregoing Complaint and Petition and know the contents thereof. The same is true of my own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, I believe it to be true.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed at Los Angeles, California.

Dated: January 5, 2023

*Jonathan Benabou*
_____
JONATHAN BENABOU as TRUSTEE FOR THE

MANI BENABOU FAMILY TRUST

VERIFIED COMPLAINT - VERIFICATION

EXHIBITS

"A"    VOTERS INFORMATION PAMPHLET WITH ORDINANCE

"B"    ARTICLE DATED FEBRUARY 26, 2022 IDENTIFYING AND DESCRIBING TWENTY-ONE (21) STATE BILLS CONCERNING "HOMELESSNESS"

# EXHIBIT A



★★★★★★★★★★★★★★★

# VOTER INFORMATION PAMPHLET

★★★★★★★★★★★★★★★

COMPILED BY HOLLY L. WOLCOTT, CITY CLERK

★ **GENERAL MUNICIPAL ELECTION** ★
**TUESDAY, NOVEMBER 8, 2022**

clerk.lacity.org/elections/

# For Election Information, please call 1-888-873-1000

## The City of Los Angeles provides voter information in English as well as in the following languages:

Այս բրոշյուրի հայերեն օրինակն ստանալու համար զանգահարեք 1-800-994-VOTE (8683) հեռախոսահամարով:

要索取取本手冊的中文版，
請致電 1-800-994-VOTE (8683)

برای تهیه‌ی نسخه‌ای از این جزوه به زبان فارسی، با شماره تلفن 1-800-994-VOTE (8683) تماس بگیرید

हिन्दी में इस पैम्फलेट की प्रति प्राप्त करने के लिए,
1-800-994-VOTE (8683) पर फोन करें

このパンフレットの日本語版をご希望の方は、
1-800-994-VOTE (8683)までお電話ください。

ដើម្បីទទួលបានឯកសារថតចម្លងម្ភួយច្បាប់ពីកូនសៀវភៅនេះជាភាសាខ្មែរ
សូមហៅទូរស័ព្ទលេខ 1-800-994-VOTE (8683)

이 팸플릿을 한국어로 원하시면 다음 전화번호로
연락하십시오. 1-800-994-VOTE (8683)

Для получения копии данной брошюры на русском
языке позвоните по номеру 1-800-994-VOTE (8683).

Para obtener una copia de este folleto en español,
llame al 1-800-994-VOTE (8683)

Para makakuha ng kopya ng pamplet na ito sa Tagalog,
tumawag sa 1-800-994-VOTE (8683)

เพื่อขอสำเนาจุลสารนี้ในภาษาไทย โปรดโทรศัพท์ติดต่อที่หมายเลข
1-800-994-VOTE (8683)

Muốn có một tập sách này bằng tiếng Việt, hãy gọi số
1-800-994-VOTE (8683)

# Table of Contents

**Page**

**Ballot Summary**. . . . . . . . . . . . . . . . . . . . . **3-5**

**Ballot Measures, Arguments, and Text**

Proposition LH . . . . . . . . . . . . . . . . . . . . . . . . **6**

Proposition SP . . . . . . . . . . . . . . . . . . . . . . . **11**

Initiative Ordinance ULA . . . . . . . . . . . . . . . . **27**

## **VOTER INFORMATION**

The County of Los Angeles Registrar-Recorder/County Clerk is the administrator of the City of Los Angeles Municipal Elections.

This pamphlet only contains information on the City's ballot measures for the November 8, 2022 General Municipal Election.

For information concerning the Election such as Vote Centers, please contact LA County at (800) 815-2666 or visit their website at www.lavote.gov.

The next 3 pages contain the simplified version of the City's ballot measures. The full text of each measure, along with other information, is printed after the Ballot Summary (see TABLE OF CONTENTS Page).

## CITY OF LOS ANGELES PROPOSITION LH

**TITLE:**
AUTHORIZATION FOR ADDITIONAL LOW-INCOME HOUSING

**THE ISSUE:**
Do you approve a measure authorizing public entities in the City of Los Angeles to develop, construct, or acquire up to 5,000 additional units of low-income rental housing in each Council District, for a total of up to 75,000 additional units of low-income housing within the City, to address homelessness and affordable housing needs, subject to availability of funding and City development requirements?

**THE SITUATION:**
Article 34 of the State Constitution requires a local government to obtain voter approval in order to develop, construct, or acquire low-income rental housing units. In 2008, the voters of the City of Los Angeles approved a ballot measure authorizing and maintaining a level of 3,500 units of low-income housing per Council District, for an aggregate total of 52,500 units of low-income housing within the City of Los Angeles. Several Council Districts are approaching their authorized limit.

According to the Housing Department, the current level is inadequate to address homelessness and affordable housing needs. Currently, the City's 2021-2029 Housing Element, as required by State law, sets a goal that the City provide 185,000 affordable housing units for low- and very low-income households by 2029.

**THE PROPOSAL:**
The measure would authorize public entities in the City to develop, construct, or acquire an additional 5,000 units of low-income rental housing in each Council District, for a total of 75,000 additional authorized units of low-income housing within the City.

**A YES VOTE MEANS:**
You want to authorize public entities in the City of Los Angeles to develop, construct, or acquire an additional 5,000 units of low-income rental housing in each Council District.

**A NO VOTE MEANS:**
You do not want to authorize public entities in the City of Los Angeles to develop, construct, or acquire an additional 5,000 units of low-income rental housing in each Council District.

**THE FULL TEXT OF THIS PROPOSITION BEGINS ON PAGE 9.**

### CITY OF LOS ANGELES PROPOSITION SP

**TITLE:**
PARKS AND RECREATIONAL FACILITIES PARCEL TAX

**THE ISSUE:**
Do you approve an ordinance providing funding for parks, recreational centers, pools, playgrounds, waterways, beaches, green spaces, open spaces, childcare and other facilities, and increasing park equity in the City of Los Angeles, through a tax of approximately 8.4 cents per square foot on improved parcels, reduced to approximately 2.2 cents upon completion of certain programs or in 30 years, with citizen oversight and exemptions for low-income households?

**THE SITUATION:**
In 1996, voters adopted Proposition K: LA for Kids Program which created a citywide assessment district to fund the acquisition, development, improvement and restoration of parks and recreational facilities.  Proposition K funding will expire in Fiscal Year 2026-27.

**THE PROPOSAL:**
The measure would authorize a new parcel tax of approximately 8.4 cents per square foot that would generate approximately $227 million annually. The tax would be reduced to approximately 2.2 cents per square foot upon completion of capital programs or in 30 years, whichever occurs first. These funds would be dedicated to the rehabilitation, remediation, improvement, development, addition, acquisition, and operations and maintenance of open spaces and recreational venues and programs, including the Los Angeles Zoo and civic center green spaces, waterways and water elements, including the Los Angeles River and the Sepulveda Basin, and park facilities, such as pools, childcare facilities, and playgrounds. Monies in the fund may be used to pay the costs of audits and operation of the oversight committees. A Citizen Oversight Committee shall be established to make recommendations to the City on projects to be funded. Such recommendations shall consider the City's equity index.

**A YES VOTE MEANS:**
You want to authorize a parcel tax to provide funding with equity considerations for costs associated with park and recreational facilities.

**A NO VOTE MEANS:**
You do not want to authorize a parcel tax to provide funding with equity considerations for costs associated with park and recreational facilities.

### THE FULL TEXT OF THIS PROPOSITION BEGINS ON PAGE 20.

### CITY OF LOS ANGELES INITIATIVE ORDINANCE ULA

**TITLE:**
FUNDING AFFORDABLE HOUSING AND TENANT ASSISTANCE PROGRAMS THROUGH
A PROPERTY TRANSFER TAX

**THE ISSUE:**
Shall an ordinance be adopted to add a tax on the sale or transfer of real property valued at over
$5 million to fund affordable housing and tenant assistance programs?

**THE SITUATION:**
There are approximately 41,000 unhoused people in Los Angeles. An estimated 63% of
households are occupied by renters. Local funding dedicated to affordable housing and tenant
programs is limited. The City collects a documentary transfer tax on the sale or transfer of
property that funds City services. This measure would establish an additional documentary
transfer tax on property valued at over $5 million to fund affordable housing and tenant programs.

**THE PROPOSAL:**
This citizen-sponsored ballot initiative would:

- Impose a 4% tax on real property sales or transfers valued at over $5 million but less
  than $10 million;
- Impose a 5.5% tax on real property sales or transfers valued at $10 million or more;
- Annually adjust the property value thresholds based on the Chained Consumer Price
  Index;
- Exempt certain housing, non-profit, and public entities from the tax;
- Create a permanent tax until repealed by voters;
- Generate approximately $600 million to $1.1 billion annually for existing and new
  programs;
- Use at least 92% of the revenue for affordable housing and tenant assistance
  programs administered by the Los Angeles Housing Department, and up to 8% for
  administration;
- Establish a Citizens Oversight Committee to make funding and program
  recommendations; and
- Establish a Tenant Council to advise on housing matters.

**A YES VOTE MEANS:**
You want to add a tax on the sale or transfer of non-exempt properties valued at over $5 million
to fund affordable housing and tenant programs.

**A NO VOTE MEANS:**
You do not want to add a tax on the sale or transfer of non-exempt properties valued at over $5
million to fund affordable housing and tenant programs.

### THE FULL TEXT OF THIS INITIATIVE ORDINANCE BEGINS ON PAGE 39.

## LH  AUTHORIZATION FOR ADDITIONAL LOW-INCOME HOUSING. PROPOSITION LH.

Shall a measure authorizing public entities in the City of Los Angeles to develop, construct, or acquire up to 5,000 additional units of low-income rental housing in each Council District to address homelessness and affordable housing needs, subject to availability of funding and City development requirements, be adopted?

### IMPARTIAL SUMMARY
### BY SHARON M. TSO, CHIEF LEGISLATIVE ANALYST

Article 34 of the State Constitution requires a local government to obtain voter approval in order to develop, construct, or acquire certain low-income rental housing units. Article 34 authority is required for every project where more than 50 percent of units are restricted for low-income households. In 2008, the voters of the City of Los Angeles approved a ballot measure authorizing and maintaining a level of 3,500 units of low-income housing per Council District, for an aggregate total of 52,500 units of low-income housing within the City of Los Angeles. The Los Angeles Housing Department reports that the current level of Article 34 authority is insufficient to address homelessness and meet the City's affordable housing needs.

Since 1969, the State of California has required that all cities and counties adequately plan to meet the housing needs of communities through a Housing Element. The Housing Element is a required part of every local government's General Plan, must be updated every eight years, and must comply with standards and requirements set by the State. The City's 2021-2029 Housing Element, as required by State law, sets a goal that the City provide 185,000 affordable housing units for low- and very low-income households by 2029. Increasing the City's current total Article 34 authority would allow for increased development of low- and very low-income housing and support the City's efforts in achieving the 2021-2029 Housing Element's goal.

This measure would authorize public entities in the City to develop, construct, or acquire an additional 5,000 units of low-income rental housing in each Council District, for an additional potential 75,000 units Citywide. This would provide an aggregate total of 127,500 units of low-income housing within the City of Los Angeles, subject to funding availability and City development requirements.

Voter approval of the additional Article 34 authority does not require or guarantee that the authorized number of units will be developed, constructed, or acquired by the City or other public entities, nor obligate the provision of additional funding for such purposes, or exempt such projects from the public review or other development processes required by the City.

This measure will become effective if approved by a majority of voters.

**FINANCIAL IMPACT STATEMENT**
**BY MATTHEW W. SZABO, CITY ADMINISTRATIVE OFFICER**

This measure would increase the number of units of low-income rental housing that public entities could develop, construct, or acquire in the City of Los Angeles by 5,000 per City Council district. Article XXXIV of the California State Constitution requires voter approval for these activities. In 2008, voters approved a level of 3,500 units per district and this measure would increase that level to 8,500. A small number of districts are approaching the 3,500 level.

This measure does not require the City to develop, construct, or acquire the increased number of units, nor does it authorize a new funding source for low-income rental housing. Furthermore, this measure does not impact funding availability for low-income rental housing, the largest sources being federal funding and voter-approved bond financing. Therefore, there is no financial impact resulting from the adoption of this measure.

TQ2-E

NOVEMBER 2022

**ARGUMENT IN FAVOR OF PROPOSITION LH**

<u>VOTE YES ON PROPOSITION LH</u>

**Proposition LH** would authorize the City of Los Angeles to build, develop, or acquire up to 75,000 units of affordable housing.

Los Angeles' housing crisis grows worse every day, with more and more Angelenos facing housing insecurity and homelessness.  The City of Los Angeles has not authorized additional affordable housing SINCE <u>2008.</u>  We need to get serious about tackling the crisis of our time.

**Proposition LH** simply AUTHORIZES the City of Los Angeles to pursue the development or acquisition of affordable housing—<u>it does not fund, site, or approve it.</u>

Any proposed new low-income housing will still be subject to environmental review, community input, and city approval.

**Proposition LH** ensures that any new housing will be developed across the city, with 5,000 units authorized in each of the city's 15 council districts.

The proposition is made necessary by the California State Constitution's requirement that all new publicly-funded affordable housing be approved by the voters.

**Proposition LH** is an essential tool in the fight to get our neighbors off the streets and help every Angeleno find their way home**.**

**VOTE <u>YES</u> ON PROPOSITION LH.**


**PERSONS SIGNING ARGUMENT IN FAVOR OF PROPOSITION LH**

JON DEUTSCH
President
Los Feliz Neighborhood Council

ALAN GREENLEE
Executive Director
Southern California Association of NonProfit Housing


**NO ARGUMENT AGAINST THIS MEASURE WAS SUBMITTED.**


> **Arguments printed on this page are the opinions of the authors and are not checked for accuracy by any City agency.**

**PROPOSITION LH**

**TEXT OF THE PROPOSED BALLOT MEASURE**

**RESOLUTION**

Resolution providing voter authorization for the development, construction, or acquisition of up to 5,000 additional units of low-income rental housing in each Council District in the City of Los Angeles (City) consistent with Article XXXIV of the State Constitution.

**WHEREAS**, Article XXXIV of the Constitution of the State of California requires the approval, by a majority of the qualified voters of the City voting in an election, for public entities in the City to develop, construct, or acquire certain categories of low rent housing projects;

**WHEREAS**, in November 2008, voters of the City approved Proposition B, entitled "Update of Low Rent Housing Authorization," which consolidated and maintained the City's prior Article XXXIV authorizations allowing 3,500 low-income rental units per Council District, and removed impediments to access federal and state funding sources to construct low-income rental housing;

**WHEREAS**, the City's current Article XXXIV authorization level of 3,500 units per Council District is limiting the ability to further develop, construct, or acquire low-income rental housing and constraining the ability of the City to address homelessness and affordable housing needs;

**WHEREAS**, as of May 1, 2022, five Council Districts in the City have a balance of less than 1,000 units of low-income rental housing units remaining of their authorized levels;

**WHEREAS**, the City needs Article XXXIV authority for the development, construction or acquisition of additional low-income rental housing projects in each Council District and throughout the City to address homelessness and meet the affordable housing demand needs of the City; and

**WHEREAS**, voter approval of the additional Article XXXIV authority does not require or guarantee that the authorized number of units will be developed, constructed, or acquired by the City, state, or federal governments, nor does the authorization obligate the provision of additional funding for such purposes or exempt such projects from the public review and other development processes required by the City.

**NOW, THEREFORE BE IT RESOLVED BY THE PEOPLE OF THE CITY OF LOS ANGELES AS FOLLOWS:**

Section 1.  Consistent with Article XXXIV of the State Constitution, the voters of the City hereby authorize public entities in the City to develop, construct, and/or acquire up to 5,000

additional units of low rent housing in each Council District for persons of low income, for a total of up to 75,000 additional units of low rent housing in the City for persons of low income.

Sec. 2.  The authorization of additional low rent housing units in the City provided by approval of this measure is in addition to any and all prior authorizations regarding low rent housing in the City, including prior authorizations approved by the voters pursuant to Article XXXIV.

Sec. 3.  The City is further authorized to take any actions necessary to implement this measure.

Sec. 4.  The terms of the authorization contained in this measure shall be construed in the same manner as Article XXXIV of the State Constitution and any laws or cases interpreting that section.

Sec. 5.  Consistent with Article XXXIV, the authorization provided by this measure shall be deemed adopted and approved by the voters of the City if the measure is approved by a majority of the electors voting on the measure.  The authorization shall be deemed effective ten days after the City Council declares the results of the election.

## SP PARKS AND RECREATIONAL FACILITIES PARCEL TAX. PROPOSITION SP.

Shall an ordinance providing funding for parks, recreational centers, pools, playgrounds, waterways, beaches, green spaces, open spaces, childcare and other facilities, and increasing park equity in the City of Los Angeles, through a tax of $0.08414 per square foot on improved parcels, reduced to $0.0222 upon completion of certain programs or in 30 years, with citizen oversight and exemptions for low-income households, generating approximately $227 million annually, be adopted?

### IMPARTIAL SUMMARY
### BY SHARON M. TSO, CHIEF LEGISLATIVE ANALYST

In 1996, voters approved the passage of Proposition K: LA for Kids Program (Proposition K) which created a citywide assessment that has generated $25 million annually for the acquisition, development, improvement and restoration of parks and recreational facilities. Proposition K will expire in Fiscal Year (FY) 2026-27 and will result in the loss of funding to support parks and recreational facilities.

The proposed measure on the ballot would amend the Municipal Code to allow the City to collect funds for the rehabilitation, remediation, improvement, development, and acquisition of open spaces and recreational venues, such as museums, theaters, the Los Angeles Zoo, and civic green spaces, waterways and water elements, such as the Los Angeles River, Sepulveda Basin, lakes, dams, reservoirs, and beaches and park facilities, such as regional parks, recreation centers, pools and bathhouses, childcare facilities, senior centers, trails, picnic areas, playgrounds, athletic fields and courts, and other open public spaces, along with their operation and maintenance, through the imposition of a special tax on improved real property parcels within the City. The distribution of the special tax funds will be prioritized based on the City's equity index with the goal of providing park poor communities with safe healthful access to parks and recreational facilities.

If approved, the special parcel tax rate to be imposed shall be $0.08414 per square footage of improvement (generating approximately $227 million annually) on real property parcels beginning in FY 2023-24 and reduced to $0.0222 (approximately $60 million annually) upon completion of capital programs or in FY 2053-54, whichever occurs first.

The measure provides exemptions from the special parcel tax for parcels owned by non-profits, low income households, and government bodies. The City shall establish the procedures and guidelines for parcel owners to apply for an exemption from the special parcel tax.

Unless the City Council seeks another method for collection of the special parcel tax, such tax shall be levied and collected by the County at the same time and manner, and subject to the same penalties, and interest as ad valorem property taxes collected by the County no sooner than July 1, 2023.

Monies collected from the special parcel tax, including penalties and interest, shall be deposited in a fund entitled "Parks and Recreational Facilities Special Parcel Tax Fund" (Fund). Monies deposited in the Fund shall not be subject to reversion to the City's Reserve Fund. Any interest earnings generated by the Fund shall remain in the Fund and be used for the purposes for which the special parcel tax is imposed.

A Citizens Oversight Committee shall be established by ordinance to make recommendations on projects to be funded from the special parcel tax and to monitor the implementation and performance of the projects, programs, and services funded by the special parcel tax. An Administrative Oversight Committee, consisting of the Mayor, City Administrative Officer, and the Chief Legislative Analyst, shall be established by ordinance to review, amend, and adopt any project recommendations prepared by the Citizens Oversight Committee based on funding priorities and awards. Such recommendations shall consider the City's equity index, as amended from time to time by the City, with the goal of providing park poor communities access to City Open Spaces and Recreational Venues, City Waterways and Water Elements, and/or Park Facilities.

The Controller shall prepare and present to the City Council an annual report identifying all receipts and expenditures associated with the Fund in accordance with state law.

This measure will become effective if approved by no less than two-thirds of the voters voting.

**FINANCIAL IMPACT STATEMENT**
**BY MATTHEW W. SZABO, CITY ADMINISTRATIVE OFFICER**

The proposition imposes a new parcel tax on properties based on the square footage of improvements, at a rate of $0.08414 per square foot of parcel improvements. The tax is expected to generate approximately $227.4 million in annual revenue. Tax revenues shall be used for the purposes of funding the acquisition, maintenance, and operation of parks, recreational centers, pools, playgrounds, waterways, beaches, green spaces, open spaces, childcare and other facilities.

The tax would be reduced to $0.0222 per square footage of improvements upon the completion of certain capital programs or in the fiscal year beginning 2053-54, whichever occurs sooner. The reduced rate is expected to generate approximately $60 million in annual revenue, to continue funding program administrative, operational and maintenance costs.

The proposition is not anticipated to have a significant impact on City finances as program expenses would be fully funded from the parcel tax collections.

**ARGUMENT IN FAVOR OF PROPOSITION SP**

We all need safe, clean parks. Today, our parks need our help.

That's why we need Measure SP.

We absolutely must address homelessness in our neighborhood parks. This can be done humanely, in partnership with local religious organizations, nonprofits and social service organizations – but it must be done. Our parks must be safe and clean for all of us to use.

More than 100,000 LA kids participate in organized afterschool and summer programs, which help keep kids on the right track and out of trouble. Measure SP supports these vital programs and helps reduce gang activity.

Too many local parks and recreation centers suffer from asbestos, mold, leaky roofs, lack of safe drinking water, termite damage, decaying walls, bad plumbing, old gas and sewer lines, unsafe lighting and restrooms. Too many are not accessible for people with disabilities, and often for senior citizens.

We need Measure SP to fix these problems.

Measure SP will maintain safe drinking water at parks and rec centers.

Measure SP will fix unsafe conditions at neighborhood parks, playgrounds, recreation centers, senior centers and other facilities to keep us safe.

Measure SP also helps fight ongoing drought and protect water quality.

Measure SP cleans up our parks, beaches and natural areas, keeping trash and pollutants out of local creeks, rivers, lakes, coastal waters and beaches.

Measure SP prevents contamination of our critical local groundwater.

Measure SP saves money and helps protect our scarce local drinking water supplies, through water conservation, including drought-tolerant plants and increased use of recycled water for playfields, landscaping, grass and natural areas.

Measure SP also removes dead trees and dried brush to reduce wildfire risks and protect our neighborhoods.

Measure SP includes strict accountability and public disclosure of all spending.

We all need safe, clean parks. Vote Yes on SP!

---

Arguments printed on this page are the opinions of the authors and are not checked for accuracy by any City agency.

**PERSONS SIGNING ARGUMENT IN FAVOR OF PROPOSITION SP**

JOE BUSCAINO
Councilmember
City of Los Angeles

JIMMY KIM
General Manager
L.A. City Recreation & Parks

ROBERT ARIAS
Chair
San Fernando Coalition on Gangs

GREGORY BOYLE
Founder
Homeboy Industries

CAROLYN RAMSAY
Executive Director
LA Parks Foundation

DR. ALICE "SWEET ALICE" HARRIS
Founder
Parents of Watts



### REBUTTAL TO THE ARGUMENT IN FAVOR OF PROPOSITION SP

**PROPOSITION SP INCREASES PROPERTY TAXES BY $84.14 PER 1,000 SQUARE FEET.**

The owner of a 1,500-square-foot home will pay an additional $1,893.15 in just the first 15 years!

**TAXPAYERS ARE ALREADY PAYING TO MAINTAIN THE PARKS, BUT THE CITY IS DIVERTING THE MONEY.**

The City Council diverts money from the current parks budget by charging Recreation and Parks for city services provided free to other departments. According to Recreation and Parks' own website, "These indirect costs now account for over 23% ($43 million) of the entire Department's budget." (Source: www.laparks.org/department on 8/21/22)

**PROPOSITION SP IS A TAX TO PAY FOR THE OLYMPICS.**

Councilman Joe Buscaino admitted in a 2021 City Council motion that a tax increase was needed for "upgrades" to Recreation and Parks facilities for the 2028 Olympics. Proposition SP is a $6.8 billion tax increase for 30 years!

**VOTE NO ON PROPOSITION SP.**

More Information:
Howard Jarvis Taxpayers Association
213-384-9656
www.NoNewTaxes.net

### PERSONS SIGNING REBUTTAL TO THE ARGUMENT IN FAVOR OF PROPOSITION SP

JON COUPAL
President
Howard Jarvis Taxpayers Association

MICHAEL D. ANTONOVICH
Los Angeles County Supervisor
1980-2016, Ret.

JACK HUMPHREVILLE
Neighborhood Council Budget Advocate

DANIEL M. YUKELSON
Executive Director
Apartment Association of Greater
Los Angeles

> **Arguments printed on this page are the opinions of the authors and are not checked for accuracy by any City agency.**



### ARGUMENT AGAINST PROPOSITION SP

**VOTE NO on PROPOSITION SP because it will cost taxpayers thousands of dollars over 30 years.**

Proposition SP will cost every homeowner $84.14 per 1,000 square feet of their home per year. The owner of a 1,500-sq-ft. home would pay an additional $1,893.15 in just the first 15 years.

**VOTE NO on PROPOSITION SP because it's a massive tax increase.**

In 1996, voters passed Proposition K, a tax increase for parks that ends in 2026. Politicians want to replace the expiring tax with a new tax increase. However, Proposition SP will raise taxes $227 MILLION PER YEAR. That's nearly 10 times as much as Proposition K, which cost $25 million per year.

**VOTE NO on PROPOSITION SP because it's a back-door tax to pay for the Olympics**

Last December, Councilman Joe Buscaino presented a motion to direct the city to hire a consultant to develop a ballot measure to raise $2.1 billion for Recreation and Parks improvements. The motion stated, "With the City hosting the 2028 Summer Olympics, and several of Recreation & Parks facilities serving as venues for various competitions, we must act now, to ensure all needed upgrades and repairs are completed prior to the games." Proposition SP is a tax increase to pay for the Olympics.

**VOTE NO on PROPOSITION SP because it's THREE TIMES MORE THAN NEEDED**

The planned $2.1 billion tax increase has turned into Proposition SP, which raises taxes by more than triple that amount. The City Council wanted to spend more, so in May, the City Administrative Officer outlined a $4.6 billion tax increase. Then in June, the Council identified "other potential projects" that required tax hikes, including the massive L.A. River overhaul. Proposition SP will cost $6.8 billion!

**VOTE NO on PROPOSITION SP.**

For More Information:
Howard Jarvis Taxpayers Association
213-384-9656
www.NoNewTaxes.net

Arguments printed on this page are the opinions of the authors and are not checked for accuracy by any City agency.

**PERSONS SIGNING ARGUMENT AGAINST PROPOSITION SP**

JON COUPAL
President
Howard Jarvis Taxpayers Association

MICHAEL D. ANTONOVICH
Los Angeles County Supervisor
Ret., 1980-2016

JACK HUMPHREVILLE
Neighborhood Council Budget Advocate

**REBUTTAL TO THE ARGUMENT AGAINST PROPOSITION SP**

Let's be clear: Measure SP has nothing to do with the Olympics.

The Olympics aren't mentioned in Measure SP or its expenditure plan. That false argument is bad-faith politics.

Measure SP funds can only be spent on one thing: keeping LA's 1,100 neighborhood parks, playgrounds, senior, recreation, youth and community centers clean and safe.

More than 100,000 LA kids rely on safe places to play for afterschool and summer programs, which are essential for reducing gang activity and helping kids stay on the right track.

Angelenos of all ages, from all neighborhoods, rely on local parks, senior centers, recreation centers and community centers, all the time.

Funding from 1996 is running out. It's time to renew local funding to improve public safety, address homelessness and make sure these important public places are safe and clean for all of us to use.

Vote Yes on SP – we all need Safe Parks!

Arguments printed on this page are the opinions of the authors and are not checked for accuracy by any City agency.

**PERSONS SIGNING REBUTTAL TO THE ARGUMENT AGAINST PROPOSITION SP**

JOE BUSCAINO
Councilmember
City of Los Angeles

STEPHANIE VENDIG
President
Los Angeles Federation of
Senior Citizen Clubs

EDWARD JAMES OLMOS
Actor

CANDICE DICKENS-RUSSELL
President and CEO
Friends of the Los Angeles River

KAREN BASS
Member of Congress

EVELYN HERNANDEZ
Health Educator
Wilmington Community Clinic

RICK CARUSO
Businessman

REV. SHANE B. SCOTT
Senior Pastor
Macedonia Baptist Church, Watts

TONY BROWN
CEO
Heart of Los Angeles Programs for
Underserved Youth

TRACY QUINN
President and CEO
Heal the Bay

## PROPOSITION SP

### TEXT OF THE PROPOSED BALLOT MEASURE

### ORDINANCE NO. _____

An ordinance amending Chapter II of the Los Angeles Municipal Code to add Article 1.18, that will fund the rehabilitation, remediation, improvement, development, addition, and acquisition of parks, recreational centers, pools, playgrounds, waterways, beaches, green spaces, open spaces, childcare and other facilities, along with their operation and maintenance, through the imposition of a special parcel tax on improved real property parcels within the City of Los Angeles (City).

**WHEREAS,** in 1996, the voters of the City adopted Proposition K: LA For Kids Program (Proposition K) which created a citywide assessment district to fund the acquisition, development, improvement and restoration of parks and recreational facilities in the City and fund City park programs and services;

**WHEREAS,** the Proposition K program assessment is set to expire in the 2026-27 fiscal year and result in the loss of funding to support parks and recreational facilities and park programs and services within the City;

**WHEREAS,** on May 23, 2022, the City Administrative Officer issued a report (CAO Report) in response to two City Council motions directing staff to report on options for establishing a new citywide assessment program for parks and recreational facilities to fund approximately $4.6 billion worth of improvements and new developments, as estimated by the Department of Recreation and Parks;

**WHEREAS,** the CAO Report outlined various revenue options to fund park facilities and park operations such as a parcel tax, a sales (transaction and use) tax, general obligations bonds, and a gross receipts tax;

**WHEREAS,** at its June 21, 2022, meeting, the City Council further identified funding needs for other potential projects related to the Los Angeles Zoo, Sepulveda Basin, Los Angeles River, civic center green spaces and other improvements to venues, open spaces and waterways in the City, while emphasizing that all projects that are to be funded include equity considerations to address park poor neighborhoods and communities;

**WHEREAS,** given the upcoming expiration of Proposition K and other priority endeavors in the City to address homelessness, public safety, infrastructure improvements, and an increasingly precarious economy, new funding must be accessed;

**WHEREAS,** to secure the funding needs for parks, recreational centers, pools, playgrounds, waterways, beaches, green spaces, open spaces, childcare and other facilities, along with their operation and maintenance in an equitable manner, without any preset funding levels or commitments, the City Council proposes the placement of a "Parks and Recreational Facilities Parcel Tax" before the voters;



**WHEREAS,** an imposition of a special parcel tax would provide a source of funding for parks, recreational centers, pools, playgrounds, waterways, beaches, green spaces, open spaces, childcare and other facilities, along with their operation and maintenance;

**WHEREAS,** the deployment of the special tax funds will be prioritized based on the City's equity index with the goal of providing park poor communities with safe healthful access to parks and recreational facilities; and

**WHEREAS,** a citizens oversight committee and an administrative oversight committee will be established to ensure that the revenue from the special parcel tax are used for the purposes described and authorized by the voters.

NOW THEREFORE,

**THE PEOPLE OF THE CITY OF LOS ANGELES
DO ORDAIN AS FOLLOWS:**

Section 1. Article 1.18 is added to Chapter II of the Los Angeles Municipal Code to read as follows:

**ARTICLE 1.18**

**PARKS AND RECREATIONAL FACILITIES PARCEL TAX**

**SEC. 21.18.1. TITLE.**

This article may be referred to as the Parks and Recreational Facilities Parcel Tax.

**SEC. 21.18.2. DEFINITIONS.**

The following words and phrases whenever used in this article shall be construed as defined in this section:

(a)    "**AMI**" shall mean the Area Median Income or Area Median Household Income as determined and amended by HUD, as applied to the City of Los Angeles.

(b)    "**Capital Programs**" shall mean the addition, rehabilitation, remediation, improvement, replacement, development, or acquisition of real property, equipment, fixtures, or improvements.

(c)    "**City**" shall mean the City of Los Angeles, a municipal corporation.

(d)    "**City Open Spaces and Recreational Venues**" shall mean City owned open spaces and recreational venues in the City, which shall include but not be limited to civic center green spaces, recreational venues, museums, and theaters such as the Los Angeles Zoo and others.

(e)    "**City Waterways and Water Elements**" shall mean rivers, waterways, tributaries, lakes, dams, reservoirs, embankments, beaches, and other locations of water that

are within the control of the City and used for recreation, including but not limited to the Los Angeles River and the Sepulveda Basin.

(f)     **"County"** shall mean the County of Los Angeles.

(g)     **"Fiscal Year"** shall mean the fiscal year of the City as defined under Vol 1, Art. III, Sec. 310 of the City Charter.

(h)     **"HUD"** shall mean the U.S. Department of Housing and Urban Development, or its successor department or agency.

(i)     **"Low Income"** shall mean a household with an annual income of 80 percent of AMI or less.

(j)     **"Owner"** shall mean the person owning, claiming, possessing, or controlling the Parcel as of the lien date.

(k)     **"Parcel"** shall mean any unit of real property designated by an assessor's parcel map and parcel number as shown on the last equalized assessment roll of the County of Los Angeles.

(l)     **"Parcel Improvement"** shall mean any building, structure, enclosure, facility, or other improvement erected on or affixed to a parcel as shown on the last equalized assessment roll of the County of Los Angeles.

(m)     **"Park Facilities"** shall mean park and recreational sites in the City that include but are not limited to regional parks, recreation centers, pools and bathhouses, restrooms, childcare facilities, senior centers, lakes, trails, picnic areas, playgrounds, community school park facilities, park ranger facilities, athletic fields and courts, and other open public spaces.

(n)     **"Person"** shall mean an individual, corporation, partnership, trust or estate, joint-stock company, association, limited liability company, syndicate, group, pool, joint venture or other unincorporated organization or group as the context may require.

(o)     **"Special Parcel Tax"** shall mean the special tax imposed by this article.

## SEC. 21.18.3. SPECIAL PARCEL TAX.

(a)     Except as otherwise provided under this article, there is hereby imposed a Special Parcel Tax on every parcel within the City. The Special Parcel Tax shall be imposed each Fiscal Year, beginning with the Fiscal Year 2023-24.

(b)     The Special Parcel Tax constitutes a debt owed by the Owner to the City.

## SEC. 21.18.4. SPECIAL PARCEL TAX RATE.

(a)     The Special Parcel Tax Rate to be imposed on each parcel shall be $0.08414 per square footage of Parcel Improvement or fractional part thereof.

(b)      The Special Parcel Tax Rate imposed on a Parcel under paragraph 21.18.4(a) shall be reduced to $0.0222 per square footage of Parcel Improvement or fractional part thereof on the earlier of the Fiscal Year that follows the Fiscal Year in which the Capital Programs related to City Open Spaces and Recreational Venues, City Waterways and Water Elements, and/or Park Facilities are complete, as determined by City Council, or the Fiscal Year beginning 2053-54.

(c)      City Council may, by ordinance, establish a Special Parcel Tax Rate less than the rate provided in subsections (a) or (b).  Following any such decrease in the Special Parcel Tax rate, the City Council may, by ordinance, increase the Special Parcel Tax rate to an amount not to exceed the rate provided in Subsection (a), subject to the provisions of Subsection (b).

### SEC. 21.18.5.  COLLECTION OF THE SPECIAL PARCEL TAX.

(a)      Unless the City Council seeks another method for collection of the Special Parcel Tax, such tax shall be levied and collected by the County at the same time and manner, and subject to the same penalties, and interest as ad valorem property taxes collected by the County.

(b)      If the City Council selects collection by the County, the Special Parcel Tax shall be imposed on the ad valorem property tax bill for the Fiscal Year beginning July 1.  The Special Parcel Tax shall be first imposed no sooner than the ad valorem property tax bill for the Fiscal Year beginning July 1, 2023.

### SEC. 21.18.6.  EXEMPTIONS.

(a)      The following Parcels shall be exempt from the Special Parcel Tax imposed under this article:

(1)      a Parcel upon which the imposition of the Special Parcel Tax would be in violation of either the Constitutions of the United States or the State of California;

(2)      a Parcel having an Owner that is the federal government, a state government, local government, or any federal, state, or local government agency or district;

(3)      a Parcel having an Owner that is a non-profit organization or entity owned or controlled by a non-profit organization satisfying the requirements of California Revenue and Taxation Code Section 214, as amended; and

(4)      a Parcel having an Owner who is a Low Income household.

(b)      The City, in a separate ordinance, shall establish the procedures and guidelines for Owners to apply for, and be granted, the exemptions identified in this section.  Owners who claim an exemption may be required to submit information annually to substantiate their continuing qualification for the exemption.



### SEC. 21.18.7. PARK AND RECREATIONAL FACILITIES SPECIAL PARCEL TAX FUND.

There is hereby established a special fund in the City Treasury entitled "Parks and Recreational Facilities Special Parcel Tax Fund" (**Fund**). Monies collected from the Special Parcel Tax under this article, including penalties and interest, shall be deposited into the Fund. Monies deposited in the Fund shall not be subject to reversion to the Reserve Fund, established under Charter Section 302. Monies of the Fund may be deposited in an interest bearing account. All interest earnings generated by monies of the Fund shall remain in it and be used only for the purpose for which the Special Parcel Tax in this article is imposed. The City may establish separate accounts or subaccounts within the Fund to the extent needed to account for the uses permitted under this article.

### SEC. 21.18.8. PURPOSE OF THE SPECIAL PARCEL TAX.

(a)    Monies in the Fund shall, without any preset spending levels or commitments, be used for:

(1)    Capital Programs related to City Open Spaces and Recreational Venues, City Waterways and Water Elements, and/or Park Facilities, such Capital Programs to take into account the City's equity index, as amended from time to time by the City, with the goal of providing park poor communities access to City Open Spaces and Recreational Venues, City Waterways and Water Elements, and/or Park Facilities;

(2)    furnishings, accessories, trash and recycling receptacles and other equipment to be used at City Open Spaces and Recreational Venues, City Waterways and Water Elements, and/or Park Facilities;

(3)    the cost to operate and maintain City Open Spaces and Recreational Venues, City Waterways and Water Elements, and/or Park Facilities;

(4)    the cost to operate and maintain recreational orientated programs at City Open Spaces and Recreational Venues, City Waterways and Water Elements, and/or Park Facilities; and

(5)    lease payments under any lease entered into to support lease revenue bonds that finance any of the purposes described under subparagraphs (1) and (2) of this section and to pay any costs or expenses reasonably related thereto.

(b)    Monies in the Fund may be used to pay the costs of audits with respect to the uses of the monies in the Fund, including preparation of the Annual Report and other reports under Section 21.18.11.

(c)    Monies in the Fund may be used to pay for the costs of administering the Special Parcel Tax, regardless of how or by what entity those administrative services are provided. No more than 10 percent of the Special Parcel Tax deposited into the Fund in any Fiscal Year may be used to pay for such administrative costs. Administrative costs include, but are not limited to:



(1)     costs associated with administering, monitoring, and enforcing compliance with this article.  Such costs include, but are not limited to, refunds, audits, adjustments, any expenses, including attorneys' fees, associated with any proceedings needed to enforce the requirements of this article;

(2)     costs associated with developing ordinances and regulations to implement this article;

(3)     costs associated with the operations of the oversight committees described in Sections 21.18.9 and 21.18.10; and

(4)     costs associated with the collection of the Special Parcel Tax through the County or by any other method of collection of the Special Parcel Tax as may be selected by the City Council.

(d)     If this article or the use of the Special Parcel Tax is legally challenged, monies from the Fund may be used to reimburse the City for its legal defense, including attorneys' fees and other expenses.

### SEC. 21.18.9.  CITIZENS OVERSIGHT COMMITTEE.

A Citizens Oversight Committee shall be established by ordinance to make recommendations on projects to be funded from the Special Parcel Tax and the Fund and to monitor the implementation and performance of the projects, programs, and services funded by the Special Parcel Tax and the Fund.  Such recommendations shall consider the City's equity index, as amended from time to time by the City, with the goal of providing park poor communities access to City Open Spaces and Recreational Venues, City Waterways and Water Elements, and/or Park Facilities.

### SEC. 21.18.10.  ADMINISTRATIVE OVERSIGHT COMMITTEE.

(a)     An Administrative Oversight Committee shall be established by ordinance to review, amend, and adopt any project recommendations prepared by the Citizens Oversight Committee based on funding priorities and awards.

(b)     The Administrative Oversight Committee shall consist of the Mayor, City Administrative Officer, and Chief Legislative Analyst, or their respective designees.

### SEC. 21.18.11.  ANNUAL REPORT.

The Controller shall (i) prepare and present to the City Council an annual report identifying all receipts into and all expenditures out of the Fund in accordance with Section 50075.3 of the California Government Code or successor provision, and (ii) prepare and provide to the relevant State authority any information required under Section 12463.2(b) of the California Government Code or successor provision.

### SEC. 21.18.12.  REFUNDS AND ADJUSTMENTS.

The City shall establish procedures and guidelines relating to refunds, exemptions,

adjustments, delinquencies, appeals, and other processes and procedures.

### SEC. 21.18.13. AMENDMENTS.

This article may only be amended by a vote of the people if the amendment would result in the Special Parcel Tax being imposed, extended, or increased in a manner not originally approved by the voters. City Council is hereby authorized to amend this article provided such amendment does not require voter approval.

### SEC. 21.18.14. SUBMISSION TO VOTERS.

The ordinance enacting this article shall be submitted to the voters of the City.  The Special Parcel Tax proposed by this article shall be levied only if the ordinance is approved by a vote of not less than two-thirds of the voters voting. If the ordinance is approved by the requisite number of voters, the article shall thereafter be considered part of the Los Angeles Municipal Code.

### SEC. 21.18.15. SEVERABILITY CLAUSE.

If any section, clause, sentence, phrase, or portion of this article is held unconstitutional or invalid by any court or tribunal of competent jurisdiction, the remaining sections, clauses, sentences, phrases, or portions of this article shall remain in full force and effect, and to this end the provisions of this article are severable.  In addition, the voters declare that they would have passed all sections, clauses, sentences, phrases, or portions of this article without the section, clause, sentence, phrase or portion held unconstitutional or invalid.

## ULA
**FUNDING FOR AFFORDABLE HOUSING AND TENANT ASSISTANCE PROGRAMS THROUGH A TAX ON REAL PROPERTY TRANSFERS OVER $5 MILLION. INITIATIVE ORDINANCE ULA.**

Shall an ordinance funding and authorizing affordable housing programs and resources for tenants at risk of homelessness through a 4% tax on sales/transfers of real property exceeding $5 million, and 5.5% on properties of $10 million or more, with exceptions; until ended by voters; generating approximately $600 million - $1.1 billion annually; be adopted?

### IMPARTIAL SUMMARY
### BY SHARON M. TSO, CHIEF LEGISLATIVE ANALYST

This citizen-sponsored ballot initiative would amend City law to add a tax on the sale or transfer of real property valued over $5 million to fund affordable housing and tenant assistance programs. The City collects a tax on the sale or transfer of property. The proposed ordinance would impose an additional tax as follows:

- A 4 percent tax on the sale and transfer of real property valued over $5 million but less than $10 million; and

- A 5.5 percent tax on the sale and transfer of real property valued at $10 million or greater.

The property value threshold subject to the tax would be adjusted annually based on the Chained Consumer Price Index. Qualified affordable housing and government entities would be exempt from the tax.

This tax is estimated to generate $600 million to $1.1 billion annually. At least 92 percent of the proceeds from the tax would fund affordable housing under the Affordable Housing Program and tenant assistance programs under the Homeless Prevention Program. No more than 8 percent would fund program administration, reporting, compliance, and implementation.

This measure's goals include increasing the supply of affordable housing, addressing the need for tenant protections and assistance programs, and building organizational capacity of organizations serving low-income and disadvantaged communities, among others.

The Affordable Housing Program would fund the development of affordable housing to serve acutely low, very low, and low-income households. Housing units would be affordable for 55 years or permanently, if permitted by law, and be subject to resale restrictions.

This program would fund affordable housing, including:

- Development of multifamily housing;
- Alternative housing solutions that can include new supportive and affordable rental or mixed rental/homeownership projects, with up to 20 percent of the units

available at market rate and 20 percent set aside for acutely or extremely low-income households;
- Acquisition, preservation, lease, rehabilitation, or operation of affordable housing; and
- Homeownership opportunities, capacity-building for Community Land Trusts and similar organizations, operating assistance, and rental subsidies.

The Los Angeles Housing Department (LAHD) would have authority to approve funding of up to $50 million per project without City Council review and approval. The measure would require payment of prevailing wages and housing developments with 40 or more units would need to comply with certain project labor agreements. If a project results in displacement of a tenant, relocation assistance and right of first refusal for a comparable unit in the development would apply.

The Homeless Prevention Program would fund resources such as:

- Rental and income assistance;
- Eviction defense and prevention programs;
- Tenant outreach and education;
- Tenant harassment protections; and
- A Tenant Council, comprised of tenants and currently homeless individuals living in the City. Members with diverse backgrounds would be appointed by the Mayor, subject to approval of the City Council. The Tenant Council would advise LAHD, the Citizens Oversight Committee, and City Council on activities related to tenant protections and fair housing.

This measure creates a 15-member Citizens Oversight Committee, comprised of 13 voting members and two advisory youth members. Members with diverse backgrounds and expertise would be appointed by the Mayor, subject to approval of the City Council. The committee would make recommendations to the City Council on funding guidelines, conduct housing-needs assessments, monitor program implementation, and audit fund expenditures.

LAHD would provide an annual Expenditure Plan to the Citizens Oversight Committee and the City Council with projected revenue and expenditures for at least three years. Funds must be expended within a specified timeline and may be periodically reallocated among categories in accordance with need, subject to certain procedures.

This measure will become effective if approved by a majority of voters.

**FINANCIAL IMPACT STATEMENT**
**BY MATTHEW W. SZABO, CITY ADMINISTRATIVE OFFICER**

This measure establishes a special tax within the City of Los Angeles, imposed on all property types valued at $5,000,000 or more when sold or when legal ownership is transferred, to fund affordable housing and tenant assistance programs. Certain affordable housing organizations may qualify for an exemption. The tax rate is determined by the property value at the time of sale or transfer: 4.0 percent tax rate for values of $5,000,000 through $9,999,999, and 5.5 percent for values of $10,000,000 or greater. The value thresholds adjust annually, based on the Consumer Price Index. The special tax imposed is in addition to the existing 0.56 percent combined City and County tax rate on property sales and transfers.

Annual revenue from the special tax, estimated between $600 million and $1.1 billion, will fluctuate according to the respective number of property sales and transfers with values above $5 million and $10 million.

**ARGUMENT IN FAVOR OF INITIATIVE ORDINANCE ULA**

As homelessness and housing experts, we encourage you to vote YES on Initiative Ordinance ULA to <u>reduce homelessness</u> and protect seniors.

Initiative Ordinance ULA gives us a new and powerful opportunity to actually move people off of the streets and into housing. It would also prevent many low-income seniors from losing their homes when they are at-risk of homelessness.

Here's how it works: When someone sells a mansion or other real estate worth more than $5 million, Initiative Ordinance ULA would invest a small percentage of that revenue back into our communities.

The money would be used to reduce homelessness, create more affordable housing, and provide **financial aid and eviction protection to low-income seniors,** veterans, people with disabilities, and other Angelenos at risk of homelessness.

**This measure is unlike anything we've tried before.** Based on 2021-2022 real estate sales, Initiative Ordinance ULA could generate around $900 million every year. Initiative Ordinance ULA will go to work quickly by purchasing existing buildings and cutting red tape to create more affordable housing. The measure will also provide support to seniors and people with disabilities who have difficulty keeping up with housing costs.

At the same time, Initiative Ordinance ULA only impacts a small fraction of properties. It would have applied to only 3% of all real estate sales in 2019 (those selling for more than $5 million). Let's be clear: **Only people selling real estate for more than $5 million will pay this tax. No one else will.**

You can tell a lot about a measure based on who supports it and who doesn't. **Initiative Ordinance ULA was drafted by homeless service providers, affordable housing nonprofits, labor unions, and renters' rights groups.** It is endorsed by over 175 organizations, including the ACLU of Southern California and the Democratic Party of LA County.

On the flip side, we know real estate speculators, corporate developers, and the folks selling $50 million condos don't love our measure. For them, LA's real estate market is a big business that generates billions of dollars.

The bottom line is this: Millionaires and billionaires cashing in on mega properties can afford to pay the "mansion tax," and we'll all benefit from reduced homelessness when they chip in and pay their fair share.

---

| Arguments printed on this page are the opinions of the authors and are not checked for accuracy by any City agency. |
| --- |

Let's talk about oversight, because we think it's important. Unlike past efforts, this measure would create sustained funding to reduce homelessness with **oversight from an independent board of homelessness and housing experts** and a dedicated inspector general.

No politician who currently holds elected office will be allowed on the board.

We're homelessness service providers and housing experts, but we're also renters, homeowners, parents, and Los Angeles residents. We are as concerned as you are about the state of our city. That's why we support Initiative Ordinance ULA and ask you to vote yes.

Yes to reduce homelessness.

Yes to protect low-income seniors and people with disabilities.

Yes to a city that is more affordable for our grandparents, our kids, and our neighbors.

**Yes to Initiative Ordinance ULA.**

### PERSONS SIGNING ARGUMENT IN FAVOR OF INITIATIVE ORDINANCE ULA

STEVE DIAZ
Skid Row Homeless Service Provider

TAKAO SUZUKI
Little Tokyo Affordable Housing Provider

NORA HERNANDEZ
South Los Angeles Renter

ELI LIPMEN
West Adams Homeowner

ANTONIO SANCHEZ
Labor Leader

Arguments printed on this page are the opinions of the authors and are not checked for accuracy by any City agency.

**REBUTTAL TO THE ARGUMENT IN FAVOR OF INITIATIVE ORDINANCE ULA**

**DON'T BE FOOLED. TENANTS AND CONSUMERS WILL PAY THIS TAX.**

Vote NO on Initiative Ordinance ULA because it isn't just a 4% tax on "mansions," it's a 4% tax on any property in L.A. that sells for more than $5 million. It will make the purchase of apartment buildings more expensive, and that will push housing costs higher as tenants pay this tax through higher rents. It's also a tax on the sale of supermarkets, restaurants and shopping centers. The cost of living in L.A. is already too high, and Initiative Ordinance ULA will lead to higher prices for consumers.

**IT'S NOT ONLY A HUGE TAX HIKE, IT'S A HUGE 'NEW AND POWERFUL' BUREAUCRACY.**

Vote NO on Initiative Ordinance ULA because it will raise taxes by an estimated $800 million to $1 billion every year, and the money goes to a new bureaucracy run by unelected, unaccountable appointees who claim to be "experts" in homeless housing and services. Los Angeles voters already approved $1.2 billion in borrowed money to build housing for the homeless (Measure HHH) and also approved a county sales tax increase for homeless services (Measure H). These higher taxes have been in effect for five years. The problem of homelessness has only gotten worse, while the money has been wasted on high-salaried bureaucrats and housing costing an astounding average of more than $600,000 per unit.

**ANOTHER BLOATED BUREAUCRACY, BUT NO PLAN TO FIX HOMELESSNESS.**

Vote NO on Initiative Ordinance ULA because we're already paying for one bloated and inefficient bureaucracy, the Los Angeles Homeless Services Authority. This measure creates another one! It would have a 13-member governing board plus a tenant council, but none of the members of the board would be representatives of taxpayers' interests. Just the administrative costs for this new bureaucracy would be $640 million over ten years! And there's no plan to fix homelessness.

**NOT ONE PENNY CAN BE SPENT TO HELP GET PEOPLE OFF THE STREETS RIGHT NOW.**

Vote NO on Initiative Ordinance ULA because it does not allow any of the money from this tax increase to be spent on emergency shelters or temporary housing. This tax is NOT a plan to fix homelessness. It is a plan to help a select few developers and homeless service organizations take control of all the money from a tax increase on real estate sales. Can you guess who paid to collect the signatures to put this measure on the ballot?

**VOTE NO ON INITIATIVE ORDINANCE ULA.**

---

> Arguments printed on this page are the opinions of the authors and are not checked for accuracy by any City agency.

For More Information:
Howard Jarvis Taxpayers Association
213-384-9656
info@hjta.org
**www.NoNewTaxes.net**

**No Plan. No Way. Vote No on ULA.**
Angelenos for Affordability
info@VoteNOonULA.com
**www.VoteNOonULA.com**

**PERSONS SIGNING REBUTTAL TO THE ARGUMENT IN FAVOR OF INITIATIVE ORDINANCE ULA**

JON COUPAL
President
Howard Jarvis Taxpayers Association

ANDY BALES
President and CEO
Union Rescue Mission

MICHAEL D. ANTONOVICH
Los Angeles County Supervisor
1980-2016, Ret.

JACK HUMPHREVILLE
Neighborhood Council Budget Advocate

DR. RUBEN GUERRA, PH.D.
Chairman and CEO
Latin Business Association

GREGORY PLUMMER
Minority Small Business Owner

DANIEL M. YUKELSON
Executive Director
Apartment Association of Greater
Los Angeles

Arguments printed on this page are the opinions of the authors and are not checked for accuracy by any City agency.

### ARGUMENT AGAINST INITIATIVE ORDINANCE ULA

**VOTE NO ON INITIATIVE ORDINANCE ULA, another TAX INCREASE to "solve" homelessness.**

L.A. voters have already raised taxes TWICE for homeless housing and services. The $1.2 billion in borrowed money for Measure HHH was supposed to build 10,000 units of housing, but so far it has failed. Our tax dollars have been wasted on bloated projects that cost roughly $600,000 per unit. Measure H raised the sales tax in L.A. County for services that would help to end homelessness. In the last five years since both measures have been in effect has homelessness in the City gotten better or worse?

**VOTE NO ON INITIATIVE ORDINANCE ULA because it will be the largest tax increase in L.A. history, and consumers will pay it.**

Initiative Ordinance ULA is a huge tax increase on real estate sales. It doesn't just affect the owners of mansions. A 4% tax on the sale of properties valued above $5 million will hit housing providers, making the purchase of apartment buildings more expensive. Who pays for that? Tenants, through higher rents. It's also a tax on the sale of supermarkets, movie theaters, shopping centers, self-storage facilities, and restaurants. Who pays for that? Consumers, through higher prices.

**VOTE NO ON INITIATIVE ORDINANCE ULA because it creates another huge bureaucracy.**

Los Angeles taxpayers already pay the salaries for a huge bureaucracy that's supposed to be solving homelessness, the Los Angeles Homeless Services Authority. Many LAHSA employees collect six-figure salaries. Why should we pay for a new bureaucracy full of high-salaried paper pushers figuring out how to spend tax dollars on new contracts? No wonder some Angelenos call the current system the "Homeless Industrial Complex."

**VOTE NO ON INITIATIVE ORDINANCE ULA because it establishes two new government boards…and more bureaucracy.**

It creates a 13-member committee plus a tenant council. These board members will be unelected and unaccountable to anyone. They will also be able to hire costly outside consultants, and no members of the committee will be drawn from groups representing taxpayers' interests.

---

Arguments printed on this page are the opinions of the authors and are not checked for accuracy by any City agency.

**VOTE NO ON INITIATIVE ORDINANCE ULA because it has been estimated that only half of its revenue would go toward construction and rehabilitation of affordable housing.**

It's also estimated that about a quarter of the measure's funding would go toward income assistance and subsidies. Another big chunk – $640 million over ten years – would go toward "administrative costs."

**VOTE NO ON INITIATIVE ORDINANCE ULA because there isn't a plan to fix homelessness.**

A real solution to homelessness must address all the causes and crises that lead to the unacceptable tragedy of people living and dying on the sidewalks. A real solution requires a comprehensive policy that includes adequate facilities and services for mental health care and treatment for substance use disorder, as well as services for victims of domestic violence. Housing is only one part of a comprehensive solution. ULA continues the failed status quo that can't even keep up with increases in the homeless population.

**VOTE NO ON INITIATIVE ORDINANCE ULA because it denies funding to emergency shelters.**

Initiative Ordinance ULA would raise taxes by roughly $8 billion over 10 years but not one dime may be spent on building temporary housing or emergency shelters to get people safely off the streets to find the care they need. This exclusion tells the story, doesn't it? This tax is all about helping a select few developers, not the homeless.

**VOTE NO ON INITIATIVE ORDINANCE ULA.**

For More Information:
Howard Jarvis Taxpayers Association
213-384-9656
info@hjta.org
**www.NoNewTaxes.net**

**No Plan. No Way. Vote No on ULA.**
**www.VoteNOonULA.com**

Arguments printed on this page are the opinions of the authors and are not checked for accuracy by any City agency.

**PERSONS SIGNING ARGUMENT AGAINST INITIATIVE ORDINANCE ULA**

JON COUPAL
President
Howard Jarvis Taxpayers Association

MICHAEL D. ANTONOVICH
Los Angeles County Supervisor
Ret., 1980-2016

JACK HUMPHREVILLE
Neighborhood Council Budget Advocate

GREGORY PLUMMER
Minority Small Business Owner

DANIEL M. YUKELSON
Executive Director
Apartment Association of Greater
Los Angeles

### REBUTTAL TO THE ARGUMENT AGAINST INITIATIVE ORDINANCE ULA

The opposition gets a lot of the basics wrong, which is unsurprising given that many of them are real estate developers—not homelessness experts.

**ULA is a new approach drafted by homelessness experts to have an immediate impact. Here's how it's different:**

- ULA invests in innovative solutions that will create housing faster and at a lower cost than what has been tried before. This includes purchasing and converting existing properties like motels and hotels.
- ULA will prevent new homelessness before it even starts, raising an estimated $240 million per year to protect seniors, people with disabilities, and others at risk of homelessness (based on 2021-2022 data).
- Over the next ten years, Measure ULA will raise more resources to address homelessness than the City of LA has ever had before.
- It will be paid for by millionaires and billionaires. Unlike past measures, the majority of people in LA will not pay a single penny.
- ULA will be overseen by an independent board of experts, not politicians.

**ULA was written by renters rights advocates, affordable housing providers, and labor unions who care more about working families in Los Angeles than your average real estate mogul.**

- Every time someone asks the ultra wealthy to pay taxes, they resort to scare tactics. Don't fall for it.
- According to the LA County assessor's office, LA County property got $122 billion more valuable last year. And yet this tax would have applied to only 2.5% of home and condo sales in 2021-2022. The millionaires and billionaires cashing in can afford to pay their taxes.
- Our opponents argue that a tax on multi-million dollar real estate will trickle down to renters. Don't let scare tactics obscure the facts. Real estate billionaires and corporations are against our ballot measure because it will require them to foot the bill for affordable housing.

**They want you to pass up this opportunity to do something about homelessness. Here's why LA can't wait:**

- 80% of seniors in Los Angeles are rent burdened, according to UCLA Center for Health Policy Research. ULA will help protect low-income seniors at risk of homelessness.

---

| Arguments printed on this page are the opinions of the authors and are not checked for accuracy by any City agency. |
| --- |

- Every day, 227 people in LA become homeless, based on the official results of the 2020 homeless count. If ULA were passed last year, it would have raised $240 million to prevent homelessness and $565 million to build housing for people experiencing homelessness.
- The measure also provides funding to help protect renters. Annually, ULA could provide an estimated 5,100 households with emergency rental assistance, nearly 13,000 households with income support, and an estimated 23,000 households with legal counsel and eviction defense.

Just like you, we are frustrated by the lack of affordable housing and ineffective solutions to housing the homeless population. This is why we took action and wrote Measure ULA.

**Vote YES on ULA to <u>substantially</u> reduce homelessness with comprehensive strategies that have never been executed before at this scale.**

### PERSONS SIGNING REBUTTAL TO THE ARGUMENT AGAINST INITIATIVE ORDINANCE ULA

STEVE DIAZ
Skid Row Homeless Service Provider

TAKAO SUZUKI
Little Tokyo Affordable Housing Provider

NORA HERNANDEZ
South Los Angeles Renter

ELI LIPMEN
West Adams Homeowner

ANTONIO SANCHEZ
Labor Leader

Arguments printed on this page are the opinions of the authors and are not checked for accuracy by any City agency.

**INITIATIVE ORDINANCE ULA**

FUNDING FOR AFFORDABLE HOUSING AND TENANT ASSISTANCE PROGRAMS
THROUGH A SPECIAL TAX ON REAL PROPERTY TRANSFERS OVER $5 MILLION.
INITIATIVE ORDINANCE.

The proposed ordinance would establish and authorize programs to increase affordable
housing and provide resources to tenants at risk of homelessness. Programs would be funded
through an additional tax on sales and transfers of real property exceeding certain thresholds.
The tax rate would be 4% of the consideration or value when the property transferred exceeds
$5 million but is less than $10 million, and 5.5% when the property transferred is $10 million
or more. Qualified affordable-housing organizations would be exempt from the new tax.
Program funds would be allocated primarily for supportive and affordable housing programs,
including development, construction, acquisition, rehabilitation, and operation of housing.
Funds also would be allocated for financial, educational, and other resources to low-income
and other tenants at risk of homelessness, displacement, or eviction. The ordinance would
create a Citizen Oversight Committee to develop funding guidelines, conduct housing-needs
assessments, monitor program implementation, and audit fund expenditures.

**TEXT OF THE PROPOSED BALLOT MEASURE**

**ORDINANCE NO.** _____

**THE PEOPLE OF THE CITY OF LOS ANGELES
DO ORDAIN AS FOLLOWS:**

**Los Angeles Program to Prevent Homelessness and Fund Affordable Housing ("House
LA")**

**SECTION 1:** The People of the City of Los Angeles hereby find:

a.    Rising rents, widespread tenant evictions and a lack of affordable housing have made
Los Angeles the city with the worst housing and homelessness crisis in the country.

b.    A household is considered cost burdened when they are paying more than 30% of their
household income on housing costs. In 2019, the City of Los Angeles ("the City" or "City")
had a higher percentage of cost-burdened renter households (59%) than any other major
American city. About 32% of City renters are severely cost-burdened, meaning they spend
over 50% of their income on rent. As families overspend on housing costs, they have less
in their budget for health care, childcare, education, healthy food, savings and retirement,
and other household costs. In addition to impacting the health, education, and economic
outcomes of the City's residents, this has far-reaching economic impacts as Angelenos
spend less at local businesses. Furthermore, young people and people in Lower Income
Households are leaving the region specifically due to high housing costs, a dynamic that
regional economists have cited as a key concern for the City's prospects for economic growth
and that local businesses are contending with as they search for employees.

c.    Among the 42% of City seniors (people aged 65 years and older) who rent, 65% are cost burdened. Among the 58% of seniors who own their homes, more than 38% are cost burdened. Longstanding housing unaffordability strains residential stability particularly for young people, seniors, people in Lower Income Households, and their communities. The two age groups in the City with the highest rates of rent burden are young people aged 18-24 years and seniors aged 65 years and older.

d.    One of the primary dynamics underlying the housing crisis is that rents are increasing faster than wages. The median household income in 2019 was $62,142, less than that of the county or state. Twenty-two percent of City families make less than $25,000/year and 42% make less than $50,000/year. Wages have fallen far behind the cost of living in the City; the top five projected occupations through 2028 all have a median income of less than $31,250, indicating an urgent need for housing for people in Acutely, Extremely and Very Low Income Households.

e.    The COVID-19 pandemic has further exacerbated housing instability among the City's lowest wage earners and makes them more susceptible to falling into homelessness.

f.    In 2020, 41,290 people were experiencing homelessness in the City of Los Angeles. About 70% of this population remains unsheltered, living on the sidewalks, under the bridges, and in the parks of the City. This has amounted to a humanitarian crisis, largely caused by government inaction.

g.    Despite a sustained increase in effectively housing people who are unhoused in the City of Los Angeles, in 2020, there was a 16.1% increase (to 41,290) homeless persons in the City, largely because of the economic pressures of lost jobs, evictions or rising rents. Effective preventative interventions, including significantly increasing the production of affordable and supportive housing and strengthening tenant protections, could dramatically reverse this pattern and reduce the number of persons who are experiencing homelessness on our streets.

h.    An estimated 30,000 formal evictions are filed in the City of Los Angeles each year and the vast majority of tenants who receive an eviction notice do not have access to an attorney and do not know how to exercise their rights. Eviction cases can be very complicated and technical; it is difficult to successfully defend an eviction case without a lawyer. Providing counsel to people facing eviction can prevent and reduce homelessness; in locales where a right to counsel exists, approximately 86% of represented tenants stay housed.

i.    As rents continue to rise across the City, the incentive is strong to push out tenants in rent-stabilized apartments and harassment is a primary driver of informal evictions.

j.    The lack of access to affordable, healthy, and stable housing is an ongoing issue that will require serious policy interventions and sustained public funding. Despite the City's historic and continued effort to secure and allocate funding for affordable housing, one of the main drivers of this crisis is lack of sufficient revenue to preserve and produce affordable homes and lack of adequate funding to support tenants to stay in their homes.

k.    The City of Los Angeles routinely falls far short of the affordable housing allocations in

its Regional Housing Needs Assessment and will continue to do so without additional policy interventions such as a dedicated funding source.

l.    The City's 2021-2029 Housing Element includes numerous affordable housing and homelessness prevention goals and implementation programs, including: Program 20 to support additional permanent sources of affordable housing and renter protection funding for the City, including options for generating funds locally, including a progressive real estate documentary transfer tax; Program 16 to prioritize public land for new models of affordable housing development and control, including Community Land Trusts or social/public housing; and Program 88 to implement an Eviction Defense Program and evaluate a tenant's "Right to Counsel" Program. New funding for these Programs will help the City comply with its 2021-2029 Housing Element and meet its Regional Housing Needs Assessment obligations for this housing element cycle and in future cycles.

m.    Regular public transit riders primarily in the City of Los Angeles tend to be Acutely, Extremely and Very Low Income; half of bus riders surveyed by the Los Angeles Metropolitan Transportation Authority ("LA Metro") onboard LA Metro's buses earned less than $18,000 per year before the COVID-19 pandemic. Displacement of transit rider households from the City's transit-rich urban areas contributes to drops in transit ridership overall. This negatively impacts the City's air quality and traffic congestion and is a major obstacle in addressing our region's carbon emissions.

n.    Areas of the City with the lowest rate of affordable housing production occur in the City's Highest and High Opportunity ("High Opportunity") areas, which reflect those area's high level of access to economic opportunities, resources, and amenities according to the Opportunity Area Maps from the State of California Tax Credit Allocation Committee and the State of California Housing and Community Development Department. A 2021 report by the City of Los Angeles's Department of City Planning and Housing Departments found that only 6% of subsidized affordable housing was built in the City's High Opportunity areas.

o.    New funding and programs for affordable housing and homelessness prevention are needed to supplement the City's existing funding and programs.

p.    Increasing the Real Property Transfer Tax on the highest priced properties in the City will generate an ongoing revenue source which will allow the City to employ robust tenant stabilization policies and practices to proactively keep vulnerable households from losing their homes and instead build significant numbers of homes that are affordable to the City's Lower Income Households, thereby directly preventing and reducing homelessness across the City and lowering the City's housing costs.

q.    The initiative will protect renters, including seniors in Lower Income Households and persons with disabilities, from being forced into homelessness or otherwise displaced by (a) providing short-term emergency funding to tenant households at risk of becoming homeless; (b) providing income support for rent-burdened at-risk seniors and persons with disabilities; (c) providing tenant outreach, education and navigation services; (d) providing legal services to tenants in Lower Income Households threatened with eviction; and (e) monitoring, enforcing and informing tenants of City protections against tenant harassment.

r.   The initiative will increase the development and preservation of homes affordable to people in Lower Income Households by: (a) Investing in new and existing models of affordable multifamily development; (b) Building on current practices for public or community acquisition of rental housing so as to provide permanent affordability and allow community and/or public sector ownership; (c) Innovating housing production strategies that emphasize permanent affordability, utilize innovative funding strategies, expand ownership methods and use leading edge construction technologies; (d) Using funds for development-based rent subsidies to help create affordable housing options for Extremely Low Income Households; and (e) Ensuring that program funds are invested to not only develop affordable housing but also to foster production creativity and long-term goal setting.

s.   The programs and policies funded through this initiative will be deployed in such a way as to address racial segregation, dismantle racially exclusionary practices, and promote racial equity in housing, academic, and economic opportunities.

t.   Article XXXIV of the Constitution of the State of California ("Article XXXIV") provides that no low-rent housing project shall be developed, constructed, or acquired in any manner by any state public body until a majority of the qualified electors of the city, town or county, as the case may be, in which it is proposed to develop, construct, or acquire the project, voting upon such issue, approve such project by voting in favor thereof at an election to be held for that purpose, or at any general or special election.

u.   The City of Los Angeles and its residents will directly benefit from the development, construction, acquisition, and administration of additional dwelling units for families and households of low income.

v.   It is the intention of the voters in adopting this initiative to ensure that tax proceeds from the Homelessness and Housing Solutions Tax be used to fund the purposes set forth in the House LA Program.

Now THEREFORE, based on these findings, the people declare that the City of Los Angeles adopt the legislation contained herein to protect tenants, produce, and preserve affordable housing, and prevent homelessness.

**SECTION 2**:  Chapter II, Article 1.9 of the City of Los Angeles Municipal Code is hereby amended as follows (with ~~strikethrough~~ indicating deleted text, and <u>underline</u> indicating new text):

### SEC. 21.9.2.  **TAX IMPOSED.**

<u>(a)</u>  There is hereby imposed on each deed, instrument or writing by which any lands, tenements, or other realty sold within the City of Los Angeles shall be granted, assigned, transferred or otherwise conveyed to, or vested in, the purchaser or purchasers, or any other person or persons, by his or their direction, when the consideration or value of the interest or property conveyed (exclusive of the value of any lien or encumbrance remaining thereon at the time of sale) exceeds $100.00, a tax at the rate of $2.25 for each $500.00 or fractional part thereof.

(b)  In addition to and separate from any tax imposed under Subsection (a) of this section, starting on April 1, 2023, there is hereby imposed a tax known as the "Homelessness and Housing Solutions Tax" on each deed, instrument or writing by which any lands, tenements, or other realty sold within the City of Los Angeles shall be granted, assigned, transferred or otherwise conveyed to, or vested in, the purchaser or purchasers, or any other person or persons, by his or their direction, when the consideration or value of the interest or property conveyed (including the value of any lien or encumbrance remaining thereon at the time of sale) exceeds:

    (1)  $5,000,000 but is less than $10,000,000, a tax at the rate of 4% of the consideration or value; or

    (2)  $10,000,000 or greater, a tax at the rate of 5.5% of the consideration or value.

(c)  The Director of Finance for the City of Los Angeles shall adjust the consideration or value thresholds set forth in Subsection (b) of this section adjusted annually based on the Bureau of Labor Statistics Chained Consumer Price Index (C-CPI-U), pursuant to guidelines and procedures he or she establish pursuant to Subsection (c) of Section 21.9.11 of this Code.

### SEC. 21.9.11.  DUTIES OF CLERK.

(a)  The Director of Finance, in his capacity as Tax Collector of the City of Los Angeles, is hereby designated as the officer of the City responsible for maintaining relations with the County of Los Angeles for the purpose of administering the tax imposed under this article and receiving and accounting for the funds collected thereunder.

(b)  If the County of Los Angeles does not collect the a tax due under this article, or any portion of such tax, then the Director of Finance shall have the power and duty to enforce all of the provisions of this article. In such case, the City taxes is are due prior to recordation with the County of Los Angeles of any written instrument subject to the tax and the Director of Finance may make an assessment for taxes not paid in the manner provided in Section 21.16 of this Code, and make refunds as provided in Section 22.13 of this Code.

(c)  The Director of Finance is authorized and empowered, consistent with applicable law and the purposes of this article, to issue any rules and regulations reasonably necessary to enforce and administer this article, including but not limited to regulations further defining the term "realty sold" in Section 21.9.2 of this article and establishing procedures for administering exemptions to the tax imposed under this article. The Director of Finance shall provide reasonable notice prior to the effective date of any rules or regulations promulgated pursuant to this section.

### SEC. 21.9.14.  EXEMPTION—QUALIFIED AFFORDABLE HOUSING ORGANIZATION.

    The Homelessness and Housing Solutions Tax imposed by Subsection (b) of Section 21.9.2 of this Code shall not apply with respect to any deed, instrument or writing by which any lands, tenements, or other realty sold within the City of Los Angeles shall be granted, assigned, transferred or otherwise conveyed to, or vested in, a purchaser or purchasers, or

any other person or persons, by his or their direction if such transferee is: (1) a non-profit entity within Internal Revenue Code Section 501(c)(3); (2) a Community Land Trust, as defined in Section 22.618.2 of the Los Angeles Administrative Code; (3) a Limited-Equity Housing Cooperative, as defined by California Civil Code Section 817; or (4) a limited partnership or limited liability company in which only bona fide nonprofit corporations, Community Land Trusts, and/or Limited-Equity Housing Cooperatives are the general partners or managing members. To qualify for an exemption under this section, the transferees or one of its partners or members must demonstrate a history of affordable housing development and/or affordable housing property management experience, as determined by the Los Angeles Housing Department, or its successor agency, according to a procedure that will be promulgated by the Los Angeles Housing Department, or its successor agency. Community Land Trusts and Limited-Equity Housing Cooperatives may qualify for an exemption under this subsection without demonstrating a history of affordable housing development and/or affordable housing property management experience by (a) partnering with experienced non-profit organizations as the Los Angeles Housing Department, or its successor agency, defines those terms consistently with the purpose of Article 9 of Chapter 24 of Division 22 of the Los Angeles Administrative Code; or (b) recording at the time of acquisition an affordability covenant consistent with Section 22.618.3(d)(1)(i).b. of the Los Angeles Administrative Code.

## SECTION 21.9.15 OTHER EXEMPTIONS.

The Homelessness and Housing Solutions Tax imposed by Subsection (b) of Section 21.9.2 of this Code shall not apply with respect to any deed, instrument or writing by which any lands, tenements, or other realty sold within the City of Los Angeles shall be granted, assigned, transferred, or otherwise conveyed to, or vested in, the purchaser or purchasers, or any other person or persons, if such transferee is:

(a) a non-profit entity within Internal Revenue Code Section 501(c)(3), which received its initial Internal Revenue Service Determination Letter at least ten years prior to the purchase and has assets of less than $1 billion;

(b) the United States or any agency or instrumentality thereof, any state or territory, or political subdivision thereof, or any other federal, state, or local public agency or public entity; or

(c) any other transferee exempt from the City's taxation power under the state or federal Constitutions.

## SEC. 21.9.16.  ADDITIONAL EXEMPTIONS—CITY COUNCIL APPROVAL.

The People of the City of Los Angeles authorize the City Council to enact ordinances, without further voter approval, to exempt from the Homelessness and Housing Solutions Tax imposed by Subsection (b) of Section 21.9.2 of this article property acquired by non-profit organizations to produce income-restricted affordable housing, as the Council may define those terms consistently with the purposes set forth in Article 9 of Chapter 24 of Division 22 of the Los Angeles Administrative Code.

**SECTION 3:** A new Chapter 192 is added to Division 5 of the Los Angeles Administrative Code, as follows:

### SEC. 5.598.1. HOUSE LA FUND.

(a) There is hereby created and established within the Treasury of the City of Los Angeles a special trust fund to be known as the House LA Fund for the deposit and use of all taxes collected pursuant to Subsection (b) of Section 21.9.2 of the Los Angeles Municipal Code. Money in the House LA Fund shall be used exclusively according to the program set forth in Article 9 of Chapter 24 of Division 22 of the Los Angeles Administrative Code (the Los Angeles Program to Prevent Homelessness and Fund Affordable Housing ("House LA Program")).

(b) All interest earnings accruing on money in the House LA Fund shall be credited to, and used for, the purposes of the House LA Fund. Money not expended from the House LA Fund in any fiscal year shall not revert to the Reserve Fund, but shall remain in the House LA Fund.

(c) Any program income generated through the House LA Program, including but not limited to any loan repayments, value recapture, or return of assets generated by the House LA Fund must be re-deposited into the House LA Fund, and shall not be commingled in any other City Fund or used for any purposes other than those described in Article 9 of Chapter 24 of Division 22 of the Los Angeles Administrative Code.

(d) The House LA Fund shall be administered by the General Manager of the Los Angeles Housing Department, or any successor agency ("Department"), or a designee of the General Manager, in strict accordance with the provisions of Article 9 of Chapter 24 of Division 22 of the Los Angeles Administrative Code.

(e) The City Council may establish by ordinance any additional funds, or accounts within this fund, necessary to implement this initiative and the expenditures described in Section 22.618.3 of this Code.

**SECTION 4**: A new Article 9 is added to Chapter 24 of Division 22 of the Los Angeles Administrative Code, as follows:

### SEC. 22.618.1. PURPOSE.

The goals of House LA include:

(a) Improving access to permanently affordable housing for vulnerable populations including but not limited to seniors in Lower Income Households, formerly homeless, persons with disabilities, veterans, single-parent households, youth in transition, and survivors of domestic violence.

(b) Addressing the City's residents' need for affordable housing and tenant protections in each of the Council Districts, Affirmatively Furthering Fair Housing goals, Housing Element goals and Regional Housing Needs Assessment affordable housing allocations.

(c) Prioritizing expenditure of housing production funding for Acutely Low Income Households, Extremely Low Income Households, Very Low Income Households, and Low Income Households categories and prioritizing expenditure of rental subsidy funding for Acutely Low Income Households and Extremely Low Income Households categories.



(d)   Developing, reviewing, and revising a plan to build the capacity of organizations with workplaces located in and/or which serve constituents in Disadvantaged Communities, and to prioritize and enable the organizations' participation in implementation of House LA.

(e)   Increasing the supply of affordable housing served by transit, and providing housing stability and tenant protections in communities served by transit.

(f)   Deploying programs and policies funded through this initiative in such a way as to address racial segregation, dismantle racially exclusionary practices, and promote racial equity in housing, academic, and economic opportunities.

(g)   Utilizing public land for affordable housing produced through this program, including but not limited to underutilized land owned by the City of Los Angeles, Los Angeles Community College District, Los Angeles Unified School District, Los Angeles County Metropolitan Transportation Authority, or other government agencies.

(h)   Establishing and resourcing a Citizens Oversight Committee that will be responsible for reviewing these goals every three years and making adjustments to the program guidelines adopted pursuant to Section 22.618.6(c)(1) of this Code as needed to address the aforementioned goals.

(i)   Establishing new funding and programs for the creation, preservation and acquisition of affordable housing and homelessness prevention that supplement existing City funding and programs.

(j)   Ensuring that construction and rehabilitation work is performed under the labor standards set forth in Section 22.618.7.

### SEC. 22.618.2.  DEFINITIONS.

"Acutely Low Income Households" shall have the same meaning as in Section 50063.5 of the California Health and Safety Code.

"Extremely Low Income Households" shall have the same meaning as in Section 50106 of the California Health and Safety Code.

"Very Low Income Households" shall have the same meaning as in Section 50105 of the California Health and Safety Code.

"Low Income Households" shall mean Lower Income Households whose gross incomes exceed the maximum for Very Low Income Households.

"Lower Income Households" shall have the same meaning as in Section 50079.5 of the California Health and Safety Code.

"Moderate Income Households" shall have the same meaning as the term "Persons and families of moderate income" as defined in Section 50093(b) of the California Health and Safety Code.



"Affirmatively Furthering Fair Housing" shall have the same meaning as in Section 8899.50 of the California Government Code.

"Community Land Trust" means a non-profit corporation within Section 501(c)(3) of the Internal Revenue Code that satisfies all of the following: (I)  Has as its primary purposes the creation and maintenance of permanently affordable single-family or multifamily residences; (II)  All dwellings and units located on the land owned by the non-profit corporation are sold to a qualified owner to be occupied as the qualified owner's primary residence or rented to Lower Income Households or Moderate Income Households, or held by the non-profit corporation for the same purpose; (III)  When a dwelling or unit that is situated on land owned by the non-profit corporation is sold to a qualified owner, the land is leased by the non-profit corporation to the income-qualified owner for the convenient occupation and use of that dwelling or unit for a renewable term of 99 years.

"Disadvantaged Communities" as defined in Section 65302(h)(4)(A) of the California Government Code.

"Limited-Equity Housing Cooperative" shall have the same meaning as in Section 817 of the California Civil Code.

"Residential Hotel" shall have the same meaning as in Section 50519(b)(1) of the California Health and Safety Code.

### SEC. 22.618.3.  HOUSE LA PROGRAMS.

(a)    Subject to the budgetary and fiscal provisions of the Los Angeles City Charter, monies in the House LA Fund, as set forth in Chapter 192 of Division 5 of this Code, shall be appropriated on an annual or supplemental basis, following the procedures set forth in Section 22.618.4 of this Code, and expended consistently with this section (the "House LA Programs").

(b)    **House LA Fund-Administration**. No more than 8% of the monies deposited in the House LA Fund annually may be used for compliance, implementation and administration ("House LA Fund-Administration") described below, including but not limited to the enforcement of affordability covenants associated with House LA Program projects, and, in coordination with the Finance Director and other City departments, the collection of the tax imposed by Subsection (b) of Section 21.9.2 of the Los Angeles Municipal Code and the refund of any overpayments of that tax. Not less than 3% of the monies allocated to the House LA Fund-Administration annually shall go to staffing and other expenses of the House LA Citizens Oversight Committee described in Section 22.618.6 of this Code. Additionally, staffing costs, stipends and honoraria that may be allocated to the Tenant Council pursuant to Section 22.618.3(d)(2)(ii).d. of this Code shall be paid for from the House LA Fund-Administration. Furthermore, the Department may fund training in processes and procedures related to project labor agreements, and may provide project labor agreement management services to contractors. For purposes of this subdivision, "project labor agreement" has the same meaning as Section 2500(b)(1) of the California Public Contract Code.

(c)  To enable transparency and accountability, House LA Fund-Administration monies shall be allocated to track, and make publicly available, reports on the implementation of the program, including but not limited to the following aspects: 1) dollars spent on housing construction and preservation during a year, over the course of years, in aggregate, per project, per housing unit, and to disaggregate and assess implementation of the program by Zip Code and Council District; 2) number of people housed during a year, over the course of years, in aggregate and as it changes over time, in each project, in each unit, and disaggregate and searchable by race, family composition, sexual orientation, age, ability, and gender, and by location and income level, and 3) residents served by the Homelessness Prevention Program during a year, over the course of years, in aggregate and as it changes over time, by Council District, and disaggregate and searchable by race, family composition, sexual orientation, age, ability, and gender. City departments shall make public and provide the Oversight Committee with information on how House LA implementation is furthering progress towards Housing Element implementation, Regional Housing Needs Assessment allocations, and Affirmatively Furthering Fair Housing.

(d)  **House LA Fund-Programs**. All monies deposited in the House LA Fund annually other than those described in Subsections (b) and (c) of this section, but in no case less than 92% of the House LA Fund shall be used for the programs specified in Section 22.618.3(d)(1), known as the "Affordable Housing Program" and Section 22.618.3(d)(2), known as the "Homelessness Prevention Program," and collectively as "House LA Fund-Programs." The House LA Fund-Programs shall be allocated as follows:

(1)  **Affordable Housing Program.** Seventy percent (70%) of the House LA Fund-Programs shall be used for the Affordable Housing Program as described by this subdivision and, according to an expenditure plan adopted pursuant to Section 22.618.4 of this Code addressing affordable housing needs in each City Council district.

(i)  Expenditure of funds for the Affordable Housing Program shall require, to the maximum possible extent and consistently with federal and state law, that funded projects comply with the following requirements:

a.   **Affordability.** All units in a funded project shall be affordable to and occupied by Acutely Low Income Households, Extremely Low Income Households, Very Low Income Households, or Low Income Households, except as allowed by Sections 22.618.3(d)(1)(ii).b.4. and 22.618.3(d)(1)(ii).c.4. of this Code. The Department shall adopt a policy to prevent the displacement of households that qualified for a unit upon initial occupancy but thereafter exceed the income limits. Such households may be charged a rent commensurate with their current income levels.

b.   **Covenants.** The programs described in Sections 22.618.3(d)(1)(ii).a.-c. of this Code, including the Multifamily

Affordable Housing program, the Alternative Models for Permanent Affordable Housing program, and the Acquisition and Rehabilitation of Affordable Housing program, are intended to provide dedicated housing that is affordable to households at the respective levels of income (e.g., Acutely Low Income, Extremely Low Income, Very Low Income, and Low Income Households) that occupy the housing units, whether as owner-occupants or tenants, and whose housing cost or rent does not exceed the affordable housing cost or affordable rent for households at such income levels. Each property and each affordable housing unit funded pursuant to Sections 22.618.3(d)(1)(ii).a.-c. of this Code shall be made subject to a recorded covenant acceptable to the Department and recorded with the Los Angeles County Recorder, that meets each of the following requirements:

1. Each housing unit in the project shall be used exclusively as a residence for households at the respective income level.

2. The housing cost or rent for such housing unit shall be no more than an affordable housing cost or affordable rent at the respective level of income.

3. No housing unit may be leased or subleased, except to a household at the level of affordability and for no more than an affordable rent for which the unit was dedicated.

4. Any resale of rental property funded by this initiative shall be restricted to non-profit entities or Limited-Equity Housing Cooperatives, including but not limited to affordable housing corporations and Community Land Trusts, to ensure the continued use of the dwelling units as affordable housing as provided in this section.

5. In the case of owner-occupied housing units, initial sales and all resales shall be restricted to purchasers whose household income does not exceed the income level to which the unit is dedicated and who do not pay in excess of affordable housing cost at that income level; or Limited-Equity Housing Cooperatives or similar entities providing for resident ownership and affordability in perpetuity with an average affordability level for Lower Income Households

and which allows not more than 20% of units to be owned and occupied at unrestricted market rates. Unrestricted market rate units shall not be used to calculate average affordability of units in a project.

6.    The term of the affordability restrictions contained in the covenant shall be in perpetuity, or such other maximum length of time as may be permitted by applicable law, except that an affordability covenant with a fixed term of no less than 55 years shall be acceptable only if necessary to meet requirements of other funding sources.

7.    The affordability restrictions shall be senior to and not subordinated to any lien, deed of trust or condition or restriction to be recorded against the property, except for any land use-related affordability covenant, such that any entity taking title to the property or a dwelling unit by foreclosure or deed-in-lieu of foreclosure shall take subject to the affordability restrictions.

c.    **Replacement, Relocation and Right of First Refusal**. Funding provided pursuant to the Affordable Housing Program shall be subject to the following conditions:

1.    Any funded development on any property that includes a parcel or parcels that currently have residential uses, or within the five years preceding the application for funding have had residential uses that have been vacated or demolished, that are or were subject to a recorded covenant, ordinance, or law that restricts rents to levels affordable to Lower Income Households, subject to any other form of rent or price control through a public entity's valid exercise of its police power, or occupied by Lower Income Households, shall comply with the requirements in California Government Code Section 65915(c)(3), provided, however, that any dwelling units that are or were, subject to a form of rent or price control through a public entity's valid exercise of its police power and that are or were occupied by a household with income above Lower Income shall be replaced with units affordable to, and occupied by, Lower Income Households. Moreover, replacement units shall be made available at

affordable rent or affordable housing cost to, and occupied by, persons and families in the same or lower income category as those households in occupancy or, if the units have been vacated or demolished, those households formerly in occupancy, including Acutely Low, Extremely Low, Very Low, and Low Income Households. If the incomes of the households in occupancy, or formerly in occupancy, are not known, it shall be rebuttably presumed that (a) Extremely Low, Very Low, and Low Income Households occupied these units in the same proportion as the proportion of renter households that are Extremely Low, Very Low, and Low Income Households to all renter households within the City, as determined by the most recently available data from the United States Department of Housing and Urban Development's Comprehensive Housing Affordability Strategy database, and (b) the proportion of Acutely Low Income Households is one-half the proportion of Extremely Low Income Households.

2.   If existing occupants must be relocated, for any period of time, the developer is required to provide them relocation benefits pursuant to Chapter 16 (commencing with Section 7260) of Division 7 of Title 1 of the Government Code and Chapter XV of the Los Angeles Municipal Code, including associated regulations. In order to effectuate the provisions of Chapter 16 of Division 7 of Title 1 of the Government Code, and in addition to all other relocation obligations, the developer shall prepare a relocation plan, and the Department shall require the plan to offer occupants reasonable choices of specifically identified comparable replacement dwellings available at the time of the offer, for which the household qualifies and is appropriate, and which is affordable to the household.

3.   In addition to the relocation benefits described above, the developer shall provide a right of first refusal for a comparable unit available in the new or rehabilitated housing development. For Lower Income Households, that unit must be affordable to the household at an affordable rent or an affordable housing cost. If such occupants

do not meet the eligibility requirements of one or more funding sources of the new or rehabilitated housing development, or for any other reason do not occupy units in the new or rehabilitated housing development, the occupants shall be given priority in renting or buying housing in other developments funded by the Affordable Housing Program. The Department shall keep a list of occupants displaced by such developments and may establish reasonable rules for determining the order of priority of those listed.

4.   Nothing in this section shall be read to prohibit the City Council from adopting unit replacement requirements, relocation assistance requirements, or right of first refusal requirements that are more protective of displaced occupants than the requirements of this section. Solely for the purpose of Section 22.618.3(d)(1)(i).c. governing replacement, relocation and right of first refusal, "affordable rent" shall have the same meaning as defined in Section 50053 of the California Health and Safety Code, and "affordable housing cost" shall have the same meaning as defined in Section 50052.5 of the California Health and Safety Code.

d.   To qualify for funding from the Affordable Housing Program, an applicant must demonstrate a history of affordable housing development and/or affordable housing property management experience, as the Department defines those terms consistently with the purpose of this article. Community Land Trusts and Limited-Equity Housing Cooperatives may qualify for funding from this initiative without demonstrating a history of affordable housing development and/or affordable housing property management experience by (a) partnering with experienced non-profit organizations, or (b) showing evidence of staff capacity adequate to manage and administer the affordable housing project, as determined by the Department and consistent with the purpose of this article.

(ii) Affordable Housing Program funds shall be allocated in the following categories, according to an expenditure plan adopted pursuant to Section 22.618.4 of this Code:

a. **Multifamily Affordable Housing**: Twenty-two and one-half percent (22.5%) of the House LA Fund Programs shall be annually allocated to the development of supportive

and/or affordable housing projects of 40 units or greater for income-qualified populations in conjunction with other federal, state, and local affordable housing funding sources, such as federal Low-Income Housing Tax Credits and State Low-Income Housing Tax Credits, or to pay the principal and interest on debt incurred for such purpose. This percentage may increase up to a maximum of twenty five percent (25%) of the House LA Fund-Programs on an annual basis, using excess revenue from the Program Stabilization Fund pursuant to Section 22.618.3(d)(1)(ii).e. of this Code. All units shall be subject to a covenant that meets the requirements of Section 22.618.3(d)(1)(i).b.

b. **Alternative Models for Permanent Affordable Housing**: Twenty-two and one-half percent (22.5%) of the House LA Fund-Programs shall be annually allocated to the construction of new supportive and affordable rental or mixed rental/homeowner projects of 40 units or greater, or to pay the principal and interest on debt incurred for such purpose. These funds may also be used for the acquisition, rehabilitation, adaptive reuse, lease, preservation and operation of supportive and/or affordable or mixed rental/homeowner projects of any size, or to pay the principal and interest on debt incurred for such purpose. This percentage may increase up to a maximum of twenty five percent (25%) of the House LA Fund-Programs on an annual basis, using excess revenue from the Program Stabilization Fund pursuant to Section 22.618.3(d)(1)(ii).e. of this Code. This funding shall be subject to the following conditions:

1. Housing units shall be developed by entities qualified for funding under Section 22.618.3(d)(1)(i).d. of this Code. Housing units shall be owned and/or managed by a public entity, a local housing authority, a Community Land Trust, a Limited Equity Housing Cooperative, or a non-profit entity within Internal Revenue Code Section 501(c)(3), which demonstrates a history of affordable housing development and/or affordable housing property management experience, through a process the Department shall determine. A Community Land Trust or a Limited-Equity Housing Cooperative without a demonstrated history of affordable housing development and/or affordable housing property management experience may qualify for funding under this subsection by (a) partnering with an experienced non-profit organization, as

determined by the Department and consistent with the purpose of this Article, or (b) showing evidence of staff capacity adequate to manage and administer the affordable housing project, as determined by the Department and consistent with the purpose of this article.

2. A project may accommodate a mix of household income types including Acutely Low Income Households, Extremely Low Income Households, Very Low Income Households, and Low Income Households.

3. A minimum of 20% of a project's housing units shall be reserved for Acutely Low Income and/or Extremely Low Income households.

4. All units shall be subject to a covenant that meets the requirements of Section 22.618.3(d)(1)(i).b., except that according to criteria established by the Department consistently with the purposes of this Article, and only for the purpose of increasing the financial stability of Acutely Low Income, Extremely Low Income, and Very Low Income Household units in the project, up to 20% of units may be unrestricted as to income and rent levels.

5. Residents shall have the right to participate directly and meaningfully in decision-making concerning the operation and management of the project.

6. Where feasible and desirable, the project shall include resident ownership, including but not limited to Limited-Equity Housing Cooperatives.

7. Where feasible and desirable, projects shall use public land.

c. **Acquisition and Rehabilitation of Affordable Housing**: Ten percent (10%) of the House LA Fund-Programs shall annually be allocated to the acquisition, preservation, rehabilitation, lease, or operation of existing housing including but not limited to rent-controlled properties, Residential Hotels, Accessory Dwelling Units, and Junior Accessory Dwelling Units, either without existing covenants

requiring affordability or with such existing covenants that will expire within ten (10) years of project onset, as the Department defines that term consistently with the purposes of this article, or to pay the principal and interest on debt incurred for such purpose, subject to the following conditions:

1.    A majority of a property's units must be occupied by Lower Income Households upon acquisition, which shall be assumed if a majority of tenants return attestations that their incomes are at or below the lower-income level in a manner the Department shall determine. Notwithstanding the above, funds may be utilized for acquisition and rehabilitation of any property that was used as a Residential Hotel within the five years preceding the application for funding.

2.    Housing units shall be acquired and managed by a public entity, a local housing authority, a Community Land Trust, a Limited Equity Housing Cooperative, or a non-profit entity within Internal Revenue Code Section 501(c)(3), which demonstrates a history of affordable housing development and/or affordable housing property management experience, through a process the Department shall determine.  A Community Land Trust or a Limited-Equity Housing Cooperative may qualify for funding by (a) partnering with an experienced non-profit organization as defined by the Department, or (b) showing evidence of staff capacity adequate to manage and administer the affordable housing project, through a process determined by the Department.

3.    All units shall be subject to a covenant that meets the requirements of Section 22.618.3(d)(1)(i).b.

4.    Notwithstanding the affordability provisions set forth in Sections 22.618.3(d)(1)(i).a. and 22.618.3(d)(1)(i).b. of this Code, existing residents of properties acquired pursuant to this Acquisition and Rehabilitation of Affordable Housing program shall not be permanently displaced, even if their incomes exceed the Lower Income Household limits, or any lower income limit set for a unit. Projects shall achieve 100 percent occupancy by

Lower Income Households (or any lower project-specific income limit) over time through unit turnover.

5.    Through a process the Department shall determine, the entity that acquires a property shall submit a plan for engaging residents in building management and operations, which may include a plan for tenant ownership such as a Limited-Equity Housing Cooperative. The Department shall cooperate and facilitate plans for tenant ownership, and shall not unreasonably impose requirements that prohibit such ownership conversion.

6.    Project funding may take the form of grants or loans, but shall not require the leveraging of additional forms of funding if such additional funding makes any of the conditions set forth in this subsection infeasible, or if funding precludes the future conversion of the property to tenant ownership.

7.    Funds may be used to acquire, install, construct, or rehabilitate housing, including Accessory Dwelling Units ("ADUs") and Junior Accessory Dwelling Units ("JDUs"), so long as all ADUs and JDUs are used as affordable rental housing or affordable homeownership. The Department may verify the use of ADUs and JDUs covered by this provision from time to time.

8.    The Department shall facilitate the use of funds from this Acquisition and Rehabilitation of Affordable Housing program to make offers to purchase assisted housing developments which are required to provide qualified entities an opportunity to purchase under California Government Code Section 65863.11 by acting within the deadlines established by that law.

d.    **Homeownership Opportunities, Capacity-Building and Operating Assistance:** Ten percent (10%) of the House LA Fund-Programs shall annually be allocated to: (1) support single family and cooperative Homeownership Opportunities, including but not limited to down-payment assistance, shared equity homeownership, and pre-

development funding associated with creating such housing; (2) provide Capacity-Building funding for Community Land Trusts and other organizations that serve and have representative leadership from Disadvantaged Communities and facilitate tenant ownership; and (3) provide long-term Operating Assistance that supports new construction, acquisition, and/or rehabilitation of existing housing in the form of project-based, multi-year rental subsidies, operating subsidies, or service subsidies. Operating Assistance will prioritize projects housing Acutely Low Income Households and/or Extremely Low Income Households; and projects that will maintain non-profit ownership, Community Land Trust stewardship, and/or shared-equity tenant ownership. In no case shall project-based Operating Assistance funding fall below fifty percent (50%) of the Homeownership Opportunities, Capacity-Building and Operating Assistance allocation, nor shall Capacity-Building funding fall below ten percent (10%) of the Homeownership Opportunities, Capacity-Building and Operating Assistance allocation.

e. **Program Stabilization Fund:** Five percent (5%) of the House LA Fund-Programs shall annually be allocated to address periodic revenue shortfalls for House LA Affordable Housing and Homelessness Prevention Programs that require a consistent revenue stream, as advised by the Department and the Oversight Committee and subject to City Council approval, to include project-based Operating Assistance, Income Support for Rent-Burdened At-Risk Seniors and Persons with Disabilities, Eviction Defense, and Tenant Outreach & Education programs, as those terms are used in this section. When the balance of the Program Stabilization Fund reaches two hundred million dollars ($200 million), excess revenue shall be evenly divided between and supplement the Multifamily Affordable Housing program in Section 22.618.3(d)(1)(ii).a., and the Alternative Models for Permanent Affordable Housing program in Section 22.618.3(d)(1)(ii).b. of this Code. If the Program Stabilization Fund falls below two hundred million dollars ($200 million), it shall be refunded to that amount before support to these two affordable housing programs may resume.

(iii) To the extent the expenditure of any monies from the House LA Fund results in, or contributes to, the development, construction, or acquisition of low rent housing projects in the City of Los Angeles by public agencies, that development, construction, or acquisition is hereby deemed authorized by the People of Los Angeles, having been duly approved by a majority of qualified electors of the City, and with

such authorization constituting the approval required by Article XXXIV of the California Constitution. The development, construction, and/or acquisition of low rent housing units authorized by this section shall be in addition to any other authorization of the development, construction, and/or acquisition of such housing by the voters of the City before or after adoption of this section. This section in no way restricts or limits the City's authority to develop or assist in the development of housing that is not subject to Article XXXIV. This Section 22.618.3(d)(1)(iii) shall be interpreted to maximize affordable housing production and acquisition. As used in this Section 22.618.3(d)(1)(iii), the terms "public entity," "develop," "construct," "acquire," and "low rent housing projects" shall be interpreted in accordance with Article XXXIV of the California Constitution, California Health and Safety Code Section 37000 et seq., and any successor legislation thereto.

(iv) The Department shall have authority to approve funding of fifty million dollars ($50,000,000) or less from the House LA Fund Programs for any eligible Affordable Housing Program project without further Council review. Such Department approval shall be consistent with the guidelines adopted pursuant to Section 22.618.6(c)(1) of this Code. Funding for any specific Affordable Housing Program project of more than fifty million dollars ($50,000,000) shall require the review and approval of City Council.

(2) **Homelessness Prevention Program.** Thirty percent (30%) of the House LA Fund Programs shall be used for the Homelessness Prevention Program, as described by this subdivision and according to an expenditure plan adopted pursuant to Section 22.618.4 of this Code:

(i) **Short-Term Rental and Income Support for Vulnerable Tenants.**

a. **Short-Term Emergency Assistance.** Five percent (5%) of the House LA Fund Programs shall be annually allocated to provide short-term emergency funding to tenant households at risk of becoming homeless. Funds will stabilize low-income tenants at risk of losing their housing due to one-time economic shocks, and may cover the entirety of rent payments for a short-term period of up to 6 months. Priority eligibility shall be established for Lower Income Households.

b. **Income Support for Rent-Burdened At-Risk Seniors and Persons with Disabilities.** Ten percent (10%) of the House LA Fund Programs shall annually be allocated to provide income assistance designed to assist households in avoiding displacement from their homes to rent-burdened, Acutely Low Income, Extremely Low Income, and Very Low

Income Households including seniors (aged 65 years and above) and/or persons with disabilities at-risk of becoming homeless.

(ii) **Tenant Rights Education, Tenant Council, Navigation Services and Eviction Prevention.**

a. **Eviction Defense/Prevention**. Ten percent (10%) of the House LA Fund-Programs shall annually be allocated to provide funding for a right-to-counsel program to provide housing-related legal services to Lower Income Household tenants threatened with eviction.

b. **Tenant Outreach and Education**. Two percent (2%) of the House LA Fund-Programs shall annually be allocated to provide tenant outreach, education, and navigation services, including but not limited to providing information about tenant rights and the Homelessness Prevention Program. Outreach, education, and navigation services may include mass mailing, targeted marketing, data visualization, and public websites.

c. **Protections from Tenant Harassment.** Three percent (3%) of the House LA Fund-Programs shall annually be allocated to fund non-profit organizations and City services to monitor and enforce protections against tenant harassment and other tenant rights, and to inform tenants of such protections and support them in exercising their rights. At least thirty percent (30%) of the Protections from Tenant Harassment expenditure shall fund programs led by non-profit organizations**.**

d. **Tenant Council**. The Department shall establish a Tenant Council, to meet at least quarterly to monitor and advise the Department regarding implementation of tenant protections and develop strategies to address Fair Housing Act violations and violations of tenant rights under federal, state, and local law. The Tenant Council shall be composed of tenants or currently homeless individuals living in the City. The Council shall comprise one tenant or currently homeless individual from each City Council District. Appointments to the Tenant Council will be consistent with the process for appointments to the Oversight Committee, as described in Section 22.618.6 of this Code. The City Council shall seek to ensure diverse representation on the Tenant Council with respect to the income level, housing status, race, gender identity, sexual orientation, national origin, immigration status, source of income, religion, age, disability, familial

status, and primary language.  The Tenant Council shall be empowered to receive reports on implementation of rent relief programs, landlord opt-outs from rental assistance programs, and tenant harassment and eviction data, and may make recommendations to the Oversight Committee, to the Department and to City Council to reduce evictions and displacement and increase tenant access to legal services. Tenant Council members shall be compensated no less than $150 for each meeting attended. Members may waive compensation.

### SEC. 22.618.4 EXPENDITURE PLAN.

(a)   The House LA Fund program year will be concurrent with the City's Fiscal Year, from July 1st to June 30th.

(b)   Between January 1, 2023 and June 30, 2023, prior to creation of the initial expenditure plan, the Department may incur expenditures up to five hundred thousand dollars ($500,000) of funds, to be reimbursed via of the expenditure plan for Fiscal Year 2023-2024 to establish the House LA Fund and House LA Program, including establishment of the Oversight Committee, as referenced in Section 22.618.6, and Tenant Council, as referenced in Section 22.618.3(d)(2)(ii).d.

(c)   By July 1, 2023, and by July 1st of each subsequent year, the Department shall provide to the Oversight Committee and to the City Council an accounting of House LA Program revenues collected in the previous fiscal year, by expenditure category. The Department shall also provide to the Oversight Committee and the City Council an expenditure plan for the subsequent year, which shall comply, to the maximum extent possible, with the program guidelines developed pursuant to Section 22.618.6(c) of this Code. The expenditure plan shall be approved in the manner provided by law and consistent with the intent of this article.

(d)   Each annual expenditure plan the Department prepares pursuant to Subsection (c) of this section shall project revenues and expenditures for at least three (3) years.  Except for the Program Stabilization Fund under Section 22.618.3(d)(1)(ii).e of this Code, monies in each Fund established under this article must be committed within three (3) years of receipt and expended within five (5) years of the receipt, except for funding for the Alternative Models for Permanent Affordable Housing pursuant to Section 22.618.3(d)(1)(ii).b., which shall be committed within five (5) years and expended within seven (7) years of receipt.

### SEC. 22.618.5 REALLOCATION OF FUNDS.

Funds may be periodically reallocated to accommodate changing needs and opportunities as follows:

(a)   Up to ten percent (10%) of funding for each expenditure category in Section 22.618.3(d) may be allocated for use in other expenditure categories within the same fiscal year.

(b)   Beginning on July 1, 2033 and every tenth year thereafter, the House LA Citizens Oversight Committee may make recommendations for, and City Council may approve, permanent changes to the expenditure categories stated in Section 22.618.3(d), provided

that no expenditure category will receive less than 75% of that which was provided in the previous decade.

(c)    Reallocations pursuant to Subsections (a) and (b) of this section must be recommended by the House LA Citizens Oversight Committee and approved by City Council.

(d)    City Council may deny a recommendation from the House LA Citizens Oversight Committee or reallocate funding from one category to another other than as the Oversight Committee recommends only upon a written finding after a duly noticed public hearing that such action is necessary to achieve the intent of this article.

### SEC. 22.618.6.  CITIZEN OVERSIGHT COMMITTEE.

(a)  The House LA Citizens Oversight Committee ("Oversight Committee") is hereby established.  By February 28, 2023, the initial group of fifteen (15) Oversight Committee members shall be appointed pursuant to this Section 22.618.6.

(b) The Oversight Committee shall help ensure the House LA Fund and this article are implemented consistently with the language and intent of this Article and in a way that is transparent and accountable to the residents of the City.  The Oversight Committee shall monitor and audit the Fund; advise the Mayor, the Department, and the City Council on priorities and the Program Guidelines authorized by Subdivision (c)(1) of this section; make recommendations to the Department, the Mayor and the City Council regarding appropriations, Expenditure Plans, administration of the House LA Fund, and implementation of the House LA Program.

(c)  The Oversight Committee shall have the authority to:

(1) Develop guidelines for prioritizing use of the House LA Funds ("Program Guidelines").  Within 120 days of any such recommendation, the City Council may accept the Oversight Committee's recommended guidelines or amend them consistently with the purpose of this article. If the City Council does not act in that time, such guidelines shall be deemed approved.

(2) By December 31, 2023, and every three years thereafter, or more frequently if the Oversight Committee deems necessary, it shall conduct a needs assessment with respect to homelessness, housing affordability, tenant protections and the housing needs of vulnerable populations, including but not limited to people experiencing homelessness, seniors in Lower Income Households, formerly homeless persons, persons with disabilities, veterans, single-parent households, youth in transition, survivors of domestic violence, and Lower Income Households. Any needs assessment conducted pursuant to this subsection shall, to the extent such data is available, include data disaggregated by race, family composition, sexual orientation, age, disability, and gender.

(3) Contract with a third-party evaluator or consultant to help conduct the housing needs assessment, measure the successes and shortcomings of expenditures of the Fund, and oversee an annual external audit of House LA Fund receipts and expenditures.

(4)  Promote and facilitate transparency in the administration of the House LA Fund-Programs to ensure it is Affirmatively Furthering Fair Housing.   This will include overseeing and reviewing reports, annually or more frequently as the Oversight Committee determines required by this article.  The Oversight Committee shall monitor and/or audit the implementation of the House LA Program, including but not limited to:  (A) dollars spent on housing construction and preservation during a year, over the course of years, in aggregate, per project, per housing unit, and disaggregated by Zip Code and Council District; (B) number of people housed during a year, over the course of years, in aggregate and as it changes over time, in each project, in each unit, disaggregated and searchable by race, family composition, sexual orientation, age, ability, and gender, and by location and income level (Acutely Low Income, Extremely Low Income, Very Low Income, Low Income, and Moderate Income Households); and (C) residents served by the Homelessness Prevention Program during a year, over the course of years, in aggregate and as it changes over time, by Council District, and disaggregated and searchable by race, family composition, sexual orientation, age, ability, and gender.

(5) The Oversight Committee shall be authorized to hold public hearings to investigate and share its findings with the public.

(6) The Oversight Committee may request reports from general managers of City departments, including but not limited to the Department, and chairs of City Council committees, including but not limited to the Housing Committee.  The Oversight Committee shall have access to all information relevant to its work and be authorized to receive relevant information from other City entities as required under this article including information related to the Housing Element and its implementation, progress towards Regional Housing Needs Assessment allocations, and progress towards Affirmatively Furthering Fair Housing.

(7) The Oversight Committee shall be authorized to identify and investigate potential conflicts of interest in the allocation and implementation of funding and to make these findings known to the public.

(8) To promote transparency and accountability, the Oversight Committee shall hold an annual town hall to report on the progress and shortcomings of the House LA Fund-Programs and hear from the public. This will be in addition to other public meetings required by this article or which the Oversight Committee otherwise deems necessary.

(9)  Promote culturally sensitive implementation of programs funded by the House LA Program Fund.

(10)  Based on the results of the housing needs assessment, compliance with the Housing Element, progress towards the Regional Housing Needs Assessment allocations, and progress towards Affirmatively Furthering Fair Housing, the Oversight Committee shall review programs and expenditures and make adjustments to the Program Guidelines referenced in Subdivision (c)(1) of this section to better achieve

the goals of this article, including the achievement of racial equity goals and reversing of exclusionary practices, expanding affordable housing into all Council Districts to meet the need and reverse segregation, and prioritizing funding for programs focused on Acutely Low Income, Extremely Low Income, Very Low Income, and Low Income Households, and prioritizing rental subsidies to Acutely Low and Extremely Low Income Households.

(d) Oversight Committee Members.

(1) The Oversight Committee shall have thirteen (13) voting members and two (2) advisory members to support youth leadership development.

(2) Membership categories are as follows:

(i) Housing Development, Preservation & Finance.

a. Seat #1:  An individual with at least five (5) years' experience in senior-level decision making in non-profit affordable housing development and preservation.

b. Seat #2:  An individual with at least five (5) years' experience in non-profit asset and property management and operations, with a preference for individuals with experience in tenant-engaged management practices or resident ownership.

c. Seat #3:  An individual with at least five (5) years' experience in housing finance (tax-exempt bonds, taxes, funding-agency work, etc.).

d. Seat #4:  An individual with at least five (5) years' experience as a member of a construction labor union involved in workforce development, apprenticeship programs and negotiating Project Labor Agreements for large-scale housing projects.

e. Seat #5:  An individual with at least five (5) years' experience in non-profit Community Land Trusts or community development corporations.

f. Seat #6:  An individual with at least five (5) years' experience in transit-oriented development.

(ii) Renter Protection & Support.

a. Seat #7:  An individual with at least five (5) years' experience as a tenant rights organizer or advocate working

at a community-based organization on behalf of tenants in Lower Income Households.

b. Seat #8:   An  individual with at least five (5) years' experience as an organizer or advocate working  at  a community-based organization to address the housing needs of seniors and/or people with disabilities.

c. Seat #9:   An individual with at least five (5) years' experience as a tenant rights or fair housing legal expert representing or advocating for tenants.

(iii) Lived Experience & Expertise.

a. Seat #10:   An individual with at least five (5) years' experience as a tenant in a Lower Income Household and/or at least one year experiencing homelessness.

b. Seat #11:   An individual with at least five (5) years' experience as a tenant of a Lower Income Household and/ or at least one year experiencing homelessness.

c. Seat #12:   An individual with at least five (5) years' experience as a representative of a public sector labor or service union, the members of which struggle with housing costs.

d. Seat #13:   An individual with at least five (5) years' experience as a community leader or an organizer advocating for high-quality transit near affordable housing and job centers and for identifying mobility options associated with the production of affordable housing.

(iv) Youth.  Seats # 14 and 15:  Two advisory, non-voting members of the Oversight Committee shall be individuals between the ages of 16 and 21.

(3) Eligibility.

(i) Members of the Oversight Committee must reside in the City of Los Angeles.

(ii) No person currently serving as an elected City, County, special district, State or Federal public official may serve as a Committee member.

(iii) The City's local conflicts of interest code under the Political Reform

Act is hereby amended to require members of the Oversight Committee to file annual statements of economic interests and otherwise to comply with the ethics and conflicts of interest provisions of that Act.

(4) Appointment.

(i) Initial appointments: Department staff shall submit to the Mayor at least three qualified candidates for each category of membership. The Mayor shall appoint members for each category listed in Subdivision (d)(2) of this section, subject to approval by the City Council.

(ii) Oversight Committee members shall serve five-year terms. However, seats 1, 2, 7, 10, and 11 shall have an initial term of three years; seats 3, 4, 8, 12, and 14 shall have an initial term of two years; and seats 5, 6, 9, 13, and 15 shall have an initial term of one year. Members may be reappointed to an unlimited number of terms at the discretion of the Mayor.

(iii) Subsequent appointments. After Oversight Committee staff is hired, its staff shall submit to the Mayor with at least three qualified candidates for each vacancy on the Committee. The Mayor shall appoint members, subject to approval by the City Council.

(5) Resignation; Disqualification. Oversight Committee members may, at any time, resign from the Oversight Committee upon written notice delivered to the Oversight Committee and the Mayor. An Oversight Committee member holding any disqualifying public office, or a Committee member's filing of intent to seek such public office, including a declaration of candidacy pursuant to California Government Code Section 85200, or an Oversight Committee member's relocation outside the City shall disqualify the member from continuing to serve on the Oversight Committee upon the Department's delivery of notice of that fact to the Oversight Committee.

(6) Grounds for Removal/Termination. Oversight Committee members shall only be removed before the end of a term for cause. Cause includes: (i) more than two absences from Committee meeting in a 12-month period not excused by the Committee; (ii) more than three absences from Committee meetings in a 12-month period even if excused by the Committee; (iii) failure to actively participate in meetings, committees, subcommittees, or Oversight Committee projects or responsibilities; (iv) acting in conflict with the intent or language of the initiative measure which adopted this ordinance, including opposing the construction or preservation of affordable housing; (v) disrupting the meetings or work of the Oversight Committee or failure to comply with accepted codes of conduct; (vi) failure to disclose a conflict of interest related to a decision pending before the Committee; and (vii) violation of law governing the conduct of the Oversight Committee, including but not limited to the Political Reform Act of 1975 and the Ralph M. Brown Act.

(7) Disclosure and Recusal. Members of the Oversight Committee must disclose

any conflict of interest, either actual or apparent, as determined by the Ethics Commission. If an Oversight Committee member has a direct or indirect financial interest in a decision of the Oversight Committee, they must recuse themselves from participating in the matter and file Form 51 with the Ethics Commission (Recusal Notification Form) or any successor to that form. If a conflict of interest is alleged by either members of the Oversight Committee or City staff, the matter will be reported to the Inspector General referenced in Subdivision (g)(2) of this section to investigate and report back to the Oversight Committee as necessary. Nothing in this section shall alter or diminish the authority of the City's Ethics Commission.

(8) Chair and Vice-Chair. The Oversight Committee shall select from among its members a Chair and Vice-Chair for each fiscal year. Members may serve as Chair or Vice-Chair for up to three consecutive fiscal years.

(e) Committee Member Compensation. Oversight Committee members will be compensated for meeting attendance no less than $150 per meeting. Members may waive compensation.

(f) Meetings. The Oversight Committee shall meet at least six times annually, except for the 2022-23 fiscal year, in which the Oversight Committee shall meet at least twice. Subcommittees shall meet as the Oversight Committee deems necessary.

(g) Staffing. The City shall provide adequate dedicated staffing to the Oversight Committee.

(1) The Oversight Committee determines its own staffing and resource needs subject to the limit on the House LA Fund-Administration stated in Subsection (b) of Section 22.618.3 of this article.

(2) The Oversight Committee shall hire an Inspector General as the lead staff person serving the Oversight Committee. The Inspector General may be removed by the City Council for such cause as is sufficient to discharge under Section 1016 of the City Charter. The Inspector General has authority to hire or fire additional staff and expend budgeted resources, as needed. The Oversight Committee shall review and approve the Inspector General's budget.

(h) Subcommittees.

(1) The Oversight Committee may create subcommittees or advisory committees to assist its work.

(i) Nothing in this Section shall limit the authority of the Mayor and the City Council to propose, amend, and adopt the City budget pursuant to the City Charter provided that such budget respects the allocations required by this article.

### SEC. 22.618.7.  CONSTRUCTION WORK.

(a) Any construction or rehabilitation project receiving funding or financing from this measure shall constitute a public work for which prevailing wages shall be paid for purposes of Chapter 1 (commencing with Section 1720) of Part 7 of Division 2 of the Labor Code.



(b)    All construction and rehabilitation on projects 40 units and greater that receive funding or financing from this measure will be subject to the City of Los Angeles Department of Public Works Project Labor Agreement. For purposes of this subdivision, the number of units means the maximum number of units authorized in any entitlement granted by the land use permitting authority for the development project, regardless of whether construction proceeds in phases or ownership is divided.

(c)    If a specific measure-wide Project Labor Agreement (PLA) is negotiated with mutual agreement between the Los Angeles/Orange Counties Building and Construction Trades Council and the Southern California Association of Nonprofit Housing (SCANPH) and approved by the Los Angeles City Council, then contractors performing construction and rehabilitation work on projects that receive funding or financing from this measure shall be required to comply with the specific measure-wide PLA, rather than the Department of Public Works PLA.

(d)    For purposes of this subdivision, "project labor agreement" has the same meaning as in paragraph (1) of subdivision (b) of Section 2500 of the Public Contract Code.

### SEC. 22.618.8. COUNCIL AUTHORITY TO AMEND.

(a)  City Council may amend this Article or any other provision of the initiative measure which adopted it, provided, however, that:

(1)    Such amendments shall further or facilitate the purposes stated in Section 22.618.1 of this article and monies in the House LA Fund are expended consistent with Section 22.618.3 of this article.

(2)    No such amendment may increase the tax imposed pursuant to Subsection (b) of Section 21.9.2 of the Municipal Code within the meaning of California Government Code Section 53750(h) without the voter approval required by Article XIII of the California Constitution.

(3)    No such amendment may diminish the requirements of Section 22.618.7.

(b) The Oversight Committee shall review any proposed amendment to this article or any other provision of the initiative measure which adopted it before the City Council adopts the proposed amendment and may express an opinion on whether the amendment furthers the purposes stated in Section 22.618.1 of this article and is consistent with the expenditure categories in Section 22.618.3 of this article. If the Oversight Committee opines that a proposed amendment is not consistent with those purposes, the City Council shall make written findings to the contrary supported by substantial evidence in the record before it to justify proceeding with the amendment despite that opposing opinion.

### SECTION 5: TERM OF MEASURE.

Upon adoption, this Los Angeles Program to Prevent Homelessness and Fund Affordable Housing Ordinance shall become effective on January 1, 2023, and shall remain in effect until repealed by the People of the City of Los Angeles.



## SECTION 6: APPROPRIATIONS LIMIT INCREASE.

Pursuant to California Constitution Article XIII B and applicable laws, for four years from November 3, 2022, the appropriations limit for the City shall be increased by the aggregate sum collected by the levy of the tax imposed under Subsection (b) of Section 21.9.2 of the Municipal Code.

## SECTION 7: SEVERABILITY.

This Act shall be interpreted so as to be consistent with all federal, state laws, local laws, rules, and regulations.  If any section, subsection, subdivision, clause, sentence, phrase, or portion of this initiative measure is declared unconstitutional or invalid by a court of competent jurisdiction, the remaining sections, subsections, subdivisions, clauses, sentences, phrases, and portions shall remain in full force and effect, and to this end the provisions of this initiative measure are severable.  The voters thus declare that they would have passed all sections, subsections, subdivisions, clauses, sentences, phrases and portions of this initiative measure without the section, subsection, subdivision, clause, sentence, phrase, or portion held unconstitutional or invalid.

# Voter Bill of Rights

### YOU HAVE THE FOLLOWING RIGHTS

1. **The right to vote if you are a registered voter.** You are eligible to vote if you are:
   - ★ a U.S. citizen living in California
   - ★ at least 18 years old
   - ★ registered where you currently live
   - ★ Not currently serving a state or federal prison term for the conviction of a felony, and
   - ★ not currently found mentally incompetent to vote by a court

2. **The right to vote if you are a registered voter even if your name is not on the list.**
   You will vote using a provisional ballot. Your vote will be counted if elections officials determine that you are eligible to vote.

3. **The right to vote if you are still in line when the polls close.**

4. **The right to cast a secret ballot** without anyone bothering you or telling you how to vote.

5. **The right to get a new ballot if you have made a mistake,** if you have not already cast your ballot. You can:
   **Ask an elections official at a polling place** for a new ballot,
   **Exchange your vote-by-mail ballot** for a new one at an elections office, or at your polling place, or
   **Vote using a provisional ballot.**

6. **The right to get help casting your ballot** from anyone you choose, except from your employer or union representative.

7. **The right to drop off your completed vote-by-mail ballot at any polling place** in California.

8. **The right to get election materials in a language other than English** if enough people in your voting precinct speak that language.

9. **The right to ask questions to elections officials about election procedures** and watch the election process. If the person you ask cannot answer your questions, they must send you to the right person for an answer. If you are disruptive, they can stop answering you.

10. **The right to report any illegal or fraudulent election activity** to an elections official or the Secretary of State's office.

**If you believe you have been denied any of these rights,** call the Secretary of State's confidential toll-free Voter Hotline at (800) 345-VOTE (8683).

 On the web at **www.sos.ca.gov**
 By phone at **(800) 345-VOTE (8683)**
By email at **elections@sos.ca.gov**

FP-VBR-E                71                NOVEMBER 2022

## Information for Voters with Special Needs



**Accessibility and other assisted devices**
**800-815-2666, Option 7 (LA County Hotline)**

LA County Vote Centers provide wheelchair accessibility and/or curbside voting. Inside the Vote Center you may find devices to assist you in your voting experience.



**Audio Recordings (213) 978-0444**
Audio equipment is available at all Vote Centers to assist you.

Audio recordings of the measures included in this booklet are available in English, Armenian, Chinese (Mandarin and Cantonese), Farsi, Hindi, Japanese, Khmer, Korean, Russian, Spanish, Tagalog, Thai, and Vietnamese. These recordings are available on our website: **clerk.lacity.org/clerk-services/elections/municipal-elections** by clicking on the "Measure(s) on the Ballot" box and at the following locations:

| | |
|---|---|
| Braille Institute Library<br>741 North Vermont Avenue<br>Los Angeles, CA  90029<br>(323) 660-3880 | Central Library<br>630 West 5th Street<br>Los Angeles, CA 90071<br>(213) 228-7000 |

Voters may also request a copy of the audio recordings from our office:

Office of the City Clerk-Election Division
Attn: Audio Recordings
555 Ramirez Street, Space 300
Los Angeles, CA 90012



**TTY Phone Number (213) 473-3231**
A TTY phone number is provided for voters who are hearing impaired.



**Language Assistance (800) 994-8683**
The City also provides voting materials in Armenian, Chinese, Farsi, Hindi, Japanese, Khmer, Korean, Russian, Spanish, Tagalog, Thai, and Vietnamese.

# Election Date Reminder

## Election Day is TUESDAY, NOVEMBER 8TH

## November

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   | ✔ | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 |   |   |   |

**Polls open at 7:00 a.m. and close 8:00 p.m.**

FP-CAL-E

73

NOVEMBER 2022

| | Voter's Notes |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

**Election Day is Tuesday, November 8th.**

*This page is necessary due to printing layouts.*

NON PROFIT ORG.
U.S. POSTAGE
**PAID**
CITY OF LOS ANGELES
ELECTION DIVISION



OFFICIAL ELECTION MAIL ®

Authorized by the U.S. Postal Service

OFFICE OF THE CITY CLERK
ELECTION DIVISION
555 RAMIREZ STREET
SPACE 300
LOS ANGELES, CA 90012

# EXHIBIT B

# Legislators Recently Introduced Several New Bills That Include Many New Actions to Help Reduce Statewide Homelessness

Joe Colletti, PhD/Legislation and Funding/February 26, 2022

Last Updated February 26, 2022 / No Comments

- These bills propose creating new state departments; convening a funder's workgroup; new grant programs and funding sources; a focus on selected subpopulations; new reporting requirements; option to provide state funding for housing that does not comply with Housing First; determining a homeless shelter crisis; new zoning designations for emergency shelters; immunity from civil liability for an injury not a result from gross negligence or intentional

misconduct; and intent to enact subsequent legislation relating to homelessness.

Bills introduced by legislators between the time the Legislature reconvened on January 3 and the last day for bills to be introduced, which was February 18, included several bills that reveal new proposed actions that legislators want to enact to help reduce statewide homelessness.

These bills, which are grouped below, must pass through a process that includes the preparation of a bill analysis, committee hearings, second and third reading, resolution of differences between the Assembly and Senate, and approval or not by the Governor by September 30.

**New State Departments and a Funder's Workgroup**

Some of the new activities to help reduce statewide homelessness involve creating new state departments and a funder's workgroup:

- *Requiring the California Department of Aging to create and administer the Housing Stabilization to Prevent and End Homelessness Among Older Adults and People with Disabilities Program (AB 2547 Housing Stabilization to Prevent and End Homelessness Among Older Adults and People with Disabilities Act)*
- *Requiring the California Interagency Council on Homelessness to convene a funder's workgroup to accomplish specified goals related to ending*

homelessness (AB 2325 Coordinated Homelessness Response)

- *Requiring the California Health and Human Services Agency to create a Department of Homelessness Prevention, Outreach, and Support (AB 2569 Department of Homelessness Prevention, Outreach, and Support)*

## New Grant Programs and Other Funding Sources

- *Requiring the Department of Justice to administer a competitive grant program to enable local law enforcement agencies to establish and operate homeless outreach teams (SB 1006 Law Enforcement: Homeless Outreach Teams)*
- *Requiring the Board of State and Community Corrections to establish two new grant programs: the Homeless and Mental Health Court Grant Program and the Transitioning Home Grant Program (SB 1427 Board of State and Community Corrections: Homeless and Mental Health Court and Transitioning Home Grant Programs)*
- *Requiring relevant state and local departments to consider the use of funds received under the terms of the 2021 Multistate Opioid Settlement Agreement settlement for the treatment and prevention of addiction within the homeless population (SB 1282 Homelessness: Addiction Treatment and Prevention: Funding)*

- *Requiring the Department of Housing and Community Development, to award reasonable priority points to Multifamily Housing Program project applicants that agree to set aside at least 25 units for individuals that are either experiencing homelessness or eligible to receive specified services, including, among others, those received under the Program of All-Inclusive Care for the Elderly* (AB 2483 Housing for Individuals Experiencing Homelessness)

## Subpopulation Focus

- *Requiring the California Interagency Council on Homelessness to set and measure progress toward goals to prevent and end homelessness among domestic violence survivors and their children and among unaccompanied women in California* (SB 914 Homeless Domestic Violence Survivors and Data Systems: Local and State Support and Guidelines)
- *Requiring the intent of the Legislature to enact legislation to support young people experiencing homelessness and to prevent and eradicate homelessness among California's youth, and would make related findings and declarations* (AB 2663 Youth Homelessness)
- *Requiring the California Rehabilitation Oversight Board in the Office of the Inspector General to examine the Department of Corrections and Rehabilitation's efforts to address the housing needs of incarcerated persons, including those who are*

*identified as having serious mental health needs, who are released to the community as parolees or subject to postrelease community supervision and to include specified data on homelessness in its reports* (SB 903 California Rehabilitation Oversight Board)

- *Requiring the intent of the Legislature enact legislation that would amend the Mental Health Services Act to provide the counties with more flexibility in shifting county MHSA money between programs for persons who are homeless and have serious mental illness* (SB 1283 Mental Health Services Act)
- *Authorizing any county or city to adopt conservatorship provisions for the appointment of a conservator for a person who is incapable of caring for the person's own health and well-being due to a serious mental illness and substance use disorder, as specified, for the purpose of providing the least restrictive and most clinically appropriate alternative needed for the protection of the person* (SB 1303 Conservatorships: Serious Mental Illness and Substance Use Disorders: Counties)

**Reporting**

- Requiring that the Department of Housing and Community Development include an assessment of the Homeless Housing, Assistance, and Prevention (HHAP) program in its annual report to the Governor and both houses of the Legislature on the operations

and accomplishments during the previous fiscal year of the housing programs administered by the department (AB 1830 Department of Housing and Community Development: Annual Report: Homeless Housing, Assistance, and Prevention Program)

- Requiring each city, county, and city and county that has used funds from any source to assist in addressing homelessness to submit a report to the California Interagency Council on Homelessness providing specified information, thereby imposing a state-mandated local program and the bill would include findings that changes proposed by this bill address a matter of statewide concern rather than a municipal affair and, therefore, apply to all cities, including charter cities (AB 2630 Housing: California Interagency Council on Homelessness: Report)

- Requiring a local city or county to develop and maintain a publicly available internet website homelessness dashboard and to annually report to the California Interagency Council on Homelessness (ICH) expenditures on homelessness programs and efforts provided to homeless persons within its jurisdiction, as well as related information regarding the funding of these services, and to post that information to its homelessness dashboard. This bill would require the council to develop and maintain a publicly available internet website homelessness dashboard for prescribed purposes. The bill would

require the ICH to annually report to the Legislature,
and annually post to its homelessness dashboard,
information related to programs that state and local
governments have undertaken to reduce
homelessness in California, including federal funding
for state and local programs (SB 1353 Homeless
Population Census Information: Collection and
Reporting)

## Non-Compliance with Housing First

- *Authorizing an agency or department that
  administers a state program that has incorporated
  core components of Housing First to provide funding
  in accordance with the state program to housing that
  does not comply with Housing First* (SB 1284
  Homelessness: State Programs: Housing First)

## Immunity from Civil Liability

- *This bill would exempt a nonprofit charitable
  organization, as defined, from civil liability for an
  injury occurring on its premises and resulting from the
  provision of services to homeless persons, unless the
  injury results from gross negligence or intentional
  misconduct* (AB 2591 Homeless services: nonprofit
  charitable organizations: immunity from civil
  liability)

## Homeless Shelters

AB 2211 Shelter Crisis: Homeless Shelters

- *Existing law provides that a temporary homeless shelter community may include supportive and self-sufficiency development services and that a homeless shelter includes a parking lot owned or leased by a city, county, or city and county specifically identified as one allowed for safe parking by homeless and unstably housed individuals. Existing law repeals these provisions as of January 1, 2026.*
- *This bill would remove the repeal date from these provisions. This bill would provide that a city, county, or city and county is in a shelter crisis if the number of unsheltered homeless persons that comprises the total homeless population within the jurisdiction of the city, county, or city and county is greater, as a percentage, than the combined average of the 49 states in the United States not including California, as determined by the Department of Housing and Community Development, as specified. This bill would apply the provisions applicable to a city, county, or city and county that has declared a shelter crisis to those jurisdictions in the above circumstance. This bill would require the department to publish a list of jurisdictions that are in a shelter crisis pursuant to this provision on its internet website. This bill would expand the definition of homeless shelter to include any facility that is leased by the city, county, or city and county for the purpose of providing temporary shelter for the homeless and any facility that is not owned or leased by the city, county, or city*

*and county but that is voluntarily provided to the city, county, or city and county for the purpose of providing temporary shelter for the homeless. By requiring a city, county, or city and county to provide a new level of service, this bill would create a state-mandated local program.*

### AB 2339 Housing Element: Emergency Shelters: Regional Housing Need

- *This bill would revise the requirements of the housing element, as described above, in connection with zoning designations that allow residential use, including mixed use, where emergency shelters are allowed as a permitted use without a conditional use or other discretionary permit. The bill would prohibit a city or county from establishing overlay districts to comply with these provisions. The bill would delete language regarding emergency shelter standards structured in relation to residential and commercial developments and instead require that emergency shelters only be subject to specified written, objective standards. The bill would specify that emergency shelters for purposes of these provisions include other interim intervention, including, but not limited to, navigation centers, bridge housing, and respite or recuperative care.*
- *The bill would require that identified zoning designations where emergency shelters are allowed to include sites that meet at least one of certain*

*prescribed standards. In this regard, the bill would require those sites to be either (1) vacant and zoned for residential use; (2) vacant and zoned for nonresidential use if the local government can demonstrate how the sites are connected to amenities and services that serve people experiencing homelessness; or (3) nonvacant if the site is adequate and available for use as a shelter in the current planning period, as specified. The bill would require the identified zoning designations to include sufficient sites to accommodate the need for shelters, as specified. The bill would also require that the number of people experiencing homelessness that can be accommodated on each identified site under these provisions be demonstrated by calculating a minimum of 200 square feet per person.*

## Enact Subsequent Legislation Relating to Homelessness

- *Existing law establishes the Homeless Housing, Assistance, and Prevention program for the purpose of providing jurisdictions, as defined, with one-time grant funds to support regional coordination and expand or develop local capacity to address their immediate homelessness challenges, as specified. This bill would declare the intent of the Legislature to enact subsequent legislation relating to homelessness (AB 2817 Homelessness)*
- *Existing law establishes various programs to address homelessness. Existing law requires the Governor to*

*establish the California Interagency Council on Homelessness, and requires the council to, among other things, set and measure progress toward goals to prevent and end homelessness among youth in California. Existing law also establishes the California Emergency Solutions and Housing Program, under the administration of the Department of Housing and Community Development and requires the department to, among other things, provide rental assistance and housing relocation and stabilization services to ensure housing affordability to people who are experiencing homelessness or who are at risk of homelessness. This bill would state the intent of the Legislature to enact legislation to address homelessness (AB 2434 Homelessness).*